# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CATFISH FARMERS OF AMERICA,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES,** <br><br> Defendant, <br><br> and <br><br> **NAM VIET CORP.,** *et al.*, <br><br> Defendant-Intervenors. | **Before: Hon. M. Miller Baker, Judge** <br><br> **Court No. 22-00125** |

## <u>ORDER</u>

Upon consideration of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record and the accompanying opening brief, and upon all other papers filed and proceedings had herein, it is hereby

**ORDERED**, that Plaintiffs' motion is granted; and it is further

**ORDERED**, that the final results of the 2019-2020 administrative review of the antidumping duty order certain frozen fish fillets from the Socialist Republic of Vietnam are remanded for further consideration; and it is further

Ct. No. 22-00125

**ORDERED**, that, in accordance with this Court's opinion, the

U.S. Department of Commerce on remand shall reconsider its decision

to select India rather than Indonesia as the primary surrogate country,

and shall make any corresponding adjustments to the margins for

NTSF Seafood Joint Stock Company and Green Farms Seafood Joint

Stock Company.

**SO ORDERED**.

Dated: _____, 2022
    New York, New York            _____
                                     Hon. M. Miller Baker, Judge

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**CATFISH FARMERS OF AMERICA**, *et al.*,

       **Plaintiffs,**

  **v.**

**UNITED STATES,**

       **Defendant,**

  **and**

**NAM VIET CORP.**, *et al.*,

       **Defendant-Intervenors.**

</td><td>

**Before: Hon. M. Miller Baker, Judge**

**Court No. 22-00125**

</td></tr>
</table>

## RULE 56.2 MOTION OF PLANTIFFS, CATFISH FARMERS OF AMERICA, *et al.* FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("CIT"), Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised

1

Ct. No. 22-00125

Catfish, Inc. (collectively, "Catfish Farmers of America, *et al.*") move for judgement on the agency record regarding the final results of the 2019-2020 administrative review of the antidumping duty order, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce Mar. 21, 2022) (final results of antidumping duty admin. review and final deter. of no shipments; 2019-2020).

    Specifically, Plaintiffs request that this Court remand the final results of the 2019-2020 administrative review to the U.S. Department of Commerce for reconsideration in accordance with the instructions in the proposed order. The arguments justifying Plaintiffs' motion are set forth in the accompanying opening brief.

Respectfully submitted,

/s/ *Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: October 20, 2022

2

NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CATFISH FARMERS OF AMERICA**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES**,<br><br>Defendant,<br><br>and<br><br>**NAM VIET CORP.**, *et al.*,<br><br>Defendant-Intervenors. | Before: Hon. M. Miller Baker, Judge<br><br>Court No. 22-00125<br><br>**<u>NON-CONFIDENTIAL VERSION</u>**<br><br>Business Proprietary Information Removed from Page 32 |

## <u>OPENING BRIEF OF PLANTIFFS, CATFISH FARMERS OF AMERICA, *et al.*</u>

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

**Dated: October 20, 2022**

Ct. No. 22-00125                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................. 1

II.   RULE 56.2 STATEMENT ...................................................... 1

   A.   The Administrative Determination Under Review ............... 1

   B.   Issues Presented for Review .................................................. 2

III.   BACKGROUND ................................................................... 3

   A.   Surrogate Country Selection ................................................. 3

   B.   Determination of First Green's Margin ............................... 6

IV.   STANDARD OF REVIEW ..................................................... 7

V.   SUMMARY OF ARGUMENT ................................................. 9

VI.   ARGUMENT ...................................................................... 10

   A.   DOC Erred in Selecting India as the Primary
       Surrogate Country ............................................................. 10

       1.   DOC's Economic Comparability Analysis
           Was Flawed ................................................................. 11

       2.   Indonesia is the Only Significant Producer
           of Comparable Merchandise ...................................... 18

       3.   Indonesia Provides the Best Available
           Information to Value Important FOPs ....................... 24

       4.   Conclusion ................................................................ 35

   B.   The Margin Determined for Green Farms Should
       Also Be Remanded ............................................................. 35

VII.   CONCLUSION .................................................................. 36

Ct. No. 22-00125                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bando Chem. Indus., Ltd. v. United States*,
  16 CIT 133, 787 F. Supp. 224 (1992), *aff'd*, 26 F. 3d 139
  (Fed. Cir. 1994)........................................................................................ 9

*Bristol Metals L.P. v. United States*,
  34 CIT 478, 703 F. Supp. 2d 1370 (2010).................................... 24, 34

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ................................................................................ 9

*China First Pencil Co. v. United States*,
  34 CIT 1284, 721 F. Supp. 2d 1369 (2010)........................................... 8

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ................................................................................ 8

*Dongbu Steel Co. v. United States*,
  635 F.3d 1363 (Fed. Cir. 2011) ........................................................... 15

*Dorbest Ltd. v. United States*,
  30 CIT 1671, 462 F. Supp. 2d 1262 (2006)........................................... 8

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984) ............................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................. 9

*Nation Ford Chem. Co. v. United States*,
  21 CIT 1371, 985 F. Supp. 133 (1997)................................................ 19

*Shakeproof Assembly Components v. United States*,
  268 F.3d 1376 (Fed. Cir. 2001) ........................................................... 19

*Sunpower Corp. v. United States*,
  179 F. Supp. 3d 1286 (Ct. Int'l Trade 2016) ...................................... 15

NON-CONFIDENTIAL VERSION

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) ..................................................... 8

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ............................................................... 8

**Statutes**

19 U.S.C. § 1516a(b)(1) ............................................................. 7

19 U.S.C. § 1677b(c)(1)(B) .......................................... 4, 24, 33, 34

19 U.S.C. § 1677b(c)(4) ............................................. 4, 11, 14, 16

19 U.S.C. § 1677f-1(c)(1) ........................................................... 6

19 U.S.C. § 1677f-1(d) ............................................................... 3

**Regulations**

19 C.F.R. § 351.408(c)(2) ........................................................... 4

**Administrative Materials**

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce Mar. 21,
    2022) ............................................................................... 1

