# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, ET AL., <br><br> PLAINTIFFS, <br><br> V. <br><br> UNITED STATES, <br><br> DEFENDANT, <br><br> AND <br><br> NAM VIET CORPORATION, ET AL., <br><br> DEFENDANT-INTERVENORS. | Court No. 22-00125 |

## PLAINTIFFS' REPLY BRIEF

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: March 10, 2023

Ct. No. 22-00125

## TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ................................................................. 1

II.   ARGUMENT ...................................................................... 2

   A.   DOC Erred in its Selection of the Primary
        Surrogate Country ............................................... 2

        1.   DOC Erred in Determining that Indonesia
             is not Economically Comparable to Vietnam ............... 6

        2.   DOC Erred in Determining that India is a
             Significant Producer of Comparable
             Merchandise .............................................. 13

        3.   DOC's Reliance on Indian Data to Value
             Specific FOPs was Flawed .......................... 18

        4.   Conclusion .............................................. 30

   B.   The Margin for Green Farms Should Be
        Remanded ......................................................... 30

III.  CONCLUSION ................................................................... 31

i

Ct. No. 22-00125

# **TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United*
    *States*, 317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018) ........................... 30

*Bristol Metals L.P. v. United States*,
    34 CIT 478, 703 F. Supp. 2d 1370 (2010) ............................... 20, 29, 30

*Nation Ford Chem. Co. v. United States*,
    21 CIT 1371, 985 F. Supp. 133 (1997) ................................................ 17

*NTSF Seafoods Joint Stock Co. v. United States*,
    No. 19-00063, slip op. 21-121
    (Ct. Int'l Trade Sept. 20, 2021) .......................................................... 30

*NTSF Seafoods Joint Stock Co. v. United States*,
    No. 20-00104, slip op. 22-38
    (Ct. Int'l Trade Apr. 25, 2022) ................................................... *passim*

*Shakeproof Assembly Components v. United States*,
    268 F.3d 1376 (Fed. Cir. 2001) .......................................................... 17

*Tri Union Frozen Prods., Inc. v. United States*,
    163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ...................................... 13

*Ultratec, Inc. v. CaptionCall, LLC*,
    872 F.3d 1267 (Fed. Cir. 2017) .............................................. 12, 19, 32

## Statutes

19 U.S.C. § 1516a(b)(1)(B) ...................................................................... 10

19 U.S.C. § 1677b(c)(1) ........................................................................ 5, 28

19 U.S.C. § 1677b(c)(1)(B) ............................................................ 6, 20, 30

19 U.S.C. § 1677b(c)(4) ............................................................................. 5

19 U.S.C. § 1677f-1(d) ............................................................................... 5

Ct. No. 22-00125

19 U.S.C. § 1677I..................................................................................10

**Other Authorities**

19 C.F.R. § 351.408(c)(2) ......................................................................5

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam*, 87 Fed. Reg. 15,912
    (Dep't Commerce Mar. 21, 2022) ..........................................4

*Certain Frozen Fish Fillets from the Socialist Republic of
    Vietnam*, 85 Fed. Reg. 23,756
    (Dep't Commerce Apr. 29, 2020) ..........................................8

*Proceedings Involving Non-Market Economies: Valuing the
    Factor Production: Labor*, 76 Fed. Reg. 36,092
    (Dep't Commerce June 21, 2011) ........................................29

Ct. No. 22-00125

# <u>GLOSSARY</u>

**CFA**

    Catfish Farmers of America

**DOC**

    Department of Commerce

**FOP**

    Factors of Production

**Green Farms**

    Green Farms Seafood Joint Stock Company

**GNI**

    Gross National Income

**NME**

    Non-Market Economy

**NTSF**

    NTSF Seafoods Joint Stock Company

Ct. No. 22-00125

## I.   __INTRODUCTION__

The Catfish Farmers of America and individual U.S. catfish

processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest

Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a

Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc.,

Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of

the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA"),

respectfully submit this reply to the response briefs filed by Defendant

the United States ("the Government"), and Defendant-Intervenors

NTSF Seafoods Joint Stock Company ("NTSF"), Nam Viet Corporation,

and Green Farms Seafood Joint Stock Company ("Green Farms")

(collectively "Intervenors"). *See* Def.'s Resp. in Opp'n to Pls.' Mots. for J.

on the Agency R. (Jan. 27, 2023), ECF No. 42 ("Government's Brief");

Def.-Intervenors' Resp. to Pls. CFA, *et al.*'s Rule 56.2 Mot. for J. on the

Agency R. (Feb. 10, 2023), ECF No. 45 ("Intervenors' Brief");[1] *see also*

Mem. in Supp. of the Opening Br. of Pls., CFA, *et al.* (Oct. 20, 2022),

ECF No. 37 ("CFA's Opening Brief").

---

[1]    Intervenors note that CFA did not include arguments relating to
Count Five of its complaint in its opening brief. Intervenors' Brief at 10-
12. CFA acknowledges that this Count was not briefed and is waived.

Ct. No. 22-00125

## II.  <u>ARGUMENT</u>

This appeal arises from the 2019-2020 administrative review conducted by the U.S. Department of Commerce ("DOC") of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"). *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg. 15,912 (Dep't Commerce Mar. 21, 2022) (fin. results of antidumping duty admin. rev. and fin. deter. of no shipments; 2019-2020), P.R. 447, Appx____-____ ("Final Results"), and accompanying Issues and Decision Memorandum, P.R. 444, Appx____-____ ("IDM"). CFA challenges DOC's (1) selection of India as the primary surrogate country and reliance on certain Indian factors of production ("FOP") to calculate the antidumping duty margin for NTSF, and (2) determination of the margin for Green Farms, inasmuch as that margin was based in part on the erroneous margin calculated for NTSF. *See* CFA's Opening Brief at 2.

### A. <u>DOC Erred in its Selection of the Primary Surrogate Country</u>

Normally, DOC calculates dumping margins by comparing the prices that foreign producers charge for subject goods in the United States against the prices that they charge for those goods in their home

Ct. No. 22-00125

market ("normal value"). *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.*

§§ 1677a, 1677b(a), and 1677b(b). However, in proceedings involving a

non-market economy ("NME") like Vietnam, DOC determines normal

value by building up surrogate, market-economy values for (1) FOPs,

(2) general expenses and profit, and (3) packing costs. *Id.* § 1677b(c)(1).

The Tariff Act of 1930 ("the Act") directs DOC, in selecting surrogate

values, to:

> utilize . . . to the extent possible . . . prices . . . in one or more
> market economy countries that are—
>
> (A) at a level of economic development comparable to that of the
>    nonmarket economy country, and
>
> (B) significant producers of comparable merchandise.

*Id.* § 1677b(c)(4). The agency "normally will value all factors in a single

surrogate country" that complies with the statutory requirements.

19 C.F.R. § 351.408(c)(2). If more than one country meets those

requirements, DOC will rely on values from the country that provides

the highest quality data. Import Administration Policy Bulletin 04.1,

*Non-Market Economy Surrogate Country Selection Process* (Mar. 1,

2004), https://enforcement.trade.gov/policy/bull04-1.html ("Policy

Ct. No. 22-00125

Bulletin"). In all cases, the Act requires DOC to rely on the "best available information." 19 U.S.C. § 1677b(c)(1)(B).

In this review, DOC identified six countries, not including Indonesia, as having a level of economic development comparable to Vietnam's. *See* Letter from Robert Galantucci, Program Manager, Off. V, Enf't & Compl., to All Interested Parties, re: *Antidumping Duty Administrative Review on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam; 2019-20: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (Apr. 6, 2021), P.R. 170, at Attachment I, Appx____-____. CFA argued that Indonesia was also economically comparable with Vietnam, a significant producer of comparable merchandise, and provided high quality data. CFA accordingly requested that Indonesia be selected as the primary surrogate country. DOC selected India instead, finding that (1) Indonesia was not economically comparable to Vietnam, (2) India was a significant producer of comparable merchandise, and (3) Indian data were "useable" and "reliable." IDM at 41-43, 47, and 57, Appx____-____, Appx____, Appx____.

4

Ct. No. 22-00125

In its opening brief, CFA explained why DOC's selection of India, and rejection of Indonesia, as the primary surrogate country was unsupported by substantial evidence and not in accordance with law. CFA's Opening Brief at 10-35. Nonetheless, the Government and Intervenors argue that DOC's selection of India should be affirmed for three reasons. *See* Government's Brief at 23-49; Intervenors' Brief at 3-9. First, they argue that DOC reasonably found that India, but not Indonesia, is at a level of economic development comparable to Vietnam. Government's Brief at 23-30; Intervenors' Brief at 3-5. Second, they argue that the agency reasonably treated India as a significant producer of goods comparable to subject merchandise. Government's Brief at 31-36; Intervenors' Brief at 5-6. Third, they argue that India provided the best available information to value the main inputs into the production of subject goods. Government's Brief at 36-49; Intervenors' Brief at 6-9.

For the reasons discussed below, these arguments should be rejected, and DOC's selection of India as the primary surrogate country should be remanded for further consideration.

5

Ct. No. 22-00125

    1.  <u>DOC Erred in Determining that Indonesia is not</u>
<u>Economically Comparable to Vietnam</u>

DOC failed to adequately explain or support its determination that

Indonesia is not economically comparable to Vietnam. CFA's Opening

Brief at 11-18. Notably, DOC's explanation for this determination is

largely identical with the explanation it provided for reaching same

conclusion in the 2017-2018 review. *Compare* IDM at 41-43, Appx____-

____, *with* Issues and Decision Memorandum accompanying *Certain*

*Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg.

23,756 (Dep't Commerce Apr. 29, 2020) (fin. results of antidumping

duty admin. rev. and fin. deter. of no shipments; 2017-2018) at 12-14

("2017-2018 IDM"). This court remanded DOC's determination in the

2017-2018 review, finding that the agency failed to adequately explain

or support its conclusion that Indonesia was not economically

comparable to Vietnam. *NTSF Seafoods Joint Stock Co. v. United*

*States*, No. 20-00104, slip op. 22-38 at 39 (Ct. Int'l Trade Apr. 25, 2022)

("Slip Op. 22-38").

DOC's explanation in the review at bar differs substantively from the

remanded explanation only through the addition of two brief

paragraphs, and the deletion of another dealing with an argument not

Ct. No. 22-00125

germane to this review. *Compare* IDM at 41-43, Appx____-____, *with*

2017-2018 IDM at 12-14. In the additional paragraphs, DOC states that

"{n}othing in the Act requires {DOC} to consider any particular country

as a surrogate country," and avers that the agency has latitude to

"perform its duties in the way it believes most suitable." IDM at 42,

Appx____. Notwithstanding its preliminary finding that India provided

"superior" data, DOC stated that it was not obliged to consider whether

Indonesia provided "superior" data. *Id.* at 42, 52, Appx____, Appx____.

DOC then concluded that Indonesia is not economically comparable

with Vietnam, because its 2019 gross national income ("GNI") was

higher than the 2019 GNI of any of the six countries included in the

agency's list of economically comparable countries. *Id.* At 43, Appx____.

   The additional paragraphs do not meaningfully distinguish the

agency's analysis here from the remanded analysis. As in the 2017-2018

review, DOC found that Indonesia is not economically comparable with

Vietnam because Indonesia was not on the list of economically

comparable countries developed by the agency's Office of Policy, *id.* at

41-43, Appx____-____, "with no explanation of how mere inclusion on

that list could somehow be determinative." Slip Op. 22-38 at 39. And

Ct. No. 22-00125

while DOC stated that it was not legally required to consider Indonesia
as a potential surrogate country, IDM at 42, Appx____, the standard of
review requires DOC to make reasonable, non-arbitrary, adequately-
explained determinations grounded in substantial record evidence.
19 U.S.C. § 1516a(b)(1)(B). CFA submitted information and argument
below in favor of Indonesia's selection, triggering DOC's duties to
provide a reasonable, non-arbitrary explanation, backed by substantial
evidence, of why it found that information and argument unconvincing.

Moreover, while DOC stated that the Act does not require it to
consider whether Indonesia offered "superior" data, IDM at 42,
Appx____, the statute requires DOC to rely on the "best available
information" to value FOPs. 19 U.S.C. § 1677I(1)(B). Indeed, DOC's
Policy Bulletin states that "the country with the best {FOP} data is
selected as the primary surrogate country." *See* Policy Bulletin. Given
that DOC explicitly found that India provided "superior" data in the
preliminary results, IDM at 52, Appx____, the agency could not logically
treat the question of data superiority as irrelevant.

DOC's analysis is not rehabilitated by its observation that
Indonesia's GNI exceeded that of any of the six countries included in its

Ct. No. 22-00125

list of economically comparable countries. *Id.* at 43, Appx____. DOC did not explain why the upper GNI limit of the six countries on its list was determinative of comparability. *Id.* Nor did it meaningfully address CFA's argument that the difference between Vietnam's GNI and Indonesia's GNI was lower in this review than it had been in prior segments of the proceeding in which DOC found Indonesia to be economically comparable with Vietnam and relied on Indonesian data. *Id.* at 42-43, Appx____-____. And as in the 2017-2018 review, DOC found that Indonesia was not at the "same level" of economic development as Vietnam, a finding that "potentially misapplies the statutory standard that {DOC} use a surrogate country that is 'at a level of economic development comparable to that of the nonmarket economy country.'" Slip Op. 22-38 at 39 (quoting 19 U.S.C. § 1677b(c)(4)); *see also* IDM at 43, Appx____.

    The defense's arguments in support of DOC are unpersuasive inasmuch as they repeat DOC's own unsatisfactory explanations. Government's Brief at 23-30; Intervenors' Brief at 3-5; *see also* IDM at 41-43, Appx____-____. The defense also observes that Indonesia's GNI was "59 percent greater than {} Vietnam's." Government's Brief at 24.

Ct. No. 22-00125

But DOC's list of comparable countries included Bolivia, with a GNI 39% greater than Vietnam's. IDM at 43, Appx____. DOC did not explain why a 39% difference was indicative of comparability, but a 59% difference was not. *Id.* Further, DOC has previously treated Indonesia as economically comparable with Vietnam despite greater GNI differences than seen here. *See, e.g.*, CFA's Opening Brief at 15-16.

The defense also argues that it is appropriate for DOC to consider whether countries are at the "same" level of economic development despite the statute's reference to "comparable" levels. Government's Brief at 25-26. But these arguments go beyond anything explained by the agency in its IDM. *Compare id.*, *with* IDM at 41-43, Appx____-____. The agency's determination must stand or fall upon the grounds articulated in the IDM, rather than counsel's *post hoc* rationalizations. *See, e.g.*, *Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1274 (Fed. Cir. 2017). Further, even had DOC articulated an acceptable basis for focusing on countries at the "same" level of development as Vietnam, this would still not explain why only the six countries included on the Office of Policy's list were deemed to be at Vietnam's "same" level of development.

Ct. No. 22-00125

The defense argues that DOC has previously refused to consider perceived GNI relativity in its analyses of economic comparability, and thus, was not required to consider relative GNI differences in this review. Government's Brief at 26-28. But in arguing that the agency may "narrow a list of countries within a band {of GNIs} for administrative feasibility" and is "required to base surrogate country selection on the facts presented in each case," the defense underscores the conclusory nature of DOC's analysis here. *Id.* (quoting *Juangcheng Kangtai Chem. Co., Ltd. v. United States*, No. 14-00056, slip op. 15-93 at 7-8 (Ct. Int'l Trade Aug. 21, 2015) and *Jiaxing Brothers Fastener Co. v. United States*, 822 F.3d. 1289, 1299 (Fed. Cir. 2016)); *see also id.* at 28 (discussing *Tri Union Frozen Prods., Inc. v. United States,* 163 F. Supp. 3d 1255, 1275 (Ct. Int'l Trade 2016)). While identifying various factors that DOC allegedly was not required to take into consideration, the defense points to no record evidence or agency explanation describing the particularized basis for DOC's selection of the GNI range here. As in the 2017-2018 review, it remains unclear why DOC considered the range of GNIs exhibited by the six countries on the Office of Policy's list

11

Ct. No. 22-00125

(and only that range) as "reasonable" and otherwise determinative of economic comparability. *See, e.g.*, Slip Op. 22-38 at 39.

Contrary to the defense's implications, CFA has never argued that DOC is required to treat Indonesia as economically comparable with Vietnam simply because it has done so in the past. Government's Brief at 29-30. Rather, CFA has argued that DOC's treatment of Vietnam here appears inexcusably arbitrary in light of analogous situations. CFA's Opening Brief at 14-18. This fact, coupled with the lack of any affirmative explanation for why the upper GNI limit of the six countries on the Office of Policy's list was determinative of economic comparability, merits remand. *Id.*

Finally, Intervenors distinguish the situation in the review at bar from that of past reviews in which DOC selected Indonesia as its primary surrogate country even though Indonesia did not appear on the Office of Policy's list of "same"-level countries. Intervenors' Brief at 4-5. Specifically, Intervenors argue that in those case, there were no countries on the list that were significant producers of comparable goods or that provided usable surrogate values. *Id.* But as explained in CFA's opening brief, economic comparability is a separate and distinct

12

Ct. No. 22-00125

requirement of the statute. CFA's Opening Brief at 16. Nor does

Intervenors' argument excuse DOC's failure to explain or support its

determination of a "reasonable range" of GNIs in this case. *See id.*

For these reasons and as detailed in CFA's Opening Brief, DOC has

not adequately explained or supported its determination that Indonesia

is not economically comparable with Vietnam for purposes of the 2019-

2020 administrative review. Accordingly, the Court should remand

DOC's economic comparability analysis for further consideration.

   2.   <u>DOC Erred in Determining that India is a Significant</u>
        <u>Producer of Comparable Merchandise</u>

In selecting India as its primary surrogate country, DOC failed to

appropriately assess the significance of India's production of frozen fish

fillets, and the comparability of the goods produced there with subject

goods. *Id.* at 18-23. The defense nonetheless contends that DOC's

analysis of production comparability and significance should be

affirmed. Government's Brief at 31-36; Intervenors' Brief at 5-6. It

argues that DOC appropriately found that India's exportation of frozen

fish fillets demonstrated India's status as a significant producer of

comparable merchandise. Government's Brief at 32. It also argues that

DOC not only found that India is a significant producer of frozen fish

Ct. No. 22-00125

fillets as a general matter, but a significant producer of frozen

*pangasius* fillets specifically. *Id.* at 32-33; Intervenors' Brief at 5-6. The

defense characterizes CFA's argument that India does not produce

goods of a quality comparable to subject merchandise as "improper,"

and argues that it is irrelevant whether India was a net exporter of fish

fillets. Government's Brief at 33-35. The defense argues that DOC's

practice is not to consider the "significance" of a potential surrogate

country's production in relation to the subject country's volume of

production. *Id.* at 35-36. Finally, Intervenors briefly argue that India

had greater exports of *pangasius* fillets than Indonesia during the

period of review. Intervenors' Brief at 6.

These arguments are unconvincing. Like DOC itself, the defense

ignores the ultimate purpose of determining whether a potential

surrogate country is a significant producer of comparable merchandise.

"{A} surrogate value must be as representative of the situation in the

NME country as is feasible if it is to further 'the basic purpose of the

statute—determining current margins as accurately as possible.'" *See*

*Nation Ford Chem. Co. v. United States*, 21 CIT 1371, 1375-76,

985 F. Supp. 133, 137 (1997); *see also Shakeproof Assembly Components*

14

Ct. No. 22-00125

*v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). Moreover, DOC's judgment regarding whether a country's production of comparable merchandise is significant "should be made consistent with the characteristics of world production of, and trade in" such goods. *See* Policy Bulletin.

The record establishes that Indonesia's industry more closely replicates that of Vietnam than does India's, and that India's production is not significant in light of "world production of, and trade in" such goods. *See* CFA's Opening Brief at 18-22; Policy Bulletin at 3. Indonesia is the second largest global exporter of frozen fish fillets (after Vietnam) and its frozen pangasius fillets compete with Vietnam's in the global market. *See* CFA's Opening Brief at 19-20. By contrast, India's global exports are smaller and of lower quality product. *Id.* at 19-21.

The insignificance of India's production in the context of "world production of, and trade in" goods comparable with fish fillets is reflected in the lack of quality Indian data to value FOPs. *See id.* at 24-35. While the Indonesian government conducts annual aquaculture production surveys that result in reliable, high-quality, nationwide FOP

15

Ct. No. 22-00125

data, the only Indian data for important FOPs came from private surveys of dubious provenance, coverage, and reliability. *See, e.g.*, *id.* at 26-31. Similarly, the record provided contemporaneous labor rates for Indonesia's aquaculture industry and reliable and appropriate Indonesian values for by-products. *Id.* at 31-35. By contrast, the record lacked Indian wage rate and by-product value data of equal breadth, contemporaneity, reliability, and specificity. *Id.*

The defense's contention that DOC reasonably determined that India is a significant producer specifically of frozen *pangasius* fillets is also unpersuasive. Government's Brief at 32-33. The defense points to a single footnote in the IDM. *Id.*; *see also* IDM at 48 n.298, Appx____. While the footnote cites certain record information as indicating that *pangasius* fillets are produced in India, DOC did not explain why that production was significant in light of "world production of, and trade in" either frozen *pangasius* fillets specifically, or comparable merchandise generally. *Id.*; *see also* Policy Bulletin at 3.

Finally, Intervenors briefly defend DOC on the basis that India had greater exports of *pangasius* fillets than Indonesia during the period of review. Intervenors' Brief at 6. But this is *post hoc* reasoning, upon

16

Ct. No. 22-00125

which basis the agency's determination cannot be affirmed. *Compare id.*, *with* IDM at 47-49, Appx____-____; *see also Ultratec*, 872 F.3d at 1274. Intervenors' arguments are also undermined by their conflation of *pangasius* fillets and non-subject fillets classifiable under Harmonized System code 0304.62, as well as by Indian export data showing that a significant portion of Indian exports under this provision were re-exports of Vietnamese fillets. Intervenors' Brief at 6; *see also* CFA's Opening Brief at 20-21 n.3; Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Rebuttal Surrogate Country Selection Information* (Apr. 27, 2021), P.R. 215-219 at Exhibit 2 (pages 309, 471-480, 514-522 of originally-filed PDF, showing A-Mart as both importer of frozen *pangasius* shipped by IDI in Vietnam and as later exporting fillets back to the same Vietnamese company), Appx____-____.

CFA recognizes that in its opinion regarding the 2017-2018 review, the Court found that DOC adequately explained and supported its determination that India is a significant producer of goods comparable to subject merchandise. Slip Op. 22-38 at 35-38. CFA nonetheless respectfully submits that in light of the overall purpose of the selection

17

Ct. No. 22-00125

of surrogate values – replicating as closely as possible the experience of

Vietnamese producers, but in a market economy setting – DOC's

determination in this review was unsupported by the record and

otherwise not in accordance with law.

> 3.    DOC's Reliance on Indian Data to Value Specific FOPs was
>        Flawed

The Act requires DOC to rely on "the best available information" to

value FOPs. 19 U.S.C. § 1677b(c)(1)(B). Indeed, "data quality is so

important" in selecting surrogate values that it can trump economic

comparability and production significance. Slip Op. 22-38 at 34 (citing

Policy Bulletin). In making data quality assessments, DOC typically

considers whether proposed surrogate values are (1) input-specific;

(2) exclusive of taxes/duties; (3) contemporaneous with the review

period; (4) represent broad market averages; and (5) publicly available.

*See, e.g.*, *Bristol Metals L.P. v. United States*, 34 CIT 478, 481, 703 F.

Supp. 2d 1370, 1374 (2010). But rather than even-handedly assess the

quality of Indonesian data using these factors, DOC here treated

Indonesian data as presumptively inferior because Indonesia was not on

its list of economically comparable countries. IDM at 52-53, Appx____-

Ct. No. 22-00125

____. As a result, DOC's data quality assessments were unreasonably

circular.

DOC's data quality assessments were also flawed in other ways. In

finding that Indian *Fishing Chimes* and *Undercurrent News* data for the

main FOPs reflected broad market averages and were otherwise

reliable, DOC failed to adequately account for geographical limitations

in these data, a lack of information regarding how the data were

collected and how much trade they reflected. CFA's Opening Brief at 25-

31. DOC relied on decades-old, non-specific Indian labor rates, despite

having contemporaneous, specific Indonesian rates available. *Id.* at

31-33. It relied on non-specific Indian data to value certain by-products.

*Id.* at 33-35.

The defense supports DOC's data quality assessments, arguing that

DOC appropriately relied on Indian data to value the main FOPs, as

well as labor and by-products. Government's Brief at 36-46; Intervenors'

Brief at 6-9. The Government further argues that DOC was not

required to assess the relative quality of Indian and Indonesian data,

while Intervenors assert that Indonesian data were flawed.

Ct. No. 22-00125

Government's Brief at 46-49; Intervenors' Brief at 7-8. As detailed

below, these arguments are not compelling.

> ### a. DOC Erred in Relying on Indian Data to Value the Main FOPs

The defense argues that DOC appropriately relied on Indian

*Undercurrent News* and *Fishing Chimes* data to value whole live fish,

fingerlings and feed. Government's Brief at 38-41; Intervenors' Brief at

6-7.

The defense argues that the *Fishing Chimes* data reflected broad

market averages because they were based on a survey of 54 farms in

two districts of Andhra Pradesh, an Indian state accounting for

"approximately 60-80 percent of pangasius production" in India.

Government's Brief at 38. While noting that the Court remanded the

use of the *Fishing Chimes* data in the 2017-2018 review, the defense

avers that DOC's reliance on that data here does not suffer from the

same flaws, because the record establishes that Andhra Pradesh is the

"predominant" area in India where *pangasius* is farmed. *Id.* at 40-41.

The defense also argues that, while non-contemporaneous with the

review period, the *Fishing Chimes* data were inflated to reflect review

period values. *Id.* at 41.

Ct. No. 22-00125

These defenses are not compelling. Indeed, not only are the flaws that the Court perceived in DOC's reliance on the *Fishing Chimes* data in the 2017-2018 review present on this record, they are even more pronounced given the passage of time. Slip Op. 22-38 at 41-48; *compare* IDM at 54, Appx____, *with* 2017-2018 IDM at 18-20; *see also* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam – Response to Request for Surrogate Value Information*(May 10, 2021), P.R. 264-279 at Exhibits SV-5-A and SV-5-B, Appx____-____ ("NTSF's May 10, 2021 SV Submission"). The data's lack of contemporaneity directly implicates the question of whether they reflect broad market averages, given the record's indication that Andhra Pradesh's share of Indian *pangasius* production has been rapidly declining. It fell from 80% in 2017 to 58% in 2018, and there is no indication that this downward trend was set to reverse itself. *Id.* at Exhibit SV-5-A (article on status of Indian pangasius farming at 37), Appx____. Moreover, with respect to fingerlings, the agency's reading of the data's coverage is neither reasonable nor fair, conflating the experience of a few dozen farmers with the experience of India's *pangasius* industry as a whole. CFA's Opening Brief at 30-31.

21

Ct. No. 22-00125

The defense also fails to persuade that DOC appropriately found that *Undercurrent News* pricing portal data reflect broad market averages. The defense repeats DOC's conclusion that *Undercurrent News* "obtains its information from numerous sources across major producing regions" and "identifies key characteristics and the location of" its data sources. Government's Brief at 39. But the portal provides no volume data, making it impossible to determine how much trade the prices represent. NTSF's May 10, 2021 SV Submission at Exhibits SV-6 – SV-9, Appx____-____; Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam – Factual Information Submission* (Aug. 2, 2021), P.R. 354-356 at Exhibits 1-5, Appx____-____ ("NTSF's August 2 Submission"). Likewise, while the portal states that "{d}ata {were} collected via interviews with" farmers or feed mills "in all major producing regions," it does not identify the number of interviewees in each region or even what areas are treated as "major producing regions." NTSF's May 10, 2021 SV Submission at Exhibits SV-6 – SV-8; NTSF's August 2 Submission at Exhibits 1-5. DOC's conclusion that the data reflect broad market averages is both unexplained and unsupported.

Ct. No. 22-00125

The defense argues that CFA has inappropriately claimed that DOC should have corroborated the *Fishing Chimes* and *Undercurrent News* data. Government's Brief at 40. But this has never been CFA's argument. Rather, CFA has argued that the agency failed to properly explain or support its treatment of these data sources as reflecting broad market averages. CFA's Opening Brief at 24-31. Nor is the Government correct in asserting that there is no record evidence that undermines DOC's conclusion that the *Fishing Chimes* and *Undercurrent News* data reflect broad market averages. Government's Brief at 40. Rather, record data regarding the rapidly falling share of Indian *pangasius* production accounted for by Andhra Pradesh, the language of the *Fishing Chimes* study itself, and a later study of *pangasius* farmers in Andhra Pradesh all undermine the agency's conclusion that the *Fishing Chimes* data reflect broad market averages and are otherwise reliable. CFA's Opening Brief at 29-31. As for the *Undercurrent News* data, the agency's conclusion that they reflect broad market averages and are reliable is undermined by the lack of information regarding the volume of trade represented and the number and location of farmers surveyed, as well as by *Undercurrent News*'s

Ct. No. 22-00125

refusal to explain its data collection methods. *Id.* at 27-29. Beyond this, *Undercurrent News* data bear indicia of irregular collection and unreliability. *Id.*; *see also* Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Initial Comments and Factual Information in Advance of Commerce's Preliminary Results of Review* (Aug. 3, 2021), P.R. 358 at Exhibit 2, Appx____-____ ("CFA's Pre-Prelim. Cmts. & NFI"); Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Rebuttal Surrogate Factor Value Information* (May 24, 2021), P.R. 295-309 at Exhibit 3-B, Appx____-____.

Overall, DOC's analysis of the relative quality of Indian and Indonesian data to value the main FOPs did not support its selection of India as the primary surrogate country, and was otherwise unreasonable and unsupported by substantial evidence.

### b. DOC Erred in Valuing Labor and By-Products

The Government defends DOC's reliance on outdated Indian data for labor by arguing that (1) the agency has found Indian wage rate data reliable in the past, (2) CFA failed to exhaust its administrative

Ct. No. 22-00125

remedies regarding the percentage of normal value accounted for by labor, and (3) DOC has a preference for valuing labor in the primary surrogate country, even if that country's labor data are not contemporaneous. Government's Brief at 43-46. These arguments are unpersuasive.

As an initial matter, while DOC may have found Indian labor data reliable as a general matter in the past, this generalized assertion does not explain or support its reliance on data more than a decade old here. Second, there is no failure to exhaust. The Government faults CFA for not anticipating the grounds upon which DOC rejected CFA's arguments that Indian wage data were too non-contemporaneous and inadequately specific to be relied on here (*i.e.*, by explaining that labor accounted for a "miniscule" portion of normal value). *Id.* at 43-44; IDM at 56, Appx____.[2] But the exhaustion doctrine cannot reasonably be

_____

[2]   CFA's arguments regarding Indian labor data were detailed in its pre-preliminary comments and incorporated by reference into its case brief. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Case Brief of the Catfish Farmers of America, et al.* (Nov. 16, 2021), P.R. 421 at 26 n.90, Appx ____; *see also* CFA's Pre-Prelim. Cmts. & NFI at 23, Appx____. DOC duly treated these arguments as appropriately raised in the case brief and addressed them in the IDM. IDM at 45, Appx____.

Ct. No. 22-00125

stretched that far. CFA had, and took advantage of, its opportunity to argue to the agency as to why DOC should not use Indian labor data. It was not also required to anticipate DOC's as-yet unarticulated basis for rejecting that claim. Tellingly, the Government concedes that DOC erred in characterizing the portion of normal value represented by labor as "miniscule." Government's Brief at 45.

Finally, the Government argues that DOC's preference is to value labor in the primary surrogate country, even where labor data from the primary surrogate are not contemporaneous. *Id.* at 45-46. But as the Policy Bulletin explains, DOC does not simply default to the primary surrogate country to value all FOPs regardless of data quality. Rather, it seeks the "best available information" for each FOP, and relies on non-primary country data where it is of higher quality. 19 U.S.C. § 1677b(c)(1); *see also* Policy Bulletin. Contemporaneity is, of course, one of the hallmarks of data quality. *See, e.g.*, *Bristol Metals*, 34 CIT at 481, 703 F. Supp. 2d at 1374.

DOC's 2011 rule regarding labor valuation is not to the contrary, despite the Government's implication. Government's Brief at 45. DOC did not state there that it was adopting a policy of relying on labor data

26

Ct. No. 22-00125

from the primary surrogate country even where more contemporaneous and/or specific data were available. *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Dep't Commerce June 21, 2011). Rather, it stated that it was abandoning a practice whereby it uniformly valued labor using a basket of wage data from multiple countries. *Id.* In so doing, it indicated that its intention was to value labor in the way that it values other FOPs. *Id.*

The case law that the Government cites is likewise non-dispositive. Government's Brief at 45-46. While the court may have affirmed reliance on non-contemporaneous labor rates in other cases, it did so based on the specific facts underlying, and the arguments raised in, those cases. Relevantly, this court has previously remanded DOC's reliance on the same outdated Indian wage rate data that is at issue here. Slip Op. 22-38 at 48-49. Those data were even more outdated two reviews later.

With respect to by-products, the defense repeats DOC's explanations that it had no reason to believe that the market value of by-products depends on species, and that it had previously relied on import

27

Ct. No. 22-00125

statistics to value by-products. *Compare* Government's Brief at 42, *with* IDM at 56, Appx____. But the agency disfavors non-specific data. *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304 (Ct. Int'l Trade 2018). Indeed, "specificity" is an important consideration in selecting surrogate values 19 U.S.C. § 1677b(c)(1)(B); *see, e.g.*, *Bristol Metals*, 34 CIT at 481, 703 F. Supp. 2d at 1374. Further, in valuing *pangasius* by-products based on import statistics in past segments of the proceeding, DOC selected statistics that were specific to the protein content of NTSF's fish oil and meal. *NTSF Seafoods Joint Stock Co. v. United States*, No. 19-00063, slip op. 21-121 at 14 (Ct. Int'l Trade Sept. 20, 2021). DOC's reliance here on by-product values that were not specific to NTSF's by-products thus remains inadequately supported and explained.

   As with its analysis of the relative quality of Indian and Indonesian data to value the main FOPs, DOC's analysis regarding labor and by-products did not support its selection of India as the primary surrogate country, and was otherwise unreasonable and unsupported by substantial evidence.

28

Ct. No. 22-00125

    *c.  DOC Did Not Appropriately Assess the Relative Merits of the Indonesian and Indian Data*

Finally, the Government argues that DOC was not required to assess the relative merits of the Indian and Indonesian data, while the Intervenors argue that Indonesian data was inferior to Indian data. Government's Brief at 46-48; Intervenors' Brief at 7-8.

The Government argues that the relative quality of the Indonesian and Indian data is irrelevant so long as only one of the two countries is properly deemed economically comparable with Vietnam. Government's Brief at 46-48. But this argument presumptively treats the agency's surrogate country list as definitive of comparability, and Indonesia's GNI as not comparable with Vietnam's. *See id.* Both presumptions, of course, are very much in doubt. Moreover, given that DOC explicitly found that India provided "superior" data in the preliminary results, IDM at 52, Appx____, the agency could not logically treat the question of data superiority as irrelevant here.

With respect to their argument that Indonesian data has "major shortcomings," Intervenors point to no explanation or support adduced by DOC itself. Intervenors' Brief at 7-8. Rather, they provide their own characterization of information that they submitted for the record. But

Ct. No. 22-00125

the agency's decision can only be affirmed based on the agency's articulation thereof. *See, e.g.*, *Ultratec*, 872 F.3d at 1274. As such, there is no basis for the Court to consider these arguments at this time.

    4.  <u>Conclusion</u>

DOC's selection of the primary surrogate country, as well as its use of Indian data to value specific FOPs, was flawed. The agency did not adequately explain or support its determination that Indonesia is not economically comparable with Vietnam. Its determination that India is a significant producer of identical or comparable goods is similarly flawed. Finally, the agency's reliance on Indian data to value specific FOPs is inadequately explained and supported. As such, the Court should remand DOC's determination of the primary surrogate country, as well as its reliance on Indian data to value whole live fish, feed, fingerlings, labor, and by-products, for further consideration.

**B. <u>The Margin for Green Farms Should Be Remanded</u>**

DOC's erroneous surrogate country and surrogate value selection processes affected its calculation of NTSF's margin. The margin for Green Farms was based in part on NTSF's margin. As such, along with remanding the surrogate country/values selections and their effects for

Ct. No. 22-00125

NTSF's margin, the Court should remand the determination of Green Farms' margin as well.

The defense argues that no remand is necessary because DOC appropriately selected India as its primary surrogate country and appropriately relied on Indian FOPs generally and to value specific inputs such as whole live fish. Government's Brief at 59; Intervenors' Brief at 9-10. The defense is incorrect on these points, as discussed above and CFA's opening brief. *See, e.g.*, CFA's Opening Brief at 10-35. Notably, the defense makes no claim that a remand of Green Farms' margin would be inappropriate should the Court remand DOC's surrogate country and surrogate value selections. Government's Brief at 59; Intervenors' Brief at 9-10. As such, the Court should remand the determination of Green Farms' margin alongside the determination of the margin for NTSF.

## III.   <u>CONCLUSION</u>

For the reasons discussed above and in its opening brief, CFA respectfully submits that the Court should remand DOC's Final Results in the 2019-2020 administrative review of the antidumping duty order

Ct. No. 22-00125

covering certain frozen fish fillets from Vietnam for further

consideration.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of
America, et al.*

Dated: March 10, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies

that this brief complies with the word limitation requirement. The word

count for Plaintiffs' Reply Brief, as computed by Wiley Rein LLP's word

processing system (Microsoft Word 2021), is 5,943 words.

*/s/ Nazak Nikakhtar*
(Signature of Attorney)

<u>Nazak Nikakhtar</u>
(Name of Attorney)

The Catfish Farmers of America and individual U.S. catfish processors
America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select
Catfish, Inc., Consolidated Catfish Companies, LLC
d/b/a Country Select Catfish, Delta Pride Catfish, Inc.,
Guidry's Catfish, Inc., Heartland Catfish Company,
Magnolia Processing, Inc. d/b/a Pride of the Pond, and
<u>Simmons Farm Raised Catfish, Inc.</u>
(Representative Of)

<u>March 10, 2023</u>
(Date)