# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
                                    )
GREEN FARMS SEAFOOD JOINT           )
STOCK COMPANY,                      )
               Plaintiff,   )
                                    )
    v.                            )
                                    )
UNITED STATES,                      )        Court No. 22-00092
             Defendant,       )
                                    )
    and                           )
                                    )
CATFISH FARMERS OF AMERICA,         )
*et al.*,                           )
           Defendant-Intervenors.    )
_____)
                                    )
CATFISH FARMERS OF AMERICA,         )
*et al.*,                           )
            Plaintiffs,     )
                                    )
    v.                            )        Court No. 22-00125
                                    )
UNITED STATES,                      )        Final Version
             Defendant,       )
                                    )
    and                           )
                                    )
NAM VIET CORPORATION, *et al.*,     )
           Defendant-Intervenors.    )
_____)

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director


REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
HENDRICKS VALENZUELA
Of Counsel                         KARA M. WESTERCAMP
Office of the Chief Counsel        Trial Counsel
 for Trade Enforcement & Compliance U.S. Department of Justice
 U.S. Department of Commerce       Civil Division
Hendricks.Valenzuela@trade.gov     Commercial Litigation Branch
                                   P.O. Box 480
                                   Ben Franklin Station
                                   Washington D.C.  20044
                                   Tel: (202) 305-7571
                                   Fax: (202) 514-8640


April 20, 2023                     Attorneys for Defendant

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...............................................3

    I.    Administrative Determination Under Review ......................3

    II.   Statement Of The Issues ........................................................3

STATEMENT OF FACTS ...................................................................4

    I.    Initiation Of Administrative Review And Preliminary Results ...............................................................................4

    II.   Final Results ...........................................................................10

SUMMARY OF ARGUMENT ...........................................................11

ARGUMENT .....................................................................................12

    I.    Standard Of Review ...............................................................12

    II.   Non-Market Economy Legal Framework...........................14

        A.    Surrogate Country Selection ........................................15

        B.    Selection Of Surrogate Values Factors Of Production ....................................................................17

    III.  Legal Framework For Separate Rates ..................................20

    IV.  Substantial Evidence Supports Commerce's Selection Of India As Primary Surrogate Country And Use Of Indian Surrogate Values ................................................................23

        A.    Commerce Reasonably Determined That India Is Economically Comparable To Vietnam Based Upon Its Surrogate Country Selection Policy ..............................23

i

B. Commerce Reasonably Determined That India Is A Significant Producer Of Comparable Merchandise.....31

C. Commerce Reasonably Found That The Indian Data Were The Best Available Information On The Record To Value The Factors Of Production............................36

 1. The Indian Data Were The Best Available Information To Value The Main Inputs .............37

 2. The Indian Data Were The Best Available Information To Value By-Products And Labor, And CFA Failed To Exhaust Its Administrative Remedies With Respect To The Labor Surrogate Value ..................................................................41

 3. Substantial Evidence Supports Commerce's Determination That The Indian Data Was The Best Available ....................................................46

V. Commerce's Determination To Grant ESS A Separate Rate Is Supported By Substantial Evidence And In Accordance With Law ................................................................49

VI. Commerce's Methodology For Calculating Green Farms's Separate Rate, Pursuant To 19 U.S.C. § 1673(c)(5)(B), Is Supported By Substantial Evidence And In Accordance With Law ................................................................57

CONCLUSION ........................................................65

ii

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(S)**

*Albemarle Corp. & Subsidiaries v. United States*,
   821 F.3d 1345 (Fed. Cir. 2016) ..................................................... passim

*AMS Assocs. v. United States*,
   719 F.3d 1376 (Fed. Cir. 2013) ..................................................... passim

*Bosun Tools Co. v. United*,
   2022 WL 94172 (Fed. Cir. Jan. 10, 2022) .......................................... 61

*Calgon Carbon Corp. v. United States*,
   190 F. Supp. 3d 1224 (Ct. Int'l Trade 2016) ...................................... 35

*Catfish Farmers of Am. v. United States*,
   641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) ...................................... 19

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*,
   467 U.S. 837 (1984) .............................................................................. 13

*Clearon Corp. v. United States*,
   711 F. App'x 648 (Fed. Cir. 2018).................................................. 26, 27

*Clearon Corp. v. United States*,
   Ct. No. 13-00073, 2016 WL 6892556 (Ct. Int'l Trade 2016).............. 26

*Coalition of Fair Trade in Garlic v. United States*,
   437 F.Supp.3d 1347 (Ct. Int'l Trade 2020) .......................................... 4

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938) .............................................................................. 13

*Consolo v. Federal Maritime Comm'n*,
   383 U.S. 607 (1966) .............................................................................. 13

iii

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007) .................................................... 44, 45

*Diamond Sawblades Mfrs. Coalition v. United States*,
866 F.3d 1304 (Fed. Cir. 2017) ........................................................ 21

*Dorbest Ltd. v. United States*,
462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ..................................... 32

*Fresh Garlic Producers Ass'n v. United States*,
121 F. Supp. 3d 1307, 1316 (Ct. Int'l Trade 2015) ............................ 35

*Fujian Lianfu Forestry Co., Ltd. v. United States*,
638 F. Supp. 2d 1325 (Ct. Int'l Trade 2009) ..................................... 16

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) .......................................................... 12

*Guangdong Chems. Imp. & Exp. v. United States*,
460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006) ................................. 18, 49

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*,
28 C.I.T. 1185 (2004)....................................................................... 19

*Heze Huayi Chem. Co., Ltd. v. United States*,
532 F. Supp. 3d 1301 (Ct. Int'l Trade 2021) ..................................... 35

*Heze Huayi Chemical Co., Ltd. v. United States*,
2018 WL 2328183 (Ct. Int'l Trade May 22, 2018) ............................. 46

*Home Meridian Int'l, Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014) ........................................................ 18

*Itochu Bldg. Prods. v. United States*,
733 F.3d 1140 (Fed. Cir. 2013) ........................................................ 45

*Jacobi Carbons AB v United States*,
313 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ................................. 26, 31

*Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*,
   396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019) ...................................... 46

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
   822 F.3d 1289 (Fed. Cir. 2016) .................................................. passim

*Jiaxing Brother Fastener Co. v. United States*,
   11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ........................................ 20

*Juangcheng Kangtai Chem. Co., Ltd. v. United States*,
   Slip Op. 15-93, 2015 WL 4999476 (Ct. Int'l Trade Aug. 21, 2015) .... 27

*Michaels Stores, Inc. v. United States*,
   766 F. 3d 1388 (Fed. Cir. 2014) ...................................................... 20

*Nation Ford Chem. Co. v. United States*,
   166 F.3d 1373 (Fed. Cir. 1999) ........................................................ 14

*National Nail Corp. v. United States*,
   279 F. Supp. 3d 1372 (Ct. Int'l Trade 2018) ......................... 22, 50, 53

*Navneet Publications (India) Ltd. v. United States*,
   999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) ...................................... 63

*Nippon Steel Corp. v. United States*,
   458 F. 3d 1345 (Fed. Cir. 2006) .................................................. 12, 13

*NTSF Seafoods Joint Stock Co. v. United States*,
   Slip Op. 22-38, 2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022).... 15,
   29, 36, 41

*PAM, S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009) ........................................................ 13

*Paul Muller Industrie GmbH & Co. v. United States*,
   502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) ...................................... 45

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) .................................................... 18, 38

*Qingdao Taifa Group Co. v. United States*,
    637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ..................................... 52

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ........................................................ 18

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ........................................................ 45

*Shandong Huarong General Group v. United States*,
    27 C.I.T. 1568 (Ct. Int'l Trade 2003) ............................................... 53

*Sigma Corp. v. United States*,
    117 F.3d 1401 (Fed. Cir. 1997) .......................................... 20, 21, 22, 57

*Solianus Inc. v. United States*,
    391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) ..................................... 59

*Torrington Co. v. United States*,
    82 F.3d 1039 (Fed. Cir. 1996) ........................................................ 14

*Tri Union Frozen Products, Inc. v. United States*,
    163 F. Supp. 3d 1255, 1275 n.14 (Ct. Int'l Trade 2016),
    *aff'd*, 741 F. App'x 801 (Fed. Cir. 2018) ..................................... 28, 29

*United States v. Great Am. Ins. Co. of New York*,
    738 F.3d 1320 (Fed. Cir. 2013) .......................................................... 4

*Vinh Hoan Corp. v. United States*,
    49 F. Supp. 3d 1285) (Ct. Int'l Trade 2015) ..................................... 48

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d. 1370 (Fed Cir. 2013) .................................................... 59, 61

*Yantai CMC Bearing Co. v. United States,*
203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ...................................... 22

*Yantai Xinke Steel Structure Co. v. United States,*
36 C.I.T. 1035 (Ct. Int'l Trade 2012) .................................................... 52

*Zenith Radio Corp. v. United States,*
437 U.S. 443 (1978) ............................................................................ 14

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,*
652 F.3d 1333 (Fed. Cir. 2011) .......................................................... 19

## <u>STATUTES</u>

19 U.S.C. § 1516a(b)(1)(B) .................................................................. 12

19 U.S.C. § 1673 .................................................................................. 14

19 U.S.C. § 1673(c)(5)(B) ........................................................ 12, 56, 57

19 U.S.C. § 1673d(c)(5) ...................................................................... 57

19 U.S.C. § 1673d(c)(5)(A) ............................................................ 57, 60

19 U.S.C. § 1673d(c)(5)(B) ...................................................... 9, 12, 58, 59

19 U.S.C. § 1677b(c)(1) .......................................................... 14, 15, 17, 37

19 U.S.C. § 1677b(c)(4) ................................................................. passim

19 U.S.C. § 1677b(c)(4)(B) ............................................................ 31, 33

## <u>REGULATIONS</u>

19 C.F.R. § 351.107(d) ........................................................................ 50

19 C.F.R. § 351.309(c)(2) .................................................................... 44

19 C.F.R. § 351.408(c)(2) .................................................................. 19, 47

## ADMINSTRATIVE DETERMINATIONS

*Diamond Sawblades from China*,
   71 Fed. Reg. 29,303 (Dep't of Commerce May 22, 2006) ................... 22

*Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*,
   76 Fed. Reg. 36,092 (Dep't of Commerce June 21, 2011) ............ 19, 46

*Certain Preserved Mushrooms from the People's Republic of China*,
   77 Fed. Reg. 55,808 (Dep't of Commerce Sept. 11, 2012) .................. 18

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) ................... 30

*Initiation of Antidumping and Countervailing Duty Administrative Review*,
   85 Fed. Reg. 63,081 (Dep't of Commerce Oct. 6, 2020) ................. 5, 51

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
   86 Fed. Reg. 36,102 (Dep't of Commerce July 8, 2021) ..................... 30

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   86 Fed. Reg. 50,698 (Dep't of Commerce Sept. 10, 2021) ................ 5, 9

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
   87 Fed. Reg. 15,912 (Dep't of Commerce Mar. 21, 2022) ......... 3, 10, 11

H.R. Rep. No. 103-316, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199 (1994) ................................................................................................ 54, 58

# GLOSSARY

AFA:                    Adverse Facts Available

CFA:                    Catfish Farmers of America, *et al.*

DOTASEAFOOD:            Seafood Joint Stock Company No. 4 Branch
                        Dongtam Fisheries Processing Company

ESS:                    East Sea Seafoods Joint Stock Company

GNI:                    Gross National Income

IDM:                    Issues and Decision Memorandum

PDM:                    Preliminary Decision Memorandum

SAA:                    Statement of Administrative Action

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____ )
GREEN FARMS SEAFOOD JOINT                                )
STOCK COMPANY,                                                        )
               Plaintiff,                               )
                                )
     v.                                                                  )
                                )
UNITED STATES,                                                          )     Court No. 22-00092
               Defendant,                           )
                                )
     and                                                                 )
                                )
CATFISH FARMERS OF AMERICA,                              )
*et al.*,                                                                   )
               Defendant-Intervenors.       )
_____)
                                )
CATFISH FARMERS OF AMERICA,                              )
*et al.*,                                                                   )
               Plaintiffs,                             )
                                )
     v.                                                                  )     Court No. 22-00125
                                )
UNITED STATES,                                                          )
               Defendant,                           )
                                )
     and                                                                 )
                                )
NAM VIET CORPORATION, *et al.*,                          )
               Defendant-Intervenors.       )
_____)

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response in opposition to the Rule 56.2 motions for judgment on the agency record filed by plaintiffs, Catfish Farmers of America, America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, CFA), ECF No. 37 (CFA Br.), and Green Farms Seafood Joint Stock Company (Green Farms), ECF No. 29 (Green Farms Br.), challenging certain aspects of the United States Department of Commerce's (Commerce) final results in the 17th administrative review of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam (Vietnam).  For the reasons explained below, we respectfully request that the Court sustain the final results because they are supported by substantial evidence and are otherwise in accordance with law.

2

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is the final results in the 17th administrative review of the antidumping duty order covering certain frozen fish fillets from Vietnam.  *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg. 15,912 (Dep't of Commerce Mar. 21, 2022) (final results) (P.R. 447), Appx1092-1095,[1] and accompanying Issues and Decision Memorandum (Dep't of Commerce Mar. 9, 2022) (IDM) (P.R. 444), Appx1035-1091.  The period of review is August 1, 2019, through July 31, 2020.

### II.    Statement Of The Issues[2]

1.    Whether Commerce's selection of India as the primary

---

[1]  Citations to the public record "P.R.___" and confidential record "C.R. ___" refer to the underlying administrative review record.

[2]  Because CFA did not address multiple counts of its complaint, Compl., ECF No. 9, the Court should deem these issues waived. Specifically, CFA did not address Count One, challenging Commerce's refusal to apply adverse facts available to NTSF Seafoods Joint Stock Company (NTSF); Counts Two and Three, challenging Commerce's acceptance of various values in NTSF's reporting; and Count Five, challenging Commerce's refusal to collapse Nam Viet Corporation

surrogate country and use of Indian surrogate data to calculate normal

value is supported by substantial evidence and in accordance with law.

2.     Whether CFA failed to exhaust its administrative remedies

with respect to Commerce's labor surrogate value determination.

3.     Whether Commerce's determination to grant mandatory

respondent East Sea Seafoods Joint Stock Company (ESS) a separate

rate and assign its rate based on total adverse facts available (AFA) is

supported by substantial evidence and in accordance with law.

4.     Whether Commerce's method for calculating the separate

rate assigned to Green Farms is supported by substantial evidence and

in accordance with law.

## STATEMENT OF FACTS

I.     <u>Initiation Of Administrative Review And Preliminary Results</u>

Following requests by interested parties, on October 6, 2020,

Commerce initiated the 17th administrative review of the antidumping

_____

(NAVICO) with another company under review.  *See id.* at 5-6.  "It is
well established that arguments that are not appropriately developed
in a party's briefing may be deemed waived."  *United States v. Great
Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013); *accord
Coalition of Fair Trade in Garlic v. United States*, 437 F.Supp.3d 1347,
1358 (Ct. Int'l Trade 2020).  As such, we do not address these issues.

4

duty order covering certain frozen fish fillets from Vietnam, and selected ESS and NTSF Seafoods Joint Stock Company (NTSF) as mandatory respondents. *See Initiation of Antidumping and Countervailing Duty Administrative Review*, 85 Fed. Reg. 63,081 (Dep't of Commerce Oct. 6, 2020), Appx7672-7685; Respondent Selection Memo (P.R. 112; C.R. 83), Appx2711-2717. Bien Dong Seafood Company Limited, ESS, Green Farms, NTSF, and Vinh Hoan Corporation requested separate rate status, and numerous other companies filed no-shipment certifications. *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 86 Fed. Reg. 50,698 (Dep't of Commerce Sept. 10, 2021) (preliminary results) (P.R. 400), Appx1031-1034, and accompanying Preliminary Decision Memorandum (Dep't of Commerce Aug. 31, 2021) (PDM) at 2 (P.R. 385), Appx1000-1030.

ESS and NTSF both timely responded to Commerce's initial non-market economy questionnaire. PDM at 3, Appx1002. In its initial response, ESS identified two suppliers, from which Commerce then requested factors of production information. *Id.* "Supplier 2" responded that it did not sell the subject merchandise to ESS during, or prior to,

the period of review. [3]  *Id.*; *see also* Supplier 2 Letter Responding to Clarification Request (Apr. 15, 2021) (P.R. 182; C.R. 146), Appx4588-4594.

Commerce thereafter issued a supplemental questionnaire to ESS explicitly relating to the statements it had made regarding its suppliers. PDM at 3, Appx1002.  As part of that supplemental questionnaire, Commerce stated that failure to provide the requested information may result in application of facts available with adverse inferences in determining ESS's dumping margin.  *Id.* at 3-4, Appx1002-1003; *see also* Commerce Supplier Clarification Letter (Apr. 19, 2021) (P.R. 187; C.R. 148), Appx4595-4596.  ESS failed to respond to this clarification request.  PDM at 4, Appx1003.

Commerce also examined the separate rate applications and certifications it received from Green Farms, ESS, and NTSF.[4]  PDM at 11, Appx1010.   In the preliminary results, Commerce determined that

---

[3] The supplier's identity is business proprietary information.  As such, Commerce refers to the supplier throughout the IDM as "Supplier 2."  *See* IDM at 26 n.164, Appx1060.

[4] Commerce did not perform a separate rate analysis for Bien Dong and Vinh Hoan because the review request for each of the two entities was timely rescinded from the review.

substantial evidence supported a finding of both *de jure* and *de facto*
absence of government control for NTSF, ESS, and Green Farms. *Id.* at
11-12, Appx1010-1011. As such, Commerce preliminarily determined
that these companies were eligible for a separate rate. *Id.* With respect
to ESS, Commerce explained that the company had provided adequate
responses as it related to its independence from the Vietnamese
government and separate rate eligibility, even though the company
ceased its participation after it had submitted this evidence. *Id.* at 12,
Appx1011 (acknowledging that ESS submitted initial responses to
Commerce's Sections A, C, and D questionnaires). Commerce
preliminarily determined that "{b}ecause ESS's noncooperation related
directly to information necessary to calculate a dumping margin, but
did not call into question the company's separate rate reporting," it was
appropriate to apply "AFA in the assignment of a dumping margin to
ESS{.}" *Id.*

Regarding the selection of a primary surrogate country, Commerce
identified Bolivia, Egypt, Honduras, India, Morocco, and Nicaragua as
countries that are at the same level of economic development as
Vietnam based on per capita 2019 gross national income (GNI) data.

*Id.* at 4, Appx1003; *see also* Surrogate Country List (P.R. 170), Appx7798-7802.  In the preliminary results, Commerce explained that its general practice is to select a surrogate country that is at the same level of economic development as the subject non-market economy country unless it is determined that none of the countries are viable options.  PDM at 13, Appx1012.  Further, "{s}urrogate countries that are not at the same level of economic development as the {non-market economy} country, but still at a level of economic development comparable to the {non-market economy} country, are selected only to the extent that data considerations outweigh the difference in levels of economic development." *Id.*

Commerce received comments from CFA and NTSF regarding the selection of a primary surrogate country and surrogate values for use in valuing the respondents' factors of production.  *Id.* at 4, Appx1003.  CFA commented that Commerce should rely on surrogate values from Indonesia and provided surrogate value information for Indonesia and India.  *Id.* at 14, Appx1013.  NTSF commented that Commerce should rely on India as the surrogate country and provided Indian surrogate value data.  *Id.*  Commerce preliminarily selected India as the primary

8

surrogate country because (1) India was at the same level of economic

development as Vietnam, whereas Indonesia was not, (2) India was also

a significant producer of merchandise comparable to subject

merchandise, and (3) India provided usable and reliable data to value

factors of production. *Id.* at 14-16, Appx1013-1015.

Commerce preliminarily calculated a dumping margin for NTSF of

$0.00 per kilogram and assigned a dumping margin using adverse

inferences in selecting from among the facts otherwise available

(applied total AFA) to ESS of $3.87 per kilogram, the highest margin

computed in a separate segment of this proceeding. *Preliminary*

*Results*, 86 Fed. Reg. at 50,700, Appx1033.  In determining the

dumping margin for Green Farms, Commerce explained that it followed

the guidance provided by 19 U.S.C. § 1673d(c)(5)(B).  PDM at 12,

Appx1011.  Because NTSF's dumping margin is zero and ESS's

dumping margin was based on total AFA, it preliminarily assigned

Green Farms a dumping margin equal to the simple average of NTSF's

and ESS's dumping margins, which equated to $1.94 per kilogram.  *Id.*;

*Preliminary Results*, 86 Fed. Reg. at 50,700, Appx1033.

Subsequently, Commerce received timely administrative case and rebuttal briefs from CFA, Colorado Boxed Beef Company (CBBC), Green Farms, NAVICO, and NTSF.  IDM at 2, Appx1036.

II.   Final Results

On March 21, 2022, Commerce published its final results, and continued to determine that it was appropriate to use India as the primary surrogate country because it was at the same level of economic development as Vietnam, a significant producer of merchandise comparable to the subject merchandise, and provided reliable data with which to value the factors of production.  *Id.* at 41-57, Appx1075-1091. Accordingly, Commerce calculated the normal value using Indian surrogate value data to value NTSF's factors of production, with the exception of boat freight, for which it used Indonesian data because the record did not have usable Indian surrogate data for this minor input. *Id.*  Commerce calculated a final dumping margin for NTSF of $0.00 per kilogram.  *Final Results*, 87 Fed. Reg. at 15,913, Appx1093.

Commerce also continued to determine that ESS and Green Farms are eligible for a separate rate.  IDM at 26-31, Appx1060-1065. Commerce continued to assign ESS a dumping margin using total AFA,

10

resulting in a $3.87 per kilogram margin for ESS.  *Id.* at 30, Appx1064.

Moreover, Commerce continued to determine that it was appropriate to

calculate a separate rate for Green Farms by using a simple average of

the $0.00 per kilogram margin for NTSF and $3.87 per kilogram total

AFA margin for ESS, the two mandatory respondents in this review.

*Id.* at 34-36, Appx1068-1070.  Thus, Commerce assigned Green Farms

the separate rate of $1.94 per kilogram.  *Id.* at 36, Appx1068; *Final

Results*, 87 Fed. Reg. at 15,913, Appx1093.

## SUMMARY OF ARGUMENT

Commerce's final determination is supported by substantial

evidence and in accordance with law.  First, substantial evidence

supports Commerce's selection of India as the primary surrogate

country because India is at a level of economic development comparable

to Vietnam, is a significant producer of comparable merchandise, and

the Indian data on the record offers surrogate value information that

satisfies Commerce's selection criteria.  The Court should reject CFA's

various arguments in opposition that Commerce erred in selecting India

as the primary surrogate country because they do not undermine nor

detract from Commerce's determination.

Second, Commerce's determination that ESS is eligible for separate rate status is supported by substantial evidence and in accordance with law.  Contrary to Green Farms's arguments, Commerce reasonably explained its analysis to focus on whether ESS provided adequate information as it relates to its separate rate status.

Finally, Commerce's selection of Green Farms's margin is supported by substantial evidence and in accordance with law. Pursuant to 19 U.S.C. § 1673(c)(5)(B), Commerce used "any reasonable method," which, in this case, was to use the simple average of ESS's AFA margin and NTSF's zero margin.  Further, Green Farms's argument that the calculated margin is not reflective of economic reality, is without merit.

<u>ARGUMENT</u>

I.   <u>Standard Of Review</u>

In reviewing Commerce's antidumping or countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in

accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F. 3d 1345, 1352 (Fed. Cir. 2006) (citation omitted). That is because "{s}ubstantial evidence" is defined as "more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The Court must affirm the agency's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusion. *Nippon Steel*, 458 F.3d at 1352. Even if it is possible to draw two inconsistent conclusions from the evidence contained in the record, this does not mean that Commerce's findings are not supported by substantial evidence. *Id.*; *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

In reviewing whether Commerce's actions are in accordance with law, the Court relies upon the two-step test articulated by the Supreme

13

Court in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).  In the first step, the Court determines "whether Congress has directly spoken to the precise question at issue" and clearly expressed its purpose and intent in the governing statute. *Id.* at 842-43.  If the statute is silent, then the Court must assess whether Commerce's interpretation achieves a "sufficiently reasonable" interpretation of the statute. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450-51 (1978) (citations omitted).  "Any reasonable construction of the statute is a permissible construction." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

II.   Non-Market Economy Legal Framework

The antidumping duty margin represents the amount by which the "normal value" of subject merchandise exceeds its "export price."  19 U.S.C § 1673.  If the proceeding involves products from a non-market economy and Commerce determines that available information does not permit a standard normal value calculation, then Commerce determines normal value on the basis of surrogate values for "the factors of production utilized in producing the merchandise" plus "an amount for general expenses and profit plus the cost of containers, coverings, and

other expenses." *Id.* § 1677b(c)(1).  This statutory scheme "construct{s}

a hypothetical market value" of the subject merchandise in the non-

market economy.  *Nation Ford Chem. Co. v. United States*, 166 F.3d

1373, 1375 (Fed. Cir. 1999).

    A.   <u>Surrogate Country Selection</u>

Commerce values a respondent's factors of production based on

"the values of such factors in a market economy country or countries

considered to be appropriate{.}"  19 U.S.C. § 1677b(c)(1).  The statute

mandates that Commerce shall, to the extent possible, use the best

available information from a market economy country or countries that

are at a level of economic development comparable to the non-market

economy and are significant producers of comparable merchandise.  *Id.*

§ 1677b(c)(4).  However, this statutory scheme leaves many questions

unanswered and does not specify on what basis Commerce may make

this determination.  *NTSF Seafoods Joint Stock Co. v. United States*,

Slip Op. 22-38, 2022 WL 1375140, at *11 (Ct. Int'l Trade Apr. 25, 2022);

*see also Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289,

1293 (Fed. Cir. 2016) ("The statute does not define 'comparable'; nor

does it require Commerce to use any particular methodology in

determining which countries are sufficiently comparable.")

As a result, Commerce has developed a four-step sequential surrogate country selection process that is guided by Policy Bulletin 04.1[5] and case law.  Under the first two steps, Commerce (1) compiles a list of countries at the same level of economic development to the country under review and (2) determines which among them, if any, produce comparable merchandise.  *See* PDM at 13-15, Appx1012-1014; *see also* Policy Bulletin 04.1.  Commerce's long-standing practice is to rely on GNI data for purposes of identifying countries at a level of economic development comparable to the non-market economy whose products are under review.  PDM at 13, Appx1012; *see also Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325, 1347-50 (Ct. Int'l Trade 2009).  Specifically, Commerce uses such data to identify a subset of countries that are at the same level of economic development.

---

[5] *See* Enforcement and Compliance's Policy Bulletin No. 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004) (Policy Bulletin 04.1), available at https://enforcement.trade.gov/policy/bull04-1.html.

Commerce next determines which of these countries, if any, produce significant amounts of comparable merchandise. PDM at 14-15, Appx1013-1014. Finally, if more than one potential country satisfies the steps above, Commerce evaluates the reliability and availability of the data from those countries, and "the country with the best factors data is selected as the primary surrogate country." Policy Bulletin 04.1 at 4; PDM at 15, Appx1014.

B. <u>Selection Of Surrogate Values Factors Of Production</u>

By statute, Commerce ultimately must select the "best available information" on the record to value the factors of production. *Jiaxing Bro.*, 822 F.3d at 1293 (citing 19 U.S.C. § 1677b(c)(1)). "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). The data selected need not be perfect, *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014), and the statute "does not mandate that Commerce use any particular data source" in

17

reaching its determination.  *Guangdong Chems. Imp. & Exp. v. United States*, 460 F. Supp. 2d 1365, 1368-69 (Ct. Int'l Trade 2006).

In practice, Commerce strives to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and tax and duty exclusive.  Policy Bulletin 04:1; *Jiaxing Bro.*, 822 F.3d at 1293; *Certain Preserved Mushrooms from the People's Republic of China*, 77 Fed. Reg. 55,808 (Dep't of Commerce Sept. 11, 2012) (final admin. review), and accompanying IDM at 9.

Commerce's surrogate value choice is supported by substantial evidence if the data bear "a rational and reasonable relationship to the factor of production it represents." *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1191 (2004).  A reviewing court determines not whether "the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011); *see also Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("Where Commerce is faced with

18

the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable").

Finally, Commerce also has a regulatory preference to use as much data as possible from a single primary surrogate country. 19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 822 F.3d at 1294 n.3 (citing Policy Bulletin 04.1); *see also Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't of Commerce June 21, 2011) (*Labor Methodologies*) (finding that using the data on industry-specific wages from the primary surrogate country is the best approach for valuing the labor input in non-market economy antidumping duty proceedings). Commerce will resort to a secondary surrogate country if data from the primary surrogate country are "unavailable or unreliable." PDM at 13, Appx1012; *see also Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014) (citation omitted), *aff'd*, 822 F.3d 1289.

III.   Legal Framework For Separate Rates

In antidumping proceedings involving non-market economy
countries, Commerce has developed a longstanding practice which
presumes that all companies within a non-market economy country are
subject to government control over their export activities and should be
assessed a single antidumping duty rate. *AMS Assocs. v. United
States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013) (citing *Sigma Corp. v.
United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)); *see also Michaels
Stores, Inc. v. United States*, 766 F. 3d 1388, 1390 (Fed. Cir. 2014).
Under this presumption, which has been upheld repeatedly by the
United States Court of Appeals for the Federal Circuit, a respondent
receives the non-market economy country-wide rate unless it
*affirmatively* demonstrates an absence of both *de jure* and *de facto*
government control. *AMS Assocs.*, 719 F.3d at 1379.  If it does, and
only then, will it obtain its "entitlement to a separate, company-specific
margin." *Sigma Corp.*, 117 F.3d at 1405.  But if the company fails to
rebut the presumption of government control, it continues to receive
the single, country-wide, dumping rate. *See Diamond Sawblades Mfrs.
Coalition v. United States*, 866 F.3d 1304, 1311 (Fed. Cir. 2017).  That

is because, under Commerce's longstanding practice, the company

applying for a separate rate bears the burden to demonstrate that its

export activities are free from *de jure* and *de facto* government control.

*AMS Assocs.*, 719 F.3d at 1379-80.

Commerce's practice further allows a party to establish an

absence of *de jure* control by references to legislation and

governmental measures that demonstrate a company's legal

independence. *AMS Assocs.*, 719 F.3d at 1379. In evaluating whether

a company is free from *de jure* government control, Commerce

considers (1) whether there is an absence of restrictive stipulations

associated with the individual exporter's business and export licenses,

(2) the applicable legislative enactments decentralizing control of a

company, and (3) any other formal measures by the government

decentralizing control of a company. *Diamond Sawblades from China*,

71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) (final

admin. determ.).

A party may demonstrate the absence of *de facto* government

control by providing evidence that (1) the exporter sets its prices

independently of the government and other exporters, (2) negotiates

21

its own contracts, (3) keeps the proceeds of its sales (not including taxes), and (4) selects its management autonomously. *AMS Assocs.*, 719 F.3d at 1379 (citing *Sigma Corp.*, 117 F.3d at 1405); Policy Bulletin No. 05.1 at 1, *available at* http://enforcement.trade.gov/policy/bull05-1.pdf.

Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria. *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017). However, Commerce's analysis of whether a respondent is eligible for a separate rate is distinct from a determination that adverse facts available is justified. *Nat'l Nail Corp. v. United States*, 279 F. Supp. 3d 1372, 1377 (Ct. Int'l Trade 2018) (explaining that "this Court has consistently held that it is unreasonable for Commerce to impute the unreliability of a company's questionnaire responses and submission concerning its factors of production and/or U.S. sales to its separate-rate responses when there is no evidence on the record indicating that the latter were false, incomplete, or otherwise deficient" (internal citations omitted)).

22

IV.    Substantial Evidence Supports Commerce's Selection Of India As
       <u>Primary Surrogate Country And Use Of Indian Surrogate Values</u>

Substantial evidence supports Commerce's selection of India as the primary surrogate country because India is at the same level of economic development comparable to Vietnam, is a significant producer of comparable merchandise, and the Indian data on the record offers surrogate value information that satisfies Commerce's selection criteria. *See* IDM at 40-57, Appx1074-1091.   The Court should reject CFA's various arguments challenging Commerce's determination.  CFA Br. at 10-35.

A.    Commerce Reasonably Determined That India Is
      Economically Comparable To Vietnam Based Upon Its
      <u>Surrogate Country Selection Policy</u>

Commerce's selection of India as the primary surrogate country is in accordance with law and supported by substantial evidence.  Because Vietnam is a nonmarket economy, Commerce applied its practice, consistent with 19 U.S.C. § 1677b(c)(4), to identify a range of countries that are at a level of economic development comparable to Vietnam in terms of per capita GNI data and compiled a surrogate country list for this administrative review.  PDM at 13-14, Appx1012-1013; IDM at 41, Appx1075.  The list included Bolivia, Egypt, Honduras, India, Morocco,

23

and Nicaragua,[6] but did not include Indonesia.  Surrogate Country

Memo, Appx7798-7802; Policy Bulletin 04.1 at 2-3.

In the final results, Commerce explained why it rejected CFA's

argument that Indonesia was nonetheless economically comparable to

Vietnam, although it was not on the list.  For example, "with respect to

economic comparability, Indonesia's per-capita GNI of $4,050 is not at

the same level of economic development as Vietnam," which is "$2,540,

and the highest GNI reflected on the Surrogate Country List is Bolivia's

GNI of $3,530."  IDM at 43, Appx1077.  Indonesia's GNI is thus 59

percent greater than that of Vietnam's.  *See id.*

Although CFA argued that "Indonesia was closer to Vietnam in

terms of per-capita GNI in 2019 than it was in prior review periods in

which Commerce selected it as the primary surrogate," Commerce also

declined to use such relative measures of GNI comparison.  *Id.*  Rather,

Commerce explained that the "band of countries that Commerce

selected in this review, in absolute terms, represents a reasonable range

of countries, given the entire worldwide range of GNIs."  *Id.*  Commerce

---

[6] No interested party submitted information regarding Bolivia, Egypt, Honduras, Morocco, or Nicaragua.

also pointed out that it had previously "rejected the use of relative measures of GNI comparison." *Id.*

Regarding level of economic development, CFA does not contest that India is at a level of economic development comparable to Vietnam. CFA, however, disagrees with Commerce's analysis regarding Indonesia's level of economic development when compared to Vietnam. *See* CFA Br. at 13-17. Regardless, this argument is without merit because substantial evidence supports Commerce's determination that Indonesia, unlike India, was not at the same level of economic development, and thus, is less comparable to Vietnam. IDM at 43, Appx1077.

In identifying the range of countries at a level of economic development comparable to Vietnam, Commerce applied its court-affirmed practice of selecting from countries that are at the "same" level of economic development as Vietnam, as measured by per capita GNI. *See* Surrogate Country Memo, Appx7798-7802; *see also Jacobi Carbons AB v United States*, 313 F. Supp. 3d 1308, 1316 (Ct. Int'l Trade 2018); *Clearon Corp. v. United States*, Ct. No. 13-00073, 2016 WL 6892556, at *3 (Ct. Int'l Trade 2016), *aff'd*, *Clearon Corp. v. United States*, 711 F.

25

App'x 648 (Fed. Cir. 2018). If two countries are at the "same" level of economic development, the two countries will necessarily also be "comparable."

Although CFA argues that Commerce failed to explain how the range was "reasonable" and why the GNI band was "far narrower" than in past reviews, CFA Br. at 16, this argument rests upon perceived GNI relativity. But Commerce explained in the final results that, although Indonesia was closer to Vietnam in terms of per-capita GNI in 2019 than it had been in prior reviews in which Commerce selected Indonesia, that factor is not significant because Commerce has rejected the use of relative measures of GNI comparisons. IDM at 43, Appx1077. Commerce further explained that Indonesia's 2019 per-capita GNI of $4,050 is not at the same level of economic development as Vietnam's 2019 GNI of $2,540, and it also exceeded the highest GNI of $3,530 (Bolivia) reflected in the Surrogate Country List. *Id.* Therefore, Commerce reasonably determined that Indonesia is outside of the range and, thus, not at the same level of economic development as Vietnam. *Id.*; *see Juangcheng Kangtai Chem. Co., Ltd. v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *7-8 (Ct. Int'l Trade Aug.

26

21, 2015) (affirming Commerce's methodological discretion, recognizing that Commerce may "narrow a list of countries within a band for purposes of administrative feasibility").

CFA also argues that Commerce "could not simply wave away its past treatment of Indonesia as being appropriately economically comparable with Vietnam despite larger differences in the countries' respective GNIs," CFA Br. at 15, but in the final results, Commerce clarified that *neither* the statute nor Commerce's surrogate selection criteria require it to consider whether countries have been selected as primary surrogate countries in previous segments.  IDM at 43, Appx1077.

In addressing similar arguments in *Jiaxing Brothers Fastener Co., Ltd. v. United States*, the Federal Circuit explained, "Commerce is required to base surrogate country selection on the facts presented in each case, and *not* on grounds of perceived tradition."  822 F.3d at 1299 (emphasis added) (rejecting Jiaxing's argument that Commerce failed to explain why its practice changed when India had served as a surrogate country to China for nearly three decades, but was not included on the surrogate country list in that review).  As the Federal Circuit held,

although India had been on the surrogate country list in past reviews, it "discern{ed} nothing in the statute that requires Commerce to consider any particular country as a surrogate country." *Id.* at 1295, 1298. Similarly, in *Tri Union Frozen Products, Inc. v. United States*, although plaintiffs had argued "that Commerce can carry over its determination from other proceedings that Indonesia is economically comparable to Vietnam in this review" with respect to an anti-dumping duty order covering shrimp from Vietnam, the Court held that "the fact that Commerce selected Indonesia as the primary surrogate country in those proceedings does not detract from Commerce's surrogate country selection here." 163 F. Supp. 3d 1255, 1275 n.14 (Ct. Int'l Trade 2016), *aff'd*, 741 F. App'x 801 (Fed. Cir. 2018).

CFA also relies on this Court's opinion in *NTSF Seafoods*, which addressed the same issues regarding economic comparability in an earlier segment of the proceeding. CFA Br. at 14 (citing *NTSF Seafoods Joint Stock Co. v. United States*, Slip Op. 22-38, 2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022)). Nonetheless, that case is not dispositive because it remains pending a final decision from this Court following further explanation from Commerce on remand. *See Catfish Farmers of*

28

*America v. United States*, Court No. 20-105, Final Results of Redetermination Pursuant to Court Remand, ECF 75-1 (Aug. 23, 2022).

In any event, each segment of an antidumping proceeding, including subsequent administrative reviews under the same order, is an independent segment with a separate record "which lead to independent determinations." IDM at 43, Appx1077; *see Jiaxing Bro.*, 822 F.3d at 1299-1300. Indeed, Commerce explained that it did not "consider{} decisions in past segments of this case in considering whether Indonesia is at a level of economic development comparable to Vietnam for the purposes of this review," IDM at 43, Appx1077, and to support its determination in this case, it *also* did not consider that it had identified India as economically comparable in the two immediately preceding prior reviews. *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102 (Dep't of Commerce July 8, 2021) (final results) (Vietnam Fish AR16), and accompanying IDM at cmt. 3; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't of Commerce Apr. 29, 2020) (final results), and accompanying IDM at cmt. 2. So on the one hand, CFA argues that Commerce should look to past reviews when it had

29

determined that Indonesia was economically comparable, CFA Br. at 15-18, but ignores that in the past two administrative reviews—which are, admittedly, not yet final—Commerce determined that Indonesia was *not* economically comparable.  Commerce, appropriately, did not find *any* of the prior segments to be dispositive because neither 19 U.S.C. § 1677b(c)(4) "nor Commerce's surrogate country selection criteria include, or consider, whether countries have been selected as primary surrogate countries in previous segments{.}"  IDM at 43, Appx1077.

Therefore, Commerce reasonably determined that the record of this review did not demonstrate that Indonesia was at a level of economic development comparable to Vietnam, regardless of surrogate country decisions in past segments of this order.  *See id.*  More important, Commerce determined that India, a country on the surrogate country list, *was* at a level of economic development comparable to Vietnam *and* was a significant producer of comparable merchandise, as we explain below.  *Id.*

30

B.      Commerce Reasonably Determined That India Is A
        <u>Significant Producer Of Comparable Merchandise</u>

Substantial evidence also supports Commerce's determination

that India is a significant producer of comparable merchandise.  IDM at

47-49, Appx1081-1083.  The Court should reject CFA's arguments to the

contrary*.  See* CFA Br. at 18-23.

First, Commerce explained that neither 19 U.S.C. § 1677b(c)(4)(B)

"nor Commerce's regulations provide further guidance on what may be

considered comparable merchandise."  IDM at 47, Appx1081.  This

Court has affirmed that "{t}he statute does not require Commerce to

find a producer of identical merchandise, but rather a producer of

comparable merchandise."  *Dorbest Ltd. v. United States*, 462 F. Supp.

2d 1262, 1273 (Ct. Int'l Trade 2006) ("{c}omparable merchandise is a

broader category than the 'such or similar' merchandise comparison

which is usually used in antidumping investigations"); *see also* Policy

Bulletin 04.1.

In the final results, Commerce explained that it has found in prior

segments of this proceeding, "that the appropriate metric for

determining which countries are significant producers of comparable

merchandise is to examine which countries are significant producers of

frozen fish fillets." IDM at 47, Appx1081. Commerce explained that "although 'frozen fish fillets' represent a broader category than in-scope *pangasius* frozen fish fillets, the category is nonetheless comparable because it allows for the selection of surrogate financial ratios from producers of similar products with similar capital structures." *Id.*; *see also* Policy Bulletin 04:1 n.6 ("If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise").

Specifically, Commerce determined that India is a significant producer of comparable merchandise because it "exported 916,040 {kilograms} of frozen fish fillets," *i.e.*, comparable merchandise. IDM at 48, Appx1082; *see also* CFA Comment on Countries with Significant Production of Comparable Merchandise at Ex. 2 (P.R. 190). Commerce also cited record evidence indicating that India is a significant producer of identical merchandise, that is, *pangasius* fillets. IDM at 48 n.298, Appx1082 (citing NTSF Surrogate Value Submission at SV-5-A (*Fishing Chimes*, July 2019, page 40), Appx11,328-11,334) (explaining the status and trends of *Pangasius* farming, production, and marketing in India).

32

Thus, substantial evidence supports Commerce's determination that India is a significant producer of comparable merchandise within the meaning of 19 U.S.C. § 1677b(c)(4)(B).  IDM at 48, Appx1082.

Yet, CFA improperly attempts to narrow the requirement for what merchandise Commerce may determine is "comparable" to subject merchandise and argues that India has "lower quality" frozen fish fillets, whereas "Indonesian pangasius fillets compete with Vietnam's in global markets."  CFA Br. at 21.  However, as Commerce explained in the final results "there is no basis to presume that the quality/grade of merchandise exported from a potential surrogate country must be the same as that exported from Vietnam in order to be considered comparable merchandise for surrogate country selection."  IDM at 48, Appx1082.  Furthermore, "while various forms of subject merchandise are discussed in the scope, quality {and} grades are not mentioned" and are also "not considered as product characteristics in the control number (CONNUM) in this proceeding."  *Id.*  Thus, the Court should reject CFA's attempt to impose "quality standards" on Commerce's analysis of what product(s) constitute comparable merchandise.  *See id.*

Relatedly, in support for its contention that Indonesia is the only

possible significant producer of comparable merchandise, CFA argues

that India is not a "net exporter" of frozen fish fillets, and that the

relative size of production does not support selecting India as a

potential surrogate country.  CFA Br. at 19-22.

However, as Commerce explained, "the Policy Bulletin does not

indicate that a surrogate country must be a significant *exporter* of

*identical* merchandise (*i.e.*, frozen *pangasius hypophthalmus* fillets),

but rather, must be a significant *producer* of *comparable* merchandise

(*i.e.* frozen fish fillets {})."  IDM at 48, Appx1082 (emphasis in original);

*see also* Policy Bulletin 04:1.  CFA's definition of "significant producer,"

thus, is unduly narrow, because this Court has held that "Commerce's

interpretation of significant producer, which looked to whether the

country *exported* comparable merchandise, is reasonable."  *Calgon*

*Carbon Corp. v. United States*, 190 F. Supp. 3d 1224, 1243 n.25 (Ct.

Int'l Trade 2016) (emphasis added); *see also Heze Huayi Chem. Co.,*

*Ltd. v. United States*, 532 F. Supp. 3d 1301, 1312 (Ct. Int'l Trade 2021)

("Rather than adopting a single definition of 'significant producers,' this

court has recognized instead that 'Commerce identifies a significant

producer based on a totality of the circumstances, and makes its

34

decision concerning significance on a case-by-case basis.'") (citation omitted); *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1307, 1316 (Ct. Int'l Trade 2015) ("Because the Court has previously held, the phrase significant producer 'is not statutorily defined, and is inherently ambiguous,' the only question to be answered is whether Commerce's definition of significant producer is 'based on a permissible construction of the statute.'"). Again, Commerce explained that record evidence indicated that not only was India a significant producer of comparable merchandise, but that it also exported 916,040 kilograms of frozen fish fillets, which was "comparable merchandise." IDM at 48, Appx1082.

Finally, Commerce's analysis of whether a country is a significant producer of comparable merchandise is not based on the size of its production relative to that of the country under review. *Id.* at 49, Appx1083. Put another way, "just because India happens to have significant imports of comparable merchandise, that does not detract from the fact that India was a significant producer of the comparable merchandise in its own rights." *Id.* Although CFA argues that Indonesia's frozen fish fillet industry "is large and export-oriented" like

35

Vietnam, and consequently, Indonesian surrogate values "provide the best representation of the situation in Vietnam," CFA Br. at 23, this Court has previously rejected that interpretation of comparable merchandise.  Indeed, in the 16th administrative review of frozen fish fillets from Vietnam, the Court held that substantial evidence supported Commerce's determination that "India is *a* 'significant producer of comparable merchandise'{.}"  *NTSF Seafoods*, 2022 WL 1375140, at *13 (emphasis in original).

Accordingly, substantial evidence supports Commerce's determination that India is a significant producer of comparable merchandise.  IDM at 47-49, Appx1081-1083; *see also* 19 U.S.C. § 1677b(c)(4).

C.   Commerce Reasonably Found That The Indian Data Were The Best Available Information On The Record To Value The Factors Of Production

After examining the Indian data that the parties had placed on the record, Commerce reasonably found that the Indian data offered the best surrogate value information available, because the data met the following criteria:  (i) product-specific; (ii) representative of a broad-market average; (iii) publicly available; (iv) contemporaneous with the

period of review, and (v) tax and duty exclusive. *See* IDM at 51-57,

Appx1085-1091; 19 U.S.C. § 1677b(c)(1). We explain below why the

Court should sustain Commerce's determination that Indian data were

the best information available and reject CFA's arguments challenging

various factors of production. *See* CFA Br. at 24-35.

> 1. The Indian Data Were The Best Available Information To Value The Main Inputs

In the final results, consistent with its practice of preferring

surrogate values from the primary surrogate country, Commerce

selected Indian surrogate values for most of the factors of production,

including the main inputs of fingerlings, fish feed, whole fish, by-

products, and financial ratios, among others. IDM at 53-57, Appx1087-

1091. CFA challenges Commerce's selection of Indian data as surrogate

value for main inputs (*i.e.,* whole live fish, fingerlings and fish feed),

claiming that Indian data do not represent a broad market average, and

are not credible or reliable. CFA Br. at 26-31. The Court should reject

CFA's challenges because, as explained above, Commerce has broad

discretion when determining what constitutes the "best available

information." *See Qingdao*, 766 F.3d at 1386.

First, Commerce relied on the publications *Fishing Chimes* and

37

*Undercurrent News* to value the main inputs of whole live fish, fingerlings, and fish feed.  IDM at 54-55, Appx1088-1089; *see also* NTSF Surrogate Value Submission at SV-5-A (*Fishing Chimes*), Appx11289-11358; NTSF Surrogate Value Submission at SV-6, Appx11553-11577, SV-7, Appx11578-11602, SV-8, Appx11603-11615  (collectively, *Undercurrent News*).  Commerce rejected CFA's assertions that Indian data do not represent a broad market average and are from unknown sources, and Commerce explained that it has determined data from a region where the "predominant production of that input is concentrated (including results from a one-time study)," to be a broad market average and reliable in past reviews.  IDM at 54, Appx1088.

For the publication *Fishing Chimes*, the feed and whole fish data were based on survey responses from 54 farmers within two of 13 districts of the Indian state of Andhra Pradesh.  *Id.*; *see also* NTSF Surrogate Value Submission at SV-5-A, Appx11289-11358.  Moreover, Commerce explained that record evidence demonstrates that Andhra Pradesh is the largest *pangasius*-producing area of India, accounting for approximately 60-80 percent of *pangasius* production.  IDM at 54, Appx1088.  Regarding the fingerling data in *Fishing Chimes*, the data

were from "commercial nurseries in two locales which collectively supplied fingerlings to 96 percent of the *pangasius* farms." *Id.* Finally, Commerce explained that while the *Fishing Chimes* source does not identify each individual survey participant, "it clearly identifies key characteristics, and the location, of the participants." *Id.*

For *Undercurrent News* data, Commerce explained that the publication collects information "from a variety of sources, including interviews with farmers/mills in all major producing regions." *Id.* *Undercurrent News*, like *Fishing Chimes*, obtains its information from numerous sources across major producing regions, and Commerce rejected CFA's assertion that the "data may have been generated for the purpose of this proceeding, {because} there is no evidence to support the claim." *Id.* Commerce also observed that *Undercurrent News* states that its scope extends beyond just Indian aquaculture and data relating to whole fish, fingerling, and fish feed pricing, further detracting from CFA's speculation that the data may be somehow unreliable. *Id.* at 54-55, Appx1088-1089.

CFA argues also that the *Undercurrent News* and *Fishing Chimes* data are unreliable because there is no information on the record about

how interviews were conducted or volume information, and that

*Undercurrent News* also "refused to engage with independent market

researchers attempting to understand the portal's data collection

methods." CFA Br. at 28.  In other words, CFA appears to argue that

Commerce should have corroborated the information contained in the

*Fishing Chimes* and *Undercurrent News* publications, but CFA

identifies no information on the record that undermines these sources,

and as such, further corroboration of their reliability would be

unnecessary. *See* IDM at 54-55, Appx1088-1089.

CFA also suggests that the *Fishing Chimes* data are further

flawed because this Court held in the 2017-2018 review that Commerce

did not "adequately explain or support its conclusion that they

represent a 'broad market average.'" CFA Br. at 29 (citing *NTSF

Seafoods*, 2022 WL 1375140, at *15).  But CFA's interpretation of *NTSF

Seafoods* misses the mark:  the Court held that "Commerce placed

considerable emphasis on the 80-percent figure and did not opine on

what market share {Commerce} considers 'significant.'" *NTSF

Seafoods*, 2022 WL 1375140, at *15.  In this case, Commerce explained

that it will consider a one-time study to constitute a broad market

40

average when data are collected "from a region where the *predominant* production of that input is concentrated."  IDM at 54, Appx1088 (emphasis added).

Regarding contemporaneity, Commerce explained that, although the *Fishing Chimes* data preceded the period of review by seven months, Commerce inflated these data to reflect period of review values. *Id.* at 55, Appx1089.  In addition, the *Undercurrent News* data are contemporaneous with the period of review.  *Id.*

Therefore, substantial evidence supports Commerce's determination that the Indian data satisfied the surrogate value selection criteria and presented the "best available information" to value the main inputs.  *See* IDM at 54-55, Appx1088-1089; *Qingdao*, 766 F.3d at 1386.

> 2.   The Indian Data Were The Best Available Information To Value By-Products And Labor, And CFA Failed To Exhaust Its Administrative Remedies With Respect To The Labor Surrogate Value

As Commerce explained in the final results, there was only one instance when Indian data are lacking, and it relied on one Indonesian surrogate value for boat freight.  IDM at 55, Appx1089.  But Commerce determined that "{t}he fact that a reliable Indian {surrogate value} for

41

one minor {factor of production} is unavailable does not outweigh the other advantages of selecting India as the primary surrogate country." *Id.* at 55-56, Appx1089-1090.

Regarding CFA's arguments that Indian by-product data were not specific, CFA Br. at 33-35, Commerce explained that, although it has found specificity with regard to *species* crucial with respect to whole fish input, because it is part of a control number characteristic, the same level of importance is not warranted for outputs.  IDM at 56, Appx1090.  Commerce further explained that CFA speculates and "did not provide any evidence that input species is a determining factor in the selling and/or buying of fish meal or fish oil" by-products.  *Id.*

In addressing arguments regarding the reliability of the Global Trade Atlas (GTA) Indian import data, Commerce further explained that it is beyond dispute that fish meal and fish oil are traded internationally, because they appear in the GTA trade data.  *Id.* Moreover, Commerce explained that it had relied on similar tariff subheadings in the past to value fish oil and fish meal by-products.  *Id.*

With respect to labor, Commerce explained that it has used that Indian wage data in the past and found it to be reliable for surrogate

42

value purposes. *Id.* Commerce also explained that the Indian data are specific as they encompass "skilled agricultural and fishery workers." *Id.* Although, the Indian labor data may not be contemporaneous, Commerce inflated the data to reflect period of review values. *Id.*

CFA *now* argues that there is no record support that labor is a "miniscule" proportion of normal value. CFA Br. at 31-33; *see also* IDM at 56, Appx1090. CFA failed to make this specific argument before Commerce. Rather, in its case brief, CFA argued only that "{f}actor value data is not specific to all of respondent's inputs and claimed by-product offsets{.}" CFA Admin. Case Br. at Appendix 2 (Nov. 16, 2021) (P.R. 421), Appx7668-7671. In its pre-preliminary comments, CFA likewise failed to address what proportion of normal value labor allegedly should represent. CFA Pre-Prelim. Comments at 23 (Aug. 3, 2021) (P.R. 358), Appx7350.

By failing to raise this argument before Commerce, CFA failed to exhaust its administrative remedies and is precluded from now making this argument. *See* 19 C.F.R. § 351.309(c)(2) (stating that a party's case brief to Commerce "must present all arguments that continue in the submitter's view to be relevant to {Commerce's} . . . final results.");

43

*Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)

(recognizing that the exhaustion requirement protects administrative

agency authority and promotes judicial efficiency).  Indeed, the Federal

Circuit has held that a party's obligation to exhaust its administrative

remedies in proceedings before Commerce applies both to broad issues

and arguments related to those issues.  *See Rhone Poulenc, Inc. v.*

*United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (disagreeing with

contention that courts can consider new arguments so long as the

general issue was raised at the agency level); *Paul Muller Industrie*

*GmbH & Co. v. United States,* 502 F. Supp. 2d 1271, 1275 (Ct. Int'l

Trade 2007) (holding that when a party raises a general issue but fails

to incorporate a specific argument among other arguments that relate

to the same issue, it fails to exhaust administrative remedies with

respect to that argument).  Exceptions to the exhaustion requirement

are limited,[7] as such the Court "generally takes a 'strict view' of the

---

[7] None of the exceptions to the exhaustion requirement are applicable in this case.  The exceptions include futility, pure question of law, lack of timely access to the confidential record, no administrative procedure to exhaust, or new interpretation from an intervening judicial decision.  *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).

requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal BV*, 502 F.3d at 1379.

Although the labor data may not comprise as "miniscule" a proportion of normal value when compared to other main inputs individually, IDM at 56, Appx1090, consistent with its methodology, Commerce prefers to value the labor input using labor rates from the primary surrogate country, even when there are other values on the record that may have been more contemporaneous. *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093 (Dep't of Commerce June 21, 2011); *Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. v. United States*, 396 F. Supp. 3d 1334, 1350-51 (Ct. Int'l Trade 2019) ("Commerce was therefore justified in using the South African labor data despite its lack of contemporaneity because the other factors favored the South African data as a whole over the Bulgarian data"); *Heze Huayi Chemical Co., Ltd. v. United States*, 2018 WL 2328183, at *8 (Ct. Int'l Trade May 22, 2018) ("Commerce was able to adjust the labor value for Mexico through its normal method of

45

inflating the value for labor . . . to account properly for inflation or changes in the labor rate over this time period"). Therefore, Commerce's preferred method to use data (inflated to reflect the period of review) from the primary surrogate country, India, to value labor is supported by substantial evidence and in accordance with law. *See* IDM at 56, Appx1090; 19 C.F.R. § 351.408(c)(2).

Thus, Commerce's determination to rely on Indian data for valuing by-products is supported by substantial evidence and in accordance with law.

> 3.   Substantial Evidence Supports Commerce's Determination That The Indian Data Was The Best Available

CFA argues that Commerce did not properly assess the quality of the data available in Indonesia and India for valuing important factors of production. CFA Br. at 27, 35. However, this argument misses the mark.

As an initial matter, if the Court sustains Commerce's determinations that India is at the same (*i.e.*, comparable) level of economic development to Vietnam and that India is a significant producer of comparable merchandise, then it need not address CFA's

arguments regarding the superiority of the data between India and
Indonesia.  As Commerce explained, it is not required to determine
whether the Indian or Indonesian data are "superior," because
Indonesia is not on the surrogate country list, and India satisfies the
surrogate country and surrogate value criteria.  IDM at 42, Appx1076;
*see Jiaxing Bro.*, 822 F.3d at 1293 (citing *Vinh Hoan Corp. v. United
States*, 49 F. Supp. 3d 1285, 1292) (Ct. Int'l Trade 2015) (quoting Policy
Bulletin 04:1)) (laying out the four steps in Commerce's hierarchical
surrogate country selection methodology).

The requirement for step (4), that more than one country satisfy
steps (1)-(3), is *not* met in this case.  Of the countries on the list of
potential surrogate countries, only India satisfied steps (1)-(3).  Thus,
Commerce properly considered that because Indonesia is not on the
surrogate country list and its GNI is not economically comparable to
Vietnam, Commerce "need not compare" the Indonesian and Indian
data.  IDM at 42, Appx1076; *see Jiaxing Bro.*, 822 F.3d at 1293
(referring to Commerce's practice of comparing data only "if more than
one country" *on the surrogate country list* is a significant producer of
comparable merchandise).

47

For example, in the preliminary results, Commerce explained that "because a country on the surrogate country list contains useable data, in accordance with {its} practice, {it} preliminarily f{ound} that there is no compelling reason to deviate from the surrogate country list in selecting a surrogate country." PDM at 16, Appx1015. Then, in the final results, Commerce explained that "{n}o new information on the record exists to make {it} reverse {its} finding with regard to the reliability of the Indian data." IDM at 53, Appx1087. CFA has offered no compelling reason for why Commerce should deviate from its established practice and consider data from a country that is *not* on the surrogate country list, when "Indian data on the record offer {surrogate value} information that satisfies Commerce's selection criteria." *Id.*

Thus, the Court should sustain Commerce's determination that the Indian data were the best available source of information, *see* IDM at 53-57, Appx1087-1091, and reject CFA's invitation to use its preferred Indonesian data. *See Guangdong Chems.*, 460 F. Supp. 2d at 1368-69.

48

V.    Commerce's Determination To Grant ESS A Separate Rate Is
      Supported By Substantial Evidence And In Accordance With Law

Commerce's determination that ESS met the criteria for separate

rate status is supported by substantial evidence and in accordance with

law.  IDM at 26-30, Appx1060-1064.  In proceedings involving a non-

market economy country, such as Vietnam, Commerce maintains a

rebuttable presumption that all companies within such countries are

subject to government control and, therefore, should be assigned a

single antidumping margin.  *See* PDM at 9, Appx1008; 19 C.F.R.

§ 351.107(d); *see also Albemarle Corp. & Subsidiaries v. United States*,

821 F.3d 1345, 1348 (Fed. Cir. 2016).  The exporter of subject

merchandise bears the burden of showing it is autonomous of

government control.  *AMS Assoc., Inc.*, 719 F.3d at 1379-80.  However,

Commerce's determination with "respect to independence from the

government is separate from its analysis regarding sales and cost data."

IDM at 27, Appx1061; *see also Nat'l Nail*, 279 F. Supp. 3d at 1377.  As

Commerce explained in the final results, ESS met its burden by

establishing that it operates outside of both *de jure* and *de facto*

government control.  PDM at 11-12, Appx1010-1011; IDM at 26-30,

Appx1060-1064.  Green Farms's arguments to the contrary are

49

meritless, as we explain below.

First, Green Farms argues that Commerce ignored its policy of requiring separate rate applicants to respond to all questionnaires issued to it in a proceeding, and directly contradicted prior decisions when it denied a separate rate to a company under "virtually identical circumstances."  Green Farms Br. at 16.  Green Farms maintains that Commerce "may not arbitrarily depart from this written policy, and particularly not without adequate notice or explanation."  *Id.* at 23.  However, Green Farms overlooks the fact that Commerce provided both notice and explanation for why it granted ESS a separate rate.  PDM at 11-12, Appx1010-1011; IDM at 26-30, Appx1060-1064.

Although Green Farms points to the language in the Initiation Notice, which requires mandatory respondents to respond to all parts of the questionnaires to qualify for a separate rate, Green Farms Br. at 18 (citing *Initiation Notice*, 85 Fed. Reg. at 63,082, Appx7674), Commerce explained that its separate rate analysis must be conducted on a case-specific basis, and that it was appropriate in this instance to focus on whether the company provided adequate information as it relates to its separate rate status.  PDM at 12, Appx1011; IDM at 27 n.172,

50

Appx1061 (acknowledging this past practice and explaining that it was reexamining "such generalized policy" in light of this Court's holdings in multiple cases).  To wit, Commerce preliminarily determined that "ESS provided an adequate response to Commerce's questionnaire as it related to the company's independence from the Vietnamese Government and separate rate eligibility," and "Commerce did not issue any additional requests for information related to the company's separate rate status."  PDM at 12, Appx1011.  Commerce added that because ESS's non-cooperation related exclusively to ESS's suppliers and solicitation of factors of production data, it did not call into question the company's separate rate reporting.  *Id.*

Put another way, Commerce explained that a respondent operating in a non-market economy is able to rebut the presumption of government control through answers regarding corporate ownership, control, management, ownership or control by a provincial or local government, profit retention, and restrictions on use of foreign currency earnings.  IDM at 26-27, Appx1060-1061.  Commerce emphasized that its "determination with respect to independence from the government is *separate* from its analysis regarding sales and cost data."  *Id.* at 27,

51

Appx1061 (emphasis added).  In support for this change in policy,

Commerce cited numerous cases wherein the Court held that

"Commerce should not apply the country-wide rate when 'the

respondent has established independence from government control' –

even where Commerce has found that other information reported by the

same respondent is unreliable or incomplete." *Id.* (citing *Qingdao Taifa*

*Group Co. v. United States*, 637 F. Supp. 2d 1231, 1240-41 (Ct. Int'l

Trade 2009)); *see also, e.g.*, *Yantai Xinke Steel Structure Co. v. United*

*States*, 36 C.I.T. 1035, 1054 (Ct. Int'l Trade 2012); *Shandong Huarong*

*General Group v. United States*, 27 C.I.T. 1568, 1594 (Ct. Int'l Trade

2003); *Nat'l Nail*, 279 F. Supp. 3d at 1377.

Thus, in this administrative review Commerce reasonably focused

its analysis of ESS's responses on the information necessary to rebut

the presumption of government control and determined that ESS is

eligible for a separate rate.  PDM at 12, Appx1011; IDM at 27,

Appx1061.  For example, Commerce explained that ESS provided the

required attestation, its business registration certificate, and its tax

forms showing independence from the government.  IDM at 27,

Appx1061 (citing ESS's Separate Rate Certification (Nov. 5, 2020) (P.R.

52

50; C.R. 9), Appx1096-1136).  ESS further provided a full response to its Section A of Commerce's questionnaire with respect to the company's operations, independence from the government, and relevant affiliations.[8]  *Id.* (citing ESS's Section A Questionnaire Response (Feb. 5, 2021) (P.R. 128; C.R. 84), Appx2718-2787). Thus, substantial evidence supports Commerce's determination regarding the reliability of the separate-rate information that ESS submitted.

Although Green Farms relies on pre-preliminary deficiency comments submitted by CFA to argue that ESS's separate rate information was insufficient and Commerce should have solicited additional data regarding its separate rate, including any alleged affiliations, Green Farms Br. at 33-37, 57-58, Commerce properly dismissed this speculation as baseless.  IDM at 28, Appx1062. Although interested parties "may request that Commerce pursue certain additional information, Commerce is the master of its own

---

[8]  While Green Farms also argues that ESS was required to file a "more fulsome 'Application'" rather than a certification, Green Farms's Br. 33-34, Commerce explained it was unnecessary to require ESS to remedy this deficiency because Commerce solicited extensive, similar information in its Section A questionnaire to ESS.  IDM at 27 n.175, Appx1061.

questionnaires and is not required to ask every proposed question" in deficiency comments.  *Id.*  In the final results, Commerce found that substantial evidence was submitted to analyze ESS's separate rate claim and determined that the evidence submitted was "sufficient to establish {ESS's} eligibility for a separate rate."  *Id.*

Commerce provided additional policy considerations unique to this proceeding for analyzing separate rates and application of AFA separately.  *Id.*  For example, Commerce clarified that its ability to apply an AFA rate, which is distinct from the country-wide rate in this proceeding, an atypical scenario, provides a necessary incentive for future compliance on the part of respondents.  *Id.*  Commerce explained that part of its practice, in evaluating a potential application of AFA, is to consider the extent to which a party may benefit from its own lack of cooperation.  *Id.* (citing *Statement of Administrative Action accompanying the Uruguay Round Agreements Act* (*SAA*), H.R. Doc. 103-316 (1994) at 870).

Thus, in this case, a possible implication of denying a separate rate to ESS is that "the company would benefit from its lack of participation, despite the fact that it initially participated in this review

54

and submitted separate rate information that Commerce has no basis to disregard." *Id.* If allowed, a company would be able to avoid application of a rate based on AFA "under such circumstances by selectively participat{ing} and withdraw{ing} from a proceeding if it anticipated an unfavorable result." *Id.* If Commerce continued to universally apply the policy that it would never grant a separate rate if any portion of a factors of production and sales reporting "questionnaire, initial or supplemental, went unanswered – {this} would severely and inappropriately limit the possibility for future application of AFA in this proceeding." *Id.* at 28-29, Appx1062-1063. Not only does this undermine the integrity of the process and the remedial purpose of the law, but it is also inconsistent with this Court's holdings on this issue. *Id.* at 28, Appx1062.

In the final results, Commerce also rejected Green Farms's assertion that its denial of a separate rate to Seafood Joint Stock Company No. 4 Branch Dongtam Fisheries Processing Company (DOTASEAFOOD) in the prior administrative review of this order is instructive. *Id.* at 29, Appx1063. In the immediately preceding administrative review, Commerce explained that DOTASEAFOOD had

55

failed to respond to Commerce's subsequent request for information regarding its separate rate status, and, as such, DOTASEAFOOD "had not provided the information necessary to determine independence from the government, warranting denial of a separate rate." *Id.* (citing Vietnam Fish AR16 IDM at Cmt. 5); *see also Catfish Farmers of America v. United States*, Court No. 21-380, ECF. 42 at 56-61 (litigation stemming from Vietnam Fish AR16).[9] In this case, Commerce explained that "ESS failed to cooperate to the best of its ability by failing to provide information necessary to calculate a dumping margin; however, ESS *did* provide sufficient information necessary to determine its independence from the {g}overnment." IDM at 26-29, Appx1060-1063 (emphasis added).

Therefore, Commerce's determination that ESS is eligible for a separate rate is supported by substantial evidence and in accordance with law. *Id.*; *AMS Assocs.*, 719 F.3d at 1379; *Sigma Corp.*, 117 F.3d at 1405.

---

[9] Oral argument was held on November 18, 2023, in the Vietnam Fish AR16 litigation, and an opinion has not yet issued.

VI.   Commerce's Methodology For Calculating Green Farms's
      Separate Rate, Pursuant To 19 U.S.C. § 1673(c)(5)(B), Is
      <u>Supported By Substantial Evidence And In Accordance With Law</u>

Commerce's determination to assign the simple average of NTSF's

and ESS's dumping margins to Green Farms pursuant to 19 U.S.C.

§ 1673(c)(5)(B) is supported by substantial evidence and in accordance

with law.  *See* PDM at 12, Appx1011; IDM at 34-36, Appx1068-1070.  In

the nonmarket economy context, because the statute does not

specifically provide for a separate rate methodology in an

administrative review, when Commerce determines the rate to apply to

companies that establish their independence from government control,

but were not selected for individual examination, Commerce looks to 19

U.S.C. § 1673d(c)(5), which provides the method for determining the

estimated all-others rate in an investigation.  *Albemarle Corp.*, 821 F.3d

at 1351-53 (applying 19 U.S.C. § 1673d(c)(5) in the nonmarket economy

administrative review context).

Under the general rule in 19 U.S.C. § 1673d(c)(5)(A), Commerce

determines the estimated all-others rate by weight averaging the

weighted average dumping margins for the individually examined

respondents, excluding any margins that are zero, *de minimis*, or determined entirely based on the facts available.  The exception to the general rule in section 1673d(c)(5)(B), however, provides that if all the margins determined for the individually examine respondents are zero, *de minimis*, or determined entirely based on the facts available, Commerce may use "any reasonable method" to determine the all-others rate, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated (*i.e.,* the zero, *de minimis*, or facts available dumping margins).

The SAA provides that in such situations the expected method is to weight-average the zero and *de minimis* margins and the margins determined pursuant to the facts available, unless doing so is not feasible or would not be reasonably reflective of potential dumping margins.  SAA, H.R. Rep. No. 103-316, at 873, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199 (1994).  The Federal Circuit affirmed that there is "no legal error" in using a simple average of a *de minimis* or zero rate and a total AFA rate assigned to two mandatory respondents to calculate the separate rate.  *Yangzhou Bestpak Gifts & Crafts Co. v.*

*United States*, 716 F.3d. 1370, 1378 (Fed Cir. 2013).  Although the *Yangzhou Bestpak* court warned against the potential for "questionable" results, it also clarified that section 1673d(c)(5)(B) and the SAA explicitly allow Commerce to factor both *de minimis* and AFA rates into the calculation methodology.  *Id.*; *see also Solianus Inc. v. United States*, 391 F. Supp. 3d 1331, 1337-1338 (Ct. Int'l Trade 2019).

Both CFA and Green Farms argue that this Court should remand to Commerce the separate rate calculated for Green Farms.  CFA Br. at 35-36; Green Farms Br. at 39-57.  However, their arguments vary significantly.  CFA argues that Commerce's calculation of NTSF's zero margin using Indian surrogate values was unsupported and inadequately explained.  CFA Br. at 35-36.  Yet, for the reasons explained above, this Court should reject CFA's argument regarding Green Farms's separate rate calculation because Commerce's determination to use Indian data is supported by substantial evidence and in accordance with law.  IDM at 52-57, Appx1086-1091.

Green Farms, for its part, argues that, even if Commerce lawfully granted ESS a separate rate, Commerce still may not rely on ESS's AFA rate to determine Green Farms's separate rate.  Green Farms Br.

at 39.  Additionally, Green Farms argues that Commerce should look to other, recent dumping rates because ESS's AFA rate is not "reasonably reflective" of Green Farms' potential margin.  *Id.* at 42-50.  We address Green Farms's arguments regarding its separate rate calculation below.

As Commerce explained, the circumstances of this case are such that it cannot rely on 19 U.S.C. § 1673d(c)(5)(A) for the calculation of the review-specific rate for Green Farms because all margins for mandatory respondents are zero or based on facts available.  IDM at 34, Appx1068.  Therefore, Commerce relied on the exception in 19 U.S.C. § 1673d(c)(5)(B), which allows Commerce to use "any reasonable method" for assigning a rate to non-selected companies when all individually investigated rates are zero, *de minimis*, or based on facts available.  *Id.* at 35, Appx1069.

Commerce further explained that it used an approach analogous to the "expected method" as provided for in the SAA.  *Id.*  Specifically, Commerce explained that it "relied on a *simple* average of the margins established for ESS and NTSF, rather than a *weighted* average, because publicly ranged shipment data were not available for ESS."  *Id.* n.222 (emphasis in original).  Commerce also recognized that the

60

Federal Circuit has affirmed this simple average methodology using both zero and AFA rates. *Id.* at 35, Appx1069 (citing *Bosun Tools Co. v. United*, 2022 WL 94172, at \*4 (Fed. Cir. Jan. 10, 2022)); *see also Yangzhou Bestpak*, 716 F.3d. at 1378.

Further, Commerce clarified that it disagreed with Green Farms's argument that the separate rate calculated using the simple average methodology is unreasonable as applied and not reflective of Green Farms' economic reality. IDM at 35, Appx1069. Commerce explained that it "examined respondents representing a substantial portion of the total volume of imports under review," and thus, the "rate assigned to the mandatory respondents is representative unless substantial evidence shows otherwise," whether those rates are zero, *de minimis*, or based on facts available. *Id.*; *see also Albemarle Corp.*, 821 F.3d at 1353.

Commerce further analyzed alternative rates that Green Farms proposed for calculating its separate rate, and rejected these suggestions. *Id.* at 35, Appx1069. Commerce first explained that Green Farms's proposal to use solely the zero rate calculated for NTSF was without basis, and directly contradicted by the instructions laid out in

61

section 1673d(c)(5)(B).  *Id.*  Additionally, Commerce explained that if it relied on an average of separate rates from three preceding review periods, that would defy the statutory directive, which explicitly contemplates use of AFA and zero or *de minimis* rates in calculating a separate rate.  *Id.*; *see also Albemarle Corp.*, 821 F.3d at 1356 ("{t}here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period.").  Therefore, Commerce reasonably determined that there was no basis to depart from the statutory directive and precedent that allows for simple averaging of AFA rates with *de minimis* rates in assigning a rate for Green Farms.  IDM at 36, Appx1070.

Although Green Farms argues that "Commerce's derivation" of its rate using "two widely divergent rates of $0.00 {per kilogram} and a total AFA rate of $3.87 {per kilogram} was unreasonable," Green Farms Br. at 42, Commerce explained why that was simply not the case.  To wit, Commerce explained that it analyzed "all the assigned rates, {and} it is apparent that there is no pattern of low or high margins in this proceeding{.}"  IDM at 36, Appx1070.  In fact, this Court "has sustained, widely divergent rates for the exporters of fish from Vietnam that

Commerce has individually examined." *Id.*

Green Farms argues, however, that rates for cooperating respondents in this and the prior two reviews periods are more reasonable. Green Farms Br. at 47-52. But Commerce explained that "the rate calculated here, $1.94 per {kilogram}, is far more similar to Green Farms's cash deposit rate during the {period of review} (*i.e.*, $1.37 per {kilogram}) than any of the rates proposed by Green Farms{.}" IDM at 36, Appx1070.

In addition, *Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014), is similarly inapposite. Green Farms Br. at 42-47. In *Navneet*, Commerce calculated the all-others rate by using the simple average of a cooperating respondent's zero margin and two AFA rates assigned to uncooperative respondents, which resulted in a 11.01 percent rate. 999 F. Supp. 2d at 1362-63. The Court rejected the 11.01 percent all-others rate because it "appear{ed} untethered to respondents' pricing behavior" and "is actually undermined by evidence suggesting that it is not an accurate depiction of pricing during the review period." *Id.* at 1363-64. In contrast, in this case, Commerce explained that the simple average of $1.94 per

63

kilogram was "far more similar" to Green Farms's cash deposit rate of

$1.37 per kilogram during the period of review, rather than a zero rate.

IDM at 36, Appx1070.  Similarly, although Green Farms argues that

"Commerce should have first considered using NTSF's calculated rate of

$0.00 {per kilogram}" as its rate, which would be "consistent" with the

prior administrative review when $0.00 per kilogram was also

calculated for the sole mandatory respondent, Vinh Hoan, Green Farms

Br. at 51, that would require Commerce to completely *ignore* ESS's rate

in calculating the separate rate, and there was "no basis to depart from

the statutory directive," which "expressly allows for factoring in AFA

rates as well as *de minimis* rates in assigning a rate for Green Farms."

IDM at 36, Appx1070; *see also id.* n.224 ("Commerce is incorporating a

zero rate into the separate rate calculation; doing so yields a rate

*comparable* to Green Farms's cash deposit rate at the outset of this

review period." (emphasis added)).

Therefore, Commerce's determination to use the simple average of

NTSF's zero margin and ESS's AFA rate of $3.87 per kilogram,

resulting in a rate of $1.94 per kilogram for Green Farms, is supported

by substantial evidence and in accordance with law.  *Id.* at 34-36,

64

Appx1068-1070; *see also Albemarle Corp.*, 821 F.3d at 1356.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain the final results in their entirety and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
HENDRICKS VALENZUELA          /s/ Kara M. Westercamp
Of Counsel                    KARA M. WESTERCAMP
Office of the Chief Counsel   Trial Counsel
 for Trade Enforcement & Compliance U.S. Department of Justice
 U.S. Department of Commerce  Civil Division
Hendricks.Valenzuela@trade.gov Commercial Litigation Branch
                              P.O. Box 480
                              Ben Franklin Station
                              Washington D.C.  20044
                              Tel: (202) 305-7571
                              Fax: (202) 514-8640

April 20, 2023                Attorneys for Defendant

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 11,779 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u>
KARA M. WESTERCAMP
Trial Attorney

# THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| GREEN FARMS SEAFOOD JOINT STOCK COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Court No. 22-00092 |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |
| CATFISH FARMERS OF AMERICA, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Court No. 22-00125 |
| | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NAM VIET CORPORATION, *et al.*, | ) | |
| Defendant-Intervenors. | ) | |

## PROPOSED ORDER

Upon consideration of the plaintiffs' motions for judgment upon the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' motions are denied; and it is further

ORDERED that judgment is entered for the United States.

_____

M. MILLER BAKER, JUDGE

Dated: _____

New York, NY