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam*, 86 Fed. Reg. 50, 698 (Dep't Commerce Sept. 10,
    2021) .......................................................................... 5, 7, 36

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam*, 85 Fed. Reg. 23,756 (Dep't Commerce Apr. 29,
    2020) ............................................................................. 29

*Certain Frozen Warmwater Shrimp from the Socialist
    Republic of Vietnam*, 78 Fed. Reg. 56,211 (Dep't
    Commerce Sept. 12, 2013) .............................................. 17, 18

Ct. No. 22-00125                                    NON-CONFIDENTIAL VERSION

**Other Authorities**

Import Administration Policy Bulletin 04.1: *Non-Market
    Economy Surrogate Country Selection Process* (Mar. 1,
    2004) ........................................................................... 4, 19, 24

# GLOSSARY

**CFA**
Catfish Farmers of America, *et al.*

**East Sea**
East Sea Seafoods LLC

**FOP**
Factor of Production

**GNI**
Gross National Income

**Green Farms**
Green Farms Seafood Joint Stock Company

**IDM**
Issues and Decision Memorandum

**MMAF**
Ministry of Marine Affairs and Fisheries

**NTSF**
NTSF Seafood Joint Stock Company

**NME**
Non-Market Economy

**SV**
Surrogate Value

**NON-CONFIDENTIAL VERSION**

## I.   <u>INTRODUCTION</u>

Plaintiffs Catfish Farmers of America and individual U.S. catfish

processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest

Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a

Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc.,

Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of

the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA")

respectfully submit this opening brief in support of their motion for

judgment on the agency record with respect to the final results issued

by the U.S. Department of Commerce ("DOC") in the 2019-2020

administrative review of the antidumping duty order on frozen fish

fillets from the Socialist Republic of Vietnam ("Vietnam").

## II.   <u>RULE 56.2 STATEMENT</u>

### A.   **The Administrative Determination Under Review**

The administrative determination subject to this appeal is *Certain*

*Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg.

15,912 (Dep't Commerce Mar. 21, 2022) (final results of antidumping

duty admin. review and final deter. of no shipments; 2019-2020), P.R.

NON-CONFIDENTIAL VERSION

447, Appx____ ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 444, Appx____ ("IDM").

### B.    Issues Presented for Review

This appeal raises the following issues:

(1) Whether DOC erred in determining the margin for NTSF Seafood Joint Stock Company ("NTSF") where, in selecting the primary surrogate country for valuing NTSF's factors of production ("FOPs"), the agency failed to appropriately assess (1) the economic comparability of Indonesia with Vietnam, (2) the significance of Indian production of goods comparable to subject merchandise and (3) the quality of the data available for valuing important FOPs, including whole live fish, fingerlings, fish feed, labor, and certain by products;

(2) Whether DOC erred in determining the margin for Green Farms Seafood Joint Stock Company ("Green Farms"), the sole company subject to the review but not selected for individual examination, where that margin was based in part on NTSF's margin, and thus affected by the agency's erroneous selection of the primary surrogate country.

### III.  **BACKGROUND**

### A.    **Surrogate Country Selection**

The antidumping duty order that gives rise to this appeal involves Vietnam, a non-market economy ("NME"). Normally, DOC calculates antidumping duty margins by comparing the prices at which respondent companies sell the goods subject to the relevant order in the United States ("export price") against the prices that the respondent companies charge for like goods in their home market ("normal value"). *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b). However, in cases involving NMEs, DOC determines normal value by building up surrogate, market economy values for (1) production inputs (generally called "factors of production" or "FOPs"), (2) general expenses and profit, and (3) packing costs. *Id.* § 1677b(c)(1).

In selecting surrogate values ("SVs"), DOC is directed to:

> utilize . . . to the extent possible . . . prices . . . in one or more market economy countries that are—
>
> (A)  at a level of economic development comparable to that of the {NME} country, and
>
> (B)  significant producers of comparable merchandise.

*Id.* § 1677b(c)(4). The agency "normally will value all factors in a single surrogate country" that complies with the statutory requirements. 19 C.F.R. § 351.408(c)(2). If more than one country meets those requirements, DOC will rely on values from the country that provides the highest quality data. U.S. Dep't of Commerce, Import Administration Policy Bulletin 04.1: *Non-Market Economy Surrogate Country Selection Process* (Mar. 1, 2004), https://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin"). In all cases, the DOC must rely on the "best available information." 19 U.S.C. § 1677b(c)(1)(B).

In this review, DOC identified six countries, not including Indonesia, as having a level of economic development comparable to Vietnam's. *See* Letter from Robert Galantucci, Program Manager, to All Interested Parties, re: A*ntidumping Duty Administrative Review on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; 2019-20: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (Apr. 6, 2021), P.R. 170, at Attachment I, Appx____-____ ("Commerce's Surrogate Country List"). CFA argued that Indonesia (1) was also economically comparable with Vietnam, (2)

was a significant producer of comparable merchandise, and (3) provided

high quality data. CFA accordingly requested that Indonesia be selected

as the primary surrogate country. DOC selected India instead, stating

that (1) Indonesia was not economically comparable to Vietnam, while

India was, (2) India was a significant producer of comparable

merchandise, and (3) Indian data were "reliable." IDM at 41-43, 47, and

57, Appx____-____, Appx____, Appx____.  DOC therefore determined the

margin for NTSF, the sole individually examined respondent for which

the agency calculated a margin, using primarily Indian SVs. *See, e.g.*,

Preliminary Decision Memorandum accompanying *Certain Frozen Fish

Fillets from the Socialist Republic of Vietnam*, 86 Fed. Reg. 50, 698

(Dep't Commerce Sept. 10, 2021), P.R. 385 at 16, Appx____

("Preliminary IDM").[1]

---

[1]     The other individually examined respondent, East Sea Seafoods LLC
("East Sea") ceased participating in the review after filing its initial
questionnaire responses. *See, e.g.*, Preliminary IDM at 12, Appx____. Because
East Sea did not cooperate with the agency's subsequent information
requests, DOC assigned the company a margin based on adverse inferences.
*Id.* at 7-9, 12, Appx____-____, Appx____.

## B.    Determination of First Green's Margin

The Tariff Act of 1930 directs DOC to determine individual,
weighted-average dumping margins for each foreign company subject to
a particular investigation or review. *See* 19 U.S.C. § 1677f-1(c)(1).
However, where it is not practicable to do this due to the large number
of companies subject to the proceeding, the agency may limit its
individual examination to the largest exporters, and use these
exporters' margins as the basis for the margins applied to the other
companies subject to the review. *Id.* § 1677f-1(c)(2). As initiated, the
2019-2020 administrative review covered 74 Vietnamese exporters.
Memorandum from Kelsie Hohenberger, Int'l Trade Compliance
Analyst, to Shawn Thompson, Director, re: *Administrative Review of
Antidumping Duty Order on Certain Frozen Fish Fillets from the
Socialist Republic of Vietnam: Respondent Selection* (Jan. 8, 2021), C.R.
83, P.R. 112 at 1, Appx____ ("Respondent Section Memo"). DOC
determined that this was too many companies to practically review, and
selected NTSF and East Sea for individual examination. Respondent
Section Memo at 1, 6, Appx____, Appx____. DOC ultimately calculated a

zero margin for NTSF, while it applied a $3.87/kg margin to East Sea. Final Results at 15,913, Appx____.

While DOC initiated a review of 74 companies, the vast majority of these companies were not subject to the final results of the review because (1) they were found ineligible for a separate rate, (2) they had no shipments during the review period, or (3) requests for their review were withdrawn. *See, e.g.*, Preliminary IDM at 1, 6, Appx____, Appx____. As a result, the only company subject to the final results of the review besides NTSF and East Sea was Green Farms. *See, e.g.*, *id.* DOC assigned Green Farms the average of NTSF's zero and East Sea's $3.87/kg margins, *i.e.*, a margin equal to $1.94/kg. Final Results at 15,913, Appx____.

## IV.   **STANDARD OF REVIEW**

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1).

Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474,

477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938)). Substantial evidence is measured by the entire record, and

DOC "must take into account whatever in the record fairly detracts

from its weight{,}" including "contradictory evidence or evidence from

which conflicting inferences could be drawn." *Suramerica de Aleaciones*

*Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)

(quotations omitted).

   The Court must determine whether the evidence and reasonable

inferences from the record support the agency's findings. *Matsushita*

*Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Careful scrutiny of SV choices is particularly important because "{i}f the

proxy values selected prove unrepresentative, reliance on them defeats

their purpose, namely, to derive a dumping margin that is as accurate

as possible." *Dorbest Ltd. v. United States*, 30 CIT 1671, 1677, 462 F.

Supp. 2d 1262, 1269 (2006).

   Finally, DOC "may not act arbitrarily in reaching its decision{.}"

*China First Pencil Co. v. United States*, 34 CIT 1284, 1290, 721 F. Supp.

2d 1369, 1375 (2010) (quotations omitted). Its determinations "must

have a reviewable, reasoned basis" to be affirmed. *Bando Chem. Indus.,*
*Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992),
*aff'd*, 26 F. 3d 139 (Fed. Cir. 1994). "{T}he agency must examine the
relevant data and articulate a satisfactory explanation for its action
including a 'rational connection between the facts found and the choice
made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United
States*, 371 U.S. 156, 168 (1962)).

## V.   SUMMARY OF ARGUMENT

DOC erred in selecting India as the primary surrogate country, and
accordingly in calculating the final margin for NTSF. In making its
surrogate country selection, the agency failed to appropriately assess
the economic comparability of Indonesia with Vietnam. It also failed to
appropriately assess the significance of India's production of
comparable merchandise, as well as the quality of the data available in
Indonesia and India for valuing important FOPs. DOC's selection of
India as the primary surrogate country should therefore be remanded
for further consideration, and for the agency to make corresponding
changes to the margin calculations for NTSF.

NTSF's margin was used in determining the margin for Green Farms, the sole respondent subject to the review but not individually examined. As such, DOC's erroneous surrogate country selection affected not just the margin determined for NTSF, but the margin assigned to First Green. DOC's determination of the margin for First Green must accordingly be remanded as well.

## VI.   ARGUMENT

As detailed below, DOC erred in selecting India as the primary surrogate country, and accordingly in calculating the final margin for NTSF. Because DOC's erroneous surrogate country selection affected not just the margin determined for NTSF, but the margin assigned to First Green, DOC's determination of the margin for First Green should be remanded as well.

### A.   DOC Erred in Selecting India as the Primary Surrogate Country

DOC rejected Indonesia as the primary surrogate country in favor of India, finding that (1) Indonesia was not economically comparable to Vietnam, while India was, (2) India was a significant producer of comparable merchandise, and (3) Indian data were "reliable." IDM at

41-43, 47-49, 52-53, and 57, Appx____-____, Appx____, Appx____. As explained below, DOC's determinations are not supported by substantial evidence and are not in accordance with law.

### 1. DOC's Economic Comparability Analysis Was Flawed

DOC must value FOPs using, to the extent possible, data from one or more market economy countries that are "at a level of economic development comparable to that of the {NME} country . . . ." 19 U.S.C. § 1677b(c)(4). During the review, DOC developed a "non-exhaustive" list of six countries, not including Indonesia, that it deemed to be at the "same" level of economic development as Vietnam based on *per capita* Gross National Income ("GNI"). *See* Commerce's Surrogate Country List at 1 and Attachment I, Appx____ and Appx____-____. CFA argued that while Indonesia was not on this list, its level of economic development was comparable to Vietnam's. *See, e.g.*, Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments on Surrogate Country List* (Apr. 13, 2021), P.R. 175-178 at 7-10, Appx____-____ ("CFA's Comments on Surrogate Country List"); Letter from Cassidy Levy Kent (USA) LLP

to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Country Selection Comments* (Apr. 20, 2021), C.R. 149-167, P.R. 189-207 at 6-7, Appx____-____ ("CFA's Surrogate Country Comments"). In particular, CFA pointed out that, at $4,050, Indonesia's GNI was closer to Vietnam's than it had been in multiple prior reviews in which DOC found Indonesia to be at the "same" level of economic development as Vietnam, and in which Indonesia was selected as the primary surrogate country. CFA's Comments on Surrogate Country List at 7-9 and Exhibit 2, Appx____-____ and Appx____-____; Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Initial Comments and Factual Information in Advance of Commerce's Preliminary Results of Review* (Aug. 3, 2021), C.R. 202, P.R. 358 at 10, Appx____ ("CFA's Pre-Preliminary Comments"); Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Case Brief of the Catfish Farmers of America, et al.* (Nov. 16, 2021), C.R. 271, P.R. 421 at 25-26 and Appendix 2, Appx ____-____, Appx____-____ ("CFA's Case Brief").

DOC found that Indonesia was not economically comparable with Vietnam. IDM at 41-43, Appx____-____. DOC reasoned that Indonesia was not included on its non-exhaustive list of countries at the "same" level of economic development as Vietnam. *Id.*; *see also* Commerce's Surrogate Country List at 1 and Attachment I, Appx____ and Appx____-____. DOC further reasoned that Indonesia's selection as the primary surrogate country in prior reviews was irrelevant to whether Indonesia was economically comparable with Vietnam during the 2019-2020 review period. IDM at 43, Appx____. DOC further found it irrelevant that, in this review period, Indonesia's GNI was closer to that of Vietnam's than it was in prior periods. *Id.* Rather, the agency found that the countries included on the non-exhaustive list represented a "reasonable range" of GNIs and noted that it had "rejected the use of relative measures of GNI comparison" in the past. *Id.*

DOC's explanations are insufficient, and its determination that Indonesia was not economically comparable with Vietnam is inconsistent with the standard of review. Importantly, this Court recently found that DOC failed to adequately explain or support its conclusion that Indonesia was not economically comparable with

Vietnam in the 2017-2018 review. *NTSF Seafoods Joint Stock Co. v. United States*, No. 20-00104, slip op. 22-38 at 38-39 (Ct. Int'l Trade Apr. 25, 2022) ("Slip Op. 22-38"). There, as here, DOC found that Indonesia was not economically comparable with Vietnam because Indonesia was not included on the agency's list of economically comparable countries, "with no explanation of how mere inclusion on that list could somehow be determinative . . . ." Slip Op. 22-38 at 39; *see also* IDM at 43, Appx____. Likewise, in both the review at bar and the 2017-2018 review, DOC found that Indonesia was not at the "same level" of economic development as Vietnam, a finding that "potentially misapplies the statutory standard that {DOC} use a surrogate country that is 'at a level of economic development *comparable* to that of the {NME} country.'" Slip Op. 22-38 at 39 (quoting 19 U.S.C. § 1677b©(4)); *see also* IDM at 43, Appx____.

DOC's decision is not rehabilitated by its observation that Indonesia's GNI exceeded that of any of the six countries included in its list of economically comparable countries. IDM at 43, Appx____. DOC did not explain why the upper GNI limit of the six countries on its list was determinative of comparability. *Id.* Nor did it meaningfully address

NON-CONFIDENTIAL VERSION

CFA's argument that the difference between Vietnam's GNI and
Indonesia's GNI was lower in this review than it had been in prior
segments of the proceeding in which DOC relied on Indonesian data.
*Id.*[2]

DOC stated that its treatment of Indonesia in prior reviews was
irrelevant, because each review is based on its own record. *Id.* But the
standard of review requires DOC to make reasonable, non-arbitrary
determinations. The hallmark of an arbitrary decision is treating
similar situations differently without reasoned explanation. *See, e.g.*,
*Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011);
*see also Sunpower Corp. v. United States*, 179 F. Supp. 3d 1286, 1295
(Ct. Int'l Trade 2016). As such, DOC could not simply wave away its
past treatment of Indonesia as being appropriately economically
comparable with Vietnam despite larger differences in the countries'
respective GNIs.

---

[2]     Indonesia's GNI in 2019 was 56.4% higher than Vietnam's. *See* CFA's
Comments on Surrogate Country List at Exhibit 3 (GNI List for 2019),
Appx____-____. In past reviews, DOC treated Indonesia as economically
comparable with Vietnam despite having a GNI as much as 134.5% higher
than Vietnam's. *Id.* at Exhibit 2, (Surrogate Country Memo for 2010-2011
administrative review), Appx____-____.

DOC claimed that prior reviews in which it selected Indonesia as the primary surrogate country were distinguishable due to "other countries on {its surrogate country lists in those reviews}" not being "significant producers of comparable merchandise and/or lack{ing} suitable SV data." IDM at 42, Appx____.  However, these factors have nothing to do with economic comparability, a separate and distinct requirement of the statute. 19 U.S.C. § 1677b(c)(4).

DOC concluded that the countries included on its surrogate country list reflected a "reasonable range" of GNIs. IDM at 43, Appx____. But DOC did not explain how it determined what would be "reasonable." Again, Indonesia's GNI here was far closer, in relation to Vietnam's, than GNIs considered economically comparable to Vietnam's in past reviews. In reviews for the periods from 2009-2017, DOC treated countries with GNIs 74.6% – 134.5% higher than Vietnam's as economically comparable with Vietnam. *See* CFA's Comments on Surrogate Country List at Exhibit 2 (Surrogate Country Memos for 2009-2017 reviews), Appx____-____. It is not at all clear why DOC found a far narrower range of GNIs "reasonable" here.

And while DOC stated that it had previously "rejected the use of relative measures of GNI comparison{,}" the two precedents to which it pointed do not support its economic comparability analysis. IDM at 43, Appx____.  DOC first relied on a prior review of the order on Vietnamese fish fillets, which is currently subject to a substantively identical challenge to the agency's economic comparability analysis. *Id.* at 43 n.272; *see also Catfish Farmers of America v. United States*, CIT Ct. No. 21-00380. Second, DOC pointed to a case in which it found that it was not required to select the country with the GNI closest to the relevant NME's as the primary surrogate country. *See* Issues and Decision Memorandum accompanying *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 78 Fed. Reg. 56,211 (Dep't Commerce Sept. 12, 2013) (final results of antidumping duty admin. rev., 2011-2012) at cmt 1.A. Here, CFA has not argued that DOC is required to select the country with the GNI closest to Vietnam's as the primary surrogate country. Moreover, DOC's reasoning for declining to make such a selection in the cited case – that GNI is not itself determinative, and that countries across a range of GNIs can be appropriately economically comparable with a particular NME – in no

17

way supports its determination here. *See id.* Instead, that reasoning underscores the lack of appropriate explanation for why DOC considered the particular GNI range represented in its non-exhaustive list determinative of economic comparability.

In sum, DOC erred in its economic comparability analysis. The agency treated the appearance of a country on its non-exhaustive list as determinative of comparability. It misconstrued the relevant standard of comparability. It failed to properly consider its past practice and relied on irrelevant precedents. All told, DOC failed to adequately explain or support its conclusion that Indonesia was not economically comparable with Vietnam. The agency's economic comparability analysis should accordingly be remanded for further consideration.

## 2. <u>Indonesia is the Only Significant Producer of Comparable Merchandise</u>

DOC declined to consider Indonesia's merits as the primary surrogate country based on its arbitrary and unexplained determination that Indonesia was not economically comparable with Vietnam.  IDM at 41-43, Appx____-____.  In so doing, the agency ignored this Court's caution that "a{n SV} must be as representative of the situation in the

NME country as is feasible if it is to further the basic purpose of the statute—determining current margins as accurately as possible." *See Nation Ford Chem. Co. v. United States*, 21 CIT 1371, 1375-76, 985 F. Supp. 133, 137 (1997) (quotations omitted); *see also Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("In determining the valuation of the {FOPs}, the critical question is whether the methodology used by {DOC} is based on the best available information and establishes antidumping margins as accurately as possible."). Moreover, DOC's judgment regarding whether a country's production of comparable merchandise is significant "should be made consistent with the characteristics of world production of, and trade in" such goods. *See* Policy Bulletin.

The record establishes that Indonesian SVs are more "representative of the situation" in Vietnam than Indian SVs, and that Indonesia's production is significant in light of world production and trade in frozen fish fillets. Like Vietnam's, Indonesia's industry is significantly export-oriented. U.N. Comtrade data show 57,658,282 kgs in exports of frozen fish fillets from Indonesia over 2019 and 2020, making Indonesia the second-largest global exporter after Vietnam. CFA's Surrogate Country

Comments at Exhibit SC-3, Appx____-____. By contrast, the data reflect just 1,477,868 kgs of exports from India over the same period. *Id.* These data show that India's locally-focused industry is not significant in light of "world production of, and trade in" subject goods.

The Comtrade data also show that India is a net importer of frozen fish fillets, while Indonesia, like Vietnam, is a net exporter. *Id.* Indeed, India's largest producers of frozen pangasius fillets do not export; the minimal quantity of frozen pangasius fillets that India did export during the review period were bound for nearby Nepal. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Rebuttal Surrogate Country Selection Information* (Apr. 27, 2021), P.R. 215-219 at 3 and Exhibits 1-2, Appx____, Appx____-____, Appx____-____ ("CFA's April 27, 2021 Rebuttal Comments").[3]

---

[3]     Indian export data under Harmonized System code 0304.62, covering frozen catfish fillets (including both pangasius and other species) show that of India's 178,135kgs in exports during the review period, 55,500kgs were destined for Nepal. A detailed review of the product descriptions for these shipments identifies 23,000kgs of the goods destined for Nepal as frozen pangasius fillets. While there are certain other exports specifically of frozen pangasius fillets represented in the data, these appear to be re-exports of Vietnamese fillets to Vietnam. CFA's April 27, 2021 Rebuttal Comments at 3 and Exhibit 2, Appx____, Appx____-____. Meanwhile, Indonesian export data

India's frozen pangasius fillet producers are also undercut in their own market by Vietnamese imports, with which India's lower-quality frozen fish fillets find it difficult to compete. *Id.* at Exhibits 1-2, Appx____-____ (declaration of Mr. Varma), Appx____-____ (showing 10,303,435kgs in Vietnamese frozen fish fillets imported into India during the review period). By contrast, Indonesian pangasius fillets compete with Vietnam's in global markets. CFA's Surrogate Country Comments at Exhibit SC-1.A (Aquaculture Frontiers Report at p. 26), and Exhibit SC-4.E, Appx____, Appx____-____.

The insignificance of India's production in the context of "world production of, and trade in" goods comparable with frozen pangasius fillets is reflected in the lack of quality Indian data to value FOPs. While the Indonesian government conducts annual aquaculture production surveys that result in reliable, high-quality, nationwide FOP data, the only Indian data for important FOPs came from private surveys of dubious provenance, coverage, and reliability. *See* discussion *infra* at Section VI.A.3; *see also* CFA's Pre-Preliminary Comments at

_____

under the same Harmonized System code show 43,000 kgs of exports specifically of frozen pangasius fillets during the review period. *Id.* at Exhibit 2, Appx____-Appx____.

18-21, Appx____; CFA's Case Brief at 26 and Appendix 2, Appx ____,

Appx____-____. Likewise, Indian wage rate data was outdated and

Indian data for valuing byproducts was not specific to pangasius

production. CFA's Pre-Preliminary Comments at 18-21, Appx___; CFA's

Case Brief at 26 and Appendix 2, Appx____, Appx____-____.

DOC did not deny that Indonesia is a significant producer of

comparable goods. IDM at 47-48, Appx____-____.  Rather, it found that

India is a significant exporter of frozen fish fillets, based on data

showing that India exported 916,040kgs of frozen fish fillets over

calendar years 2019 and 2020. *See id.* DOC also found the record

evidence regarding the low quality of India's frozen fillets irrelevant,

because quality/grade are not mentioned in the scope of the order and

are not considered as product characteristics in the control number

buildup in this proceeding. *Id.* at 48, Appx____.

But as explained above, Indonesia's frozen fish fillet industry, like

Vietnam's, is large and export-oriented, competing with Vietnam's

industry in global markets. By comparison, India is a much smaller

producer of goods that do not compete with Vietnam's. Further, while

DOC found India's production significant on the basis of its exports, the

record indicates that these exports are minimal in the context of global trade. Indeed, a substantial quantity of India's exports appear to be re-exports of Vietnamese fish fillets. *See* discussion *supra* at 20 n.3; *see also* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam – Comment on Countries with Significant Production of Comparable Merchandise* (Apr. 20, 2021), P.R. 188 at Exhibit 2, Appx____. Consequently, Indonesian SVs for the inputs into subject goods provide the best representation of the situation in Vietnam and the appropriate choice to calculate margins as accurately as possible.

By refusing to consider whether Indonesia or India produce merchandise that is most comparable to Vietnam, DOC contradicted the purpose of the NME statute, *i.e.*, to replicate the experience of the respondent as if it were in a market economy. Consequently, DOC's determination is not supported by the record and is not in accordance with law.

### 3.   Indonesia Provides the Best Available Information to Value Important FOPs

DOC must rely on "the best available information" to value FOPs.
19 U.S.C. § 1677b(c)(1)(B). Indeed, "data quality is so important" in
selecting SVs that it can trump economic comparability and production
significance. Slip Op. 22-38 at 34 (citing Policy Bulletin). In making
data quality assessments, DOC typically considers whether proposed
surrogate values are (1) input-specific; (2) exclusive of taxes/duties; (3)
contemporaneous with the review period; (4) represent broad market
averages; and (5) publicly available. *See, e.g.*, *Bristol Metals L.P. v.
United States*, 34 CIT 478, 481, 703 F. Supp. 2d 1370, 1374 (2010).

Here, DOC found Indian FOP data "reliable," while declining to
consider Indonesian SVs on the basis that Indonesia was not
economically comparable with Vietnam. IDM at 52-53, 57, Appx____-
____, Appx____. But DOC is not permitted to simply default to
information that deems "reliable." It must use the "best available
information." 19 U.S.C. § 1677b(c)(1)(B). Here, rather than
evenhandedly assess potential Indonesian and Indian SVs in keeping
with this requirement, DOC dismissed Indonesian data on the basis

that Indonesia was not economically comparable with Vietnam. IDM at 52-53, Appx____-____. As a result, DOC's data quality assessments were unreasonably circular.

DOC's data quality assessments were also flawed in other ways. In relying on Indian data to value the main FOPs, DOC failed to adequately account for geographical limitations in these data, a lack of information regarding how the data were collected, and a lack of contemporaneity. *Id.* at 53-55; *see also* CFA's Pre-Preliminary Comments at 18-21, Appx____-____; CFA's Case Brief at 26 and Appendix 2, Appx____, Appx____-____. DOC also relied on decades-old, non-specific Indian labor rates, despite having contemporaneous Indonesian rates available. IDM at 56, Appx___; *see also* CFA's Pre-Preliminary Comments at 23, Appx___; CFA's Case Brief at 25-26 and Appendix 2, Appx____, Appx____-____. Finally, the agency relied on non-specific Indian data to value certain by-products. IDM at 53-55, Appx___-___; *see also* CFA's Pre-Preliminary Comments at 23-25, Appx___-____; CFA's Case Brief at 26 and Appendix 2, Appx____, Appx____-____.

### a.  DOC Erred in Selecting Indian Data to Value the Main FOPs

The record included Indonesian SVs for whole live fish, fingerlings, and feed, including data drawn from a longstanding, annual aquaculture production survey administered by Indonesia's Ministry of Marine Affairs and Fisheries. CFA's Surrogate Country Comments at Exhibits SC-7.A, SC-7.B and SC-7.J, Appx____-____ and Appx____-____; Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Pre-Preliminary Surrogate Value and Factual Information Submission* (July 30, 2021), P.R. 325-352 at Exhibit 4, Appx____-____ ("CFA's July 30, 2021 SV Submission"); Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Submission of Proposed Surrogate Factor Values* (May 10, 2021), P.R. 239-263 at 9-10 and Exhibits 5-A – 5-D, Appx____-____, Appx____-____ ("CFA's May 10, 2021 SV Submission"). DOC rejected this time-tested data in favor of Indian SVs derived from the *Undercurrent News* pricing portal (whole live fish, feed, and fingerlings) and a *Fishing Chimes* study (feed and fingerlings). IDM at 53-55,

26

NON-CONFIDENTIAL VERSION

Appx____-____; Memorandum from Javier Barrientos, Senior Case Analyst, to The File, re: *17th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Surrogate Values for the Preliminary Results* (Aug. 31, 2021), P.R. 387-288 at Attachment 1, Appx____-____ ("Preliminary SV Memo").[4] The selection of Indian data, and the rejection of Indonesian SVs for these important FOPs, is not adequately explained and supported.

In relying on SVs sourced from the *Undercurrent News* pricing portal, DOC failed to grapple with the lack of information regarding how the data were collected and the volume of trade represented. The pricing portal indicates that its data were "collected via interviews with farmers {or "feed mills"} in all major producing regions." Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam – Response to Request for*

---

[4]   DOC was unclear in the preliminary results as to the source of its SVs for whole live fish. In some places, it stated that the data were obtained from the *Fishing Chimes* study, and in others, from *Undercurrent News*. A close review of its calculations in conjunction with the underlying data indicates that it relied exclusively on the prices from *Undercurrent News* to value whole live fish. Preliminary SV Memo at Attachment 1, Appx____; NTSF's May 10, 2021 SV Submission at Exhibit SV-8, Appx____-____; NTSF's August 2, 2021 Pre-Preliminary SV Submission at Exhibit 1, Appx____-____.

*Surrogate Value Information* (May 10, 2021), P.R. 264-279 at Exhibits SV-6 – SV-8, Appx____-____ ("NTSF's May 10, 2021 SV Submission"); Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam – Factual Information Submission* (Aug. 2, 2021), P.R. 354-356 at Exhibits 1-5, Appx___-___ ("NTSF's August 2, 2021 Pre-Preliminary SV Submission"). But no information is provided as to how many interviews were conducted or when, what regions were considered "major," or what volume of trade is represented. NTSF's May 10, 2021 SV Submission at Exhibits SV-6 – SV-9, Appx____-____; NTSF's August 2, 2021 Pre-Preliminary SV Submission at Exhibits 1-5, Appx____-____. Beyond this, *Undercurrent News* refused to engage with independent market researchers attempting to understand the portal's data collection methods, CFA's Pre-Preliminary Comments at Exhibit 2, Appx____-____, and the data themselves bear indicia of unreliability and inconsistent collection. *Id.*; *see also* Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Rebuttal Surrogate Factor Value Information* (May 24, 2021), P.R. 295-309 at Exhibit 3-B, Appx____-____

28

("CFA's May 24, 2021 Rebuttal SV Submission"). Accordingly, while
DOC found that the *Undercurrent News* data represented broad market
averages and were reliable, IDM at 54-55, Appx____-____, these
findings are inadequately explained and supported.

The *Fishing Chimes* data suffer from similar flaws. These data come
from a single private survey of 54 farmers in two districts of a single
Indian state, Andhra Pradesh, conducted during 2017-2018. NTSF's
May 10 SV Submission at Exhibits SV-5-A (Summary Charts and
article on status of Indian pangasius farming) and SV-5-B, Appx____-
____, Appx____-____, and Appx____-____. This Court recently remanded
the use of these data in the 2017-2018 review, finding that DOC did not
adequately explain or support its conclusion that they represent a
"broad market average." Slip Op. 22-38 at 41-48.

The same issues are present on this record. *See id.*; *compare* IDM at
54, Appx____-____, *with* Issues and Decision Memorandum
accompanying *Certain Frozen Fish Fillets from the Socialist Republic of
Vietnam*, 85 Fed. Reg. 23,756 (Dep't Commerce Apr. 29, 2020) (final
results of antidumping duty admin. rev. and final deter. of no
shipments; 2017–2018) at 18-20. Indeed, the issues are even more

pronounced here, given (1) the lack of contemporaneity of the *Fishing Chimes* data with the review period and (2) record evidence indicating that Andhra Pradesh's share of India's pangasius production has rapidly fallen. NTSF's May 10 SV Submission at Exhibit SV-5-A (article on status of Indian pangasius farming at 37, indicating that Andhra Pradesh's share of Indian pangasius production fell from 80% in 2017 to 58% in 2018.) Moreover, a second study of pangasius farmers in Andhra Pradesh indicated that none of the surveyed farmers participated in the study that generated the *Fishing Chimes* data. CFA's May 24, 2021 Rebuttal SV Submission at Exhibit 1-C, Appx____-____. This further calls into question the study's overall reliability and whether its data regarding feed and fingerlings reflect "broad market averages."

Moreover, with specific respect to fingerlings, DOC stated that the *Fishing Chimes* data were collected from commercial nurseries in two locations that collectively supplied fingerlings to 96% of India's pangasius farms. IDM at 54, Appx____. But this is not a fair reading of the record, which instead indicates that of the survey participants – *i.e.*, the 54 surveyed farmers in Andhra Pradesh – approximately 95% obtained fingerlings and fry from commercial nurseries surrounding

Eluru and Undi, two "mandals" in Andhra Pradesh. NTSF's May 10 SV Submission at Ex.SV-5-A (article on status of Indian pangasius farming at 35, 38), Appx____, Appx____. As such, the *Fishing Chimes* data for fingerlings suffer from the same issues as the *Fishing Chimes* data regarding feed.

In sum, DOC failed to adequately explain or support its determination that the *Undercurrent News* and *Fishing Chimes* data for valuing whole live fish, fingerlings, and feed represented "broad market averages" and were otherwise reliable.

### b.  *DOC Erred in Selecting Indian Data to Value Labor*

The record contained contemporaneous Indonesian wage rates for "Agriculture" and "Manufacturing" workers. CFA's May 10, 2021 SV Submission at Exhibit 8, Appx____-____. DOC, however, relied on 2011-2012 Indian wage data, despite its lack of contemporaneity. *See, e.g.*, Preliminary SV Memo at Attachment 1, Appx____-____. DOC explained that labor accounts for "a miniscule proportion" of costs, but cited no record evidence for this proposition. IDM at 56, Appx____. Instead, it cited its findings in a prior review. *Id.*

31

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

The Court recently remanded DOC's reliance on the same Indian wage data in the 2017-2018 review, reasoning that the agency had not adequately explained or supported its reliance on such outdated data. Slip Op. 22-38 at 48-49. Those data were even more outdated two reviews later.

Further, contrary to DOC's assertion, labor does not comprise "a miniscule proportion of {normal value} compared to the main inputs." IDM at 56, Appx____. As can be seen from the SAS Output, labor accounted for [                                                      ], making it one of the more significant inputs by value. Memorandum from Javier Barrientos, Senior Case Analyst, to The File, re: *17th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results Analysis Memorandum for NTSF Seafoods Joint Stock Company* (Aug. 31, 2021), C.R. 221, P.R. 389 at Attachment 4, pp. 24-25, Appx____-____.[5]  In fact the total value of all labor inputs is [

                                ]. *Id.*; IDM at 53, Appx____.

---

[5]      This calculation is based on [

                                ].

The statute requires the agency to rely on the "best available information." 19 U.S.C. § 1677b(c)(1)(B). Given the agency's failure to appropriately analyze economic comparability, and the woefully outdated nature of the Indian labor data, DOC's selection of the labor SV is inconsistent with the standard of review.

### c.   *DOC Erred in Valuing By-Products Using Indian Data*

The record of the review included contemporaneous Indonesian data for valuing by-products such as fish meal and fish oil. CFA's May 10, 2021 SV Submission at Exhibits 9-A – 9-C, Appx____-____; CFA's July 30, 2021 SV Submission at Exhibits 1 & 3, Appx____-____, Appx____-____. These data were specific to NTSF's production, and otherwise complied with DOC's requirements for SVs. *See, e.g.*, CFA's Pre-Preliminary Comments at 23-24, Appx____-____.

DOC instead valued these by-products using Indian import data. Preliminary SV Memo at 5, Appx____. Responding to the arguments in CFA's pre-preliminary comments (which were incorporated by reference into its case brief), DOC stated that it was irrelevant that the import data were not specific to pangasius by-products, as there was no reason

to believe that the market value of by-products was dependent on
species. IDM at 56, Appx____; *see also* CFA's Pre-Preliminary
Comments at 24-25, Appx____-____. CFA's Case Brief at 26 and
Appendix 2, Appx____, Appx____-____. But again, the agency is required
to rely on the "best available information," and specificity of the SV is
an important consideration. 19 U.S.C. § 1677b(c)(1)(B); *see, e.g.*, *Bristol
Metals*, 34 CIT at 481, 703 F. Supp. 2d at 1374. Too, while DOC may
have relied on import statistics to value fish oil and fish meal by-
products in the past, IDM at 56, Appx____, in the most recent
proceeding cited by the agency, the statistics were (1) Indonesian and
(2) collected under tariff provisions that this Court has found specific to
the protein content of NTSF's oil/meal. *See NTSF Seafoods Joint Stock
Co. v. United States*, No. 19-00063, slip op. 21-121 at 14 (Ct. Int'l Trade
Sept. 20, 2021) (finding that Indonesian tariff provisions 2301.20.20 and
1504.20.90, used in the 2016-2017 administrative review, correspond to
"fish oil and fish meal . . . of a high protein content" of the kind
produced by NTSF). By contrast, the Indian import statistics here were
derived from tariff provisions far more general in scope. Preliminary SV
Memo at Attachment 1, Appx____. Finally, DOC failed to show that it

appropriately compared the data quality of the Indian statistics against the Indonesian SV data on the record, particularly given the agency's unsupported and inadequately explained economic comparability analysis.

### 4.    Conclusion

The Court should remand DOC's selection of India as the primary surrogate country for further consideration, and for any necessary adjustments to NTSF's margin resulting from that consideration. As explained above, the agency failed to appropriately assess the economic comparability of Indonesia and Vietnam when making its surrogate country selection. DOC further failed to appropriately explain and support its determination that India was a significant producer of goods comparable to subject merchandise. Finally, the agency did not properly assess the quality of the data available in Indonesia and India for valuing important FOPs.

### B.    The Margin Determined for Green Farms Should Also Be Remanded

DOC's erroneous surrogate country selection process affected its calculation of NTSF's margin, which relied primarily on Indian SVs.

*See, e.g.*, Preliminary SV Memo at 1-2, Appx____-____; Preliminary IDM at 16, Appx____. Green Farms' margin was based, in part, on NTSF's margin. *See, e.g.*, Preliminary IDM at 12, Appx____. As such, along with remanding the surrogate country selection and its effects for NTSF's margin, the Court should remand the determination of Green Farms' margin as well.

## VII. <u>CONCLUSION</u>

For the reasons discussed above, CFA respectfully submits that the Court should remand DOCs final results in the 2019-2020 administrative review of the antidumping duty order covering certain frozen fish fillets from Vietnam for further consideration.

NON-CONFIDENTIAL VERSION

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of
America, et al.*

Dated: October 20, 2022

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Opening Brief of Plaintiffs, Catfish Farmers of America, *et al.*, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 6,595 words.

*/s/ Nazak Nikakhtar*
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

The Catfish Farmers of America and individual U.S. catfish processors
America's Catch, Inc., Alabama Catfish, LLC
d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC
d/b/a Country Select Catfish, Delta Pride Catfish, Inc.,
Guidry's Catfish, Inc., Heartland Catfish Company,
Magnolia Processing, Inc. d/b/a Pride of the Pond, and
Simmons Farm Raised Catfish, Inc.
(Representative Of)

October 20, 2022
(Date)