Ct. No. 22-125

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CATFISH FARMERS OF AMERICA,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**NAM VIET CORPORATION,** et al.,<br><br>Defendant-Intervenor. | **Before: Hon. M. Miller Baker, Judge**<br><br>**Court No. 22-00125** |

## PLAINTIFFS' COMMENTS IN OPPOSITION TO THE REMAND RESULTS

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Tatiana Sainati, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Catfish Farmers of America, et al.*

Dated: December 16, 2024

**Ct. No. 22-125**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION.................................................................1

II.  BACKGROUND ...............................................................1

III. ARGUMENT ....................................................................4

    A.   Commerce Failed to Use the Best Available Information to Determine Normal Value of Key Inputs ..........................................6

        1..Fishing Chimes/Chepala Sandadi and Undercurrent News Are Unreliable and Do Not Provide Data Reflecting Broad Market Averages ...................................................................9

        2. The Indonesian Data For Whole Fish, Fingerlings, and Feed Is Superior to the Flawed Indian Data .........................24

    B.   Commerce Has Not Adequately Explained or Supported its Use of Indonesian Data for Labor, Byproducts, and Financial Ratios ...................................................................................35

IV.  CONCLUSION ...............................................................46

Ct. No. 22-125

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  618 F.3d 1316 (Fed. Cir. 2010) .............................................................. 17

*Asociacion Colombiana Exportadores de Flores v. United States,*
  23 CIT 148, 40 F. Supp. 2d 466 (1999)................................................... 28

*Bristol Metals L.P. v. United States,*
  34 CIT 478, 703 F. Supp. 2d 1370 (2010)............................................... 5

*Fresh Garlic Producers Ass'n v. United States,*
  83 F. Supp. 3d 1330 (Ct. Int'l Trade 2015) ........................................... 17

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm. Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................. 34

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
  44 F.3d 978 (Fed. Cir. 1994) ........................................................... 24, 26

*Universal Camera Corp. v. N.L.R.B.,*
  340 U.S. 474 (1951)................................................................................ 23

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
  716 F.3d 1370 (Fed. Cir. 2013) .............................................................. 2

**Statutes**

19 U.S.C. § 1677(b)(c)(1).............................................................................. 5

19 U.S.C. § 1677b(c).................................................................................... 5

19 U.S.C. § 1677b(c)(1)(B) .......................................................................... 5

**Ct. No. 22-125**

## Regulations

Import Administration Policy Bulletin 04.1 .............................................. 5

## Administrative Materials

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 79 Fed. Reg. 19,053 (Dep't Commerce Apr. 7, 2014) ........................................................................... 17

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 81 Fed. Reg. 17,435 (Dep't Commerce Mar. 29, 2016) ........................................................................... 29

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019) ...................................................................... 30, 43

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 89 Fed. Reg. 18, 595 (Dep't Commerce Mar. 14, 2024) ........................................................................... 43

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam*, 72 Fed. Reg. 52,052 (Dep't Commerce Sept. 12, 2007) ............................................................ 44, 45

*Monosodium Glutamate From the People's Republic of China*, 79 Fed. Reg. 58,326 (Dep't Commerce Sept. 29, 2014) ........................................................................... 36

## Other Authorities

*Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process* (Dep't Commerce Mar. 1, 2004) ...................................................... 5, 23

**Ct. No. 22-125**

# <u>GLOSSARY</u>

**Commerce**

Department of Commerce

**Fish Fillets**

Certain Frozen Fish Fillets

**FOP**

Factors of Production

**NME**

Non-Market Economy

**POR**

Period of Review

**SV**

Surrogate Value

**Vietnam**

Socialist Republic of Vietnam

Ct. No. 22-125

## I.  __INTRODUCTION__

On behalf of the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA"), we respectfully submit the following comments in opposition to the October 18, 2024 remand results filed by the U.S. Department of Commerce ("Commerce") in this action. *See* Final Results of Redetermination Pursuant to Court Remand, *Green Farms Seafood Joint Stock Company v. United States*, Ct. No. 22-00092; *Catfish Farmers of America v. United States*, Ct. No. 22-00125, Slip Op. 24-46 (CIT Apr. 17, 2024) (Oct. 18, 2024), ECF No. 69, C.R.R. 4, P.R.R. 6, Appx18509-18589 ("Final Remand Results").

## II.  __BACKGROUND__

The Final Remand Results arise from litigation challenging the final results of an administrative review of the antidumping duty order on certain frozen fish fillets ("fish fillets") for *pangasius hypopthalmus* from the Socialist Republic of Vietnam ("Vietnam") covering the period

Ct. No. 22-125

of review ("POR") from August 1, 2019, through July 31, 2020. *See, e.g.,*
*Catfish Farmers of America, et al. v. United States,* Consol Ct. No. 20-
00125, slip op. 24-46 (Ct. Int'l Trade Apr. 17, 2024) ECF No. 63 ("Slip
Op. 24-46").

In Slip Op. 24-46, the Court held that Commerce had properly
determined that mandatory respondent East Sea Seafoods LLC ("ESS")
was eligible for a separate rate as a matter of law, but that the agency
had not adequately explained the basis upon which it concluded that
ESS's separate rate certification and Section A questionnaire response
demonstrated the company's freedom from Vietnamese governmental
control. *Id.* at 10, 12. The Court also remanded so that Commerce could
further consider whether the separate rate determined for non-
examined respondent Green Farms Seafood Joint Stock Company
("Green Farms") comported with Green Farms' "economic reality," citing
the decision issued by the Court of Appeals for the Federal Circuit in
*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,* 716 F.3d
1370 (Fed. Cir. 2013). *Id.* at 17-18. Finally, the Court found that
Commerce impermissibly disregarded the statutory standard of
economic comparability in selecting India as its primary surrogate

Ct. No. 22-125

country. *Id*. at. 18-21. It therefore remanded and ordered Commerce to "either explain why it disagrees {that Indonesia is economically comparable with Vietnam} or else compare {Indian and Indonesian} data to assess which set is superior." *Id*. at 21 (internal citation omitted).

Commerce issued draft results on August 13, 2024. *See* Draft Results of Redetermination Pursuant to Court Remand (Aug. 13, 2024), C.R.R. 1, P.R.R. 1, Appx18397-18432. In the Draft Results, Commerce heeded the Court's instruction to compare the quality of the Indian and Indonesian data to assess which data set is superior. *Id*. at 14-35, Appx18410-18431. However, the agency failed to adequately explain or support its selection of the primary surrogate country, and otherwise failed to adequately explain and support its selection of the surrogate values ("SVs") for whole live fish, fingerling, feed, labor, financial factors, and byproducts. *Id*.

CFA filed comments on the Draft Results on August 27, 2024, in which it agreed with Commerce's treatment of Indonesia as economically comparable with Vietnam but disputed the agency's continued selection of India as the primary surrogate country. Letter

Ct. No. 22-125

from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments on Draft Results of Redetermination* (Aug. 27, 2024) at 22-52, C.R.R. 2, P.R.R. 4, Appx18454-18484 ("CFA Draft Comments"). CFA demonstrated that the Draft Results failed to appropriately assess the quality of Indian versus Indonesian data, demonstrate that the Indian data relied upon reflect broad market averages and are otherwise reliable, and otherwise misread and mischaracterized record data from Indonesia. *Id.* In the Final Remand Results, Commerce continued to use India as the primary surrogate country and to rely on Indian data to value nearly all factors of production ("FOP"). *See* Final Remand Results at 25 (data regarding whole fish) Appx18533; *see also id.* at 30-33 (feed, fingerlings, by-products, labor, and financial ratios), Appx18538-18541.

## III.  <u>ARGUMENT</u>

In determining the normal value of a product from a non-market economy ("NME") like Vietnam, the Tariff Act "requires, in all instances, the use of 'the best available information' about the value of factors of production" from a surrogate country. *Catfish Farmers of America, et al. v. United States*, Ct. No. 21-00380, slip op. 24-67 at 13

Ct. No. 22-125

(Ct. Int'l Trade June 5, 2024) ("Slip Op. 24-67") (quoting 19 U.S.C. § 1677(b)(c)(1)); *see also Bristol Metals L.P. v. United States,* 34 CIT 478, 481, 703 F. Supp. 2d 1370, 1374 (2010) (valuation of FOPs) in an NME case is governed by 19 U.S.C. § 1677b(c), which directs Commerce to use the *"best available information"* in determining SVs). 19 U.S.C. § 1677b(c)(1)(B)) (emphasis added). To implement this statutory directive to identify the *best* available information, where more than one potential surrogate country is economically comparable with the subject country, Commerce compares the relative quality of the SV data available from each to select the primary surrogate. Import Administration Policy Bulletin 04.1, *Non-Market Economy Surrogate Country Selection Process* (Dep't Commerce Mar. 1, 2004), *available at* https://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin"). In assessing relative quality, Commerce considers whether the values are (1) specific to each input; (2) tax and import duty exclusive; (3) contemporaneous with the POR; (4) representative of a broad market average; and (5) publicly available. *See Bristol Metals L.P.*, 34 CIT 481, 703 F. Supp. 2d 1374.

Ct. No. 22-125

In the Final Remand Results, Commerce appropriately treated Indonesia as economically comparable with Vietnam but failed to adequately explain or support the conclusion that India offers better data for valuing FOP in general, or for whole live fish, fingerlings, fish feed, labor, by-products, and financial factors specifically.[1] As explained below, this failure requires a second remand.

### A.  Commerce Failed to Use the Best Available Information to Determine Normal Value of Key Inputs

The key inputs for the fish fillets subject to this administrative review are whole live fish, fingerlings, and feed. The relative quality of

---

[1]    Commerce also reiterated and attempted to justify its "preference to rely on countries at the 'same' level of economic development" in the Final Remand Results. *See* Final Remand Results at 16, 51-54, Appx18524, Appx18559-18562. For the reasons set forth in CFA's comments on the Draft Remand Results, this approach is a deliberate, and unlawful, departure from the statutory requirement. *See* CFA's Draft Comments at 13-22, Appx18445-18454. CFA incorporates those arguments by reference here, but because notwithstanding its continued defense of its "same" level preference methodology, Commerce in its Final Remand Results "afford{ed} no preference to India," and considered "the relative merits of the Indian and Indonesian data," CFA focuses its arguments on the flawed analysis that led Commerce to adopt Indian over Indonesian SVs. Final Remand Results at 24, 53-54, Appx18532, Appx18561-18562.

Ct. No. 22-125

the Indian and Indonesian data for these inputs has been a key issue in this litigation.

In this, as in other administrative reviews involving frozen *pangasius* products from Vietnam, Commerce relied on SVs for these inputs derived from two Indian sources:

> (1) reports of a study of *pangasius* production conducted in two districts within a single Indian state—Andhra Pradesh—as published in *Fishing Chimes* and its Telegu-language sister publication, *Chepala Sandadi*, and

> (2) a pricing portal maintained by *Undercurrent News*.

Final Remand Results at 25, 54-55, Appx18533, Appx18562-18563.

In the context of administrative reviews involving substantially identical challenges to Commerce's preference for Indian over Indonesian data, this Court has repeatedly questioned these sources. *See, e.g.*, *Catfish Farmers of America, et al. v. United States*, Ct. No. 20-00150, slip op. 24-23 at 6-9 (Ct. Int'l Trade Feb. 26, 2024) ("Slip Op. 24-23"); *Catfish Farmers of America, et al. v. United States*, Ct. No. 20-00150, slip op. 22-38 at 41-48 (Ct. Int'l Trade Apr. 25, 2022) ("Slip Op. 22-38"). In particular, with respect to the *Fishing Chimes/Chepala*

Ct. No. 22-125

*Sandadi* study reports, this Court has queried how a study covering

only two districts can represent a broad market average absent data

showing that those districts "produced far more fish than anywhere

else." Slip Op. 22-38 at 44. Likewise, with regard to the *Undercurrent*

*News* pricing data, the Court has stated that a "vague and unsupported

reference to an unspecified number of farmers . . . in 'all major

producing regions'" does not constitute substantial record evidence that

the data reflect broad market averages. Slip Op. 24-67 at 7-8.

Commerce nevertheless persists in relying on these sources without

making any credible attempt at addressing the issues flagged by this

Court. Final Remand Results at 24, Appx18532. Specifically, Commerce

relies on *Undercurrent News* for the prices of whole live fish[2] and on

---

[2]    In the Final Remand Results, Commerce indicates that it relied on
*Fishing Chimes/Chepala Sandadi* data as well as *Undercurrent News*
data to value whole live fish. Final Remand Results at 25, 54,
Appx18533, Appx18562. However, the agency's substantive discussion
of its valuation of the whole live fish input refers only to the
*Undercurrent News* pricing data, which was also the only source used in
valuing this input in the original final determination in the review and
in the Draft Results. *Id.* at 25-26, Appx18533-18534; see also CFA Draft
Comments at 22-23, n.99, Appx18454-18455. CFA has not been able to
find information confirming the agency's actual use of the *Fishing
Chimes/Chepala Sandadi* reports in valuing whole live fish in the final
remand results. Nonetheless, given Commerce's references to these
reports in relation to whole live fish, CFA addresses deficiencies specific

Ct. No. 22-125

information from both *Fishing Chimes/Chepala Sandadi* and

*Undercurrent News* for data on fingerlings and feed. *See id.* at 25-31,

Appx18533-18539. For this reason alone, Commerce's Final Remand

Results must again be remanded.

### 1.  Fishing Chimes/Chepala Sandadi and Undercurrent News Are Unreliable and Do Not Provide Data Reflecting Broad Market Averages

Commerce asserts that the *Fishing Chimes/Chepala Sandadi*

study and *Undercurrent News* data portal "relied on a large number of

data points from the Indian state (Andhra Pradesh) that accounted for a

clear majority of India's production." *Id.* at 55-56, Appx18563-18564. A

brief review of the record proves Commerce wrong. As an initial matter,

Commerce appears in the Final Remand Results to conflate the study

reports published in *Fishing Chimes/Chepala Sandadi* and the entirely

separate pricing data from the *Undercurrent News* portal. *See*, *e.g.*, *id.*

at 55, Appx18563 (referring to a unitary "*Fishing Chimes / UCN*

survey"). To be clear, there is no such unitary source. To the extent that

Commerce ascribes the information in the *Fishing Chimes/Chepala*

---

to the *Fishing Chimes/Chepala Sandadi* reports' whole live fish data
below.

Ct. No. 22-125

*Sandadi* study reports to the *Undercurrent News* pricing portal or *vice versa*, this itself provides ground for remand. Such conflation of distinct data sources indicates that the agency has substantially misread and misunderstood the record, and presents serious and doubtful questions regarding the sufficiency of its explanations and the record support for its valuation of important inputs.

Beyond this, the *Fishing Chimes/Chepala Sandadi* data and the separate *Undercurrent News* prices are based on geographically and temporally limited and incomplete information. The underlying reports and portal information do not and cannot establish that the prices derived from these sources reflect broad market averages for pangasius production in Andhra Pradesh—let alone in India writ large. Commerce thus has no basis to claim that the Indian data derived from *Fishing Chimes/Chepala Sandadi* and, separately, *Undercurrent News*, are better than the more complete Indonesian information provided by CFA.

The *Fishing Chimes* report (which is included in the record together with a "variation" report published in the Tegulu-language sister publication, *Chepala Sandadi*) purports to "discuss{} the current

10

status and influencing factors" of Indian pangasius production. Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam – Response to Request for Surrogate Value Information* (May 10, 2021) at Ex. SV-5-A, p. 34, P.R. 264-278, Appx11289-11358 ("NTSF May 10 Submission"). The report is based on a questionnaire-style survey conducted by the authors through "direct field visits" to "a total of 54 farmers in 46 villages" from "West Godavari and Krishna districts of Andhra Pradesh." *Id.* at Ex. SV-5-A, p. 34-35, 38 and Ex. SV-5-B (English Translation), Appx11289, Appx11328-11329, Appx11332, Appx11359, Appx11370-11377. Although, as Commerce notes, the *Fishing Chimes* report also confusingly and conflictingly states that "field visits were conducted in 300 villages from two large-scale pangasius producing districts in Andhra Pradesh." *See* Final Remand Results at 27, Appx18535. The translated *Chepala Sandadi* variation report provides some clarification on the resulting ambiguity, explaining that the study was "carried out in West Godavari and Krishna districts of Andhra Pradesh by interviewing 54 farmers in 46 villages," and confirming that it "is estimated that, at present Pangasius farming is carried out more than

Ct. No. 22-125

300 villages in West Godavari and Krishna districts." NTSF May 10 Submission at Ex. SV-5-B (English Translation), Appx11359, Appx11370-11377. The variation report then states that "{o}ut of" these "300 villages {the} study covered 46 villages in these two districts." *Id.* Thus, it appears that the study is based on data collected from 54 farmers in 46 of the 300 villages—or approximately 15 percent—of villages within two districts in one Indian state.

Regardless, Commerce concludes that "there is no question that the survey relied on a large number of data points from a broad collection of farmers." Final Remand Results at 27-28, Appx18535-18536. But Commerce ignores that "large" is a relative term. Based on the scant information contained in the reports, it is clear that they do not include "data points" from 85 percent of villages in the "two large-scale pangasius producing districts" of Andhra Pradesh. *Id.* at 27, Appx18535. And there is no way to determine what percentage of overall farmers are represented by the 54 survey respondents in the remaining 15 percent of villages since the reports do not state how many total pangasius producing farms exist in the region. Commerce's

Ct. No. 22-125

conclusion that the survey "relied on a large number of data points" is thus wrong as a matter of logic and basic math.

It is, in other words, impossible to determine whether the 54 farmers in these 46 villages represent a broad market sample of pangasius production in the two districts studied—let alone whether they represent a broad market sample for overall Indian pangasius production. The report provides no information on the total number of pangasius-producing farms in the districts of Krishna and West Godavari, the state of Andhra Pradesh, or India as a whole. The report is similarly silent as to the total volume of whole live fish production attributable to the 54 farms surveyed or the quantities of fingerlings and feed purchased by these farms. NTSF May 10 Submission at Ex. SV-5-A, p. 34-40 and Ex. SV-5-B, Appx11289, Appx11328-11334, Appx11359-11377. Without this information, it is impossible to determine whether the *Fishing Chimes* report reflects responses from "numerous" farmers—as Commerce contends—because there is no way to determine whether these 54 farmers represent 90 or 0.090 percent of the overall pangasius farmers in India, Andhra Pradesh, or even in West Godavari/Krishna. Final Remand Results at 31, Appx18539.

Ct. No. 22-125

What is clear is that the study's hard data regarding prices for whole live fish, fingerlings, and feed are extremely limited. For example, assuming that Commerce relied on the *Fishing Chimes/Chepala Sandadi* data to value whole live fish, *see supra* at note 2, the study authors purported to collect monthly farm-gate price data for whole live fish. But not all farms provided the requested data for each month of the study. At best, the data includes prices from a maximum of eleven out of the 54 surveyed farms in any given month. The report includes no data at all for February through June 2018, and the pricing data for July 2018 is based on information from a single farm. NTSF May 10 Submission at Ex. SV-5-A, p. 34-40 and Ex. SV-5-B, Appx11289, Appx11328-11334, Appx11359-11377. Exacerbating the gaps created by the lack of responses, the study fails to specify the volume of fish associated with the reported monthly prices.

The study reports are similarly silent regarding the volume of fingerlings represented by the data. This lack of volume data is particularly troubling given the limited number of observations. Surveyed farms did not purchase fingerlings in each month, as there are no reported purchases or pricing data for June to November 2017,

**Ct. No. 22-125**

May 2018, July 2018, September 2018, or December 2018. *Id.* at Ex. SV-5-A, p. 39 and Ex. SV-5-B, Appx11289, Appx11333, Appx11359-11377. Nor is there other information available that would contextualize the volume of fingerlings purchased by surveyed farms in relation to India's fingerlings production generally, or even the fingerlings used in Andhra Pradesh more specifically. Finally, although the *Chepala Sandadi* version of the report includes a table of fingerling prices by size, it does not indicate how many surveyed farms reported purchases of each size, the volume by size represented, or the monthly prices for those fingerlings. *Id.* at Ex. SV-5 (p. 17 of Telegu version and English translation), Appx11359, Appx11366, Appx11373-11374.

The data regarding feed are equally limited. The *Fishing Chimes* version of the report states that feed prices "were collected from the {54} farmers through a questionnaire and then their averages were calculated." *Id.* at Ex. SV-5-A, p. 38-39, Appx11289, Appx11332-11333. The *Chepala Sandadi* counterpart states that "price of feeds recorded from the data questionnaire from farmers." *Id.* at Ex. SV-5-B (English translation), Appx11359, Appx11370-11377. The *Chepala Sandadi* version then provides average prices for certain feeds in 2017 and

15

**Ct. No. 22-125**

2018—but fails to provide any information as to how many farms provided information regarding each kind of feed, or the volume of feed reflected in the data. *Id.*[3] Thus, as with whole live fish and fingerlings, the report fails to provide adequate information to support a reasonable inference that the feed prices stated in the study reflect broad market averages.

In addition to these fundamental problems regarding reliability and breadth, the *Fishing Chimes/Chepala Sandadi* data comes from 2017-2018 and is thus non-contemporaneous with the 2019-2020 review period.

Commerce attempts to overcome these deficiencies in two main ways. *First*, Commerce argues that it does not require data "collected from every segment of an entire market," but instead routinely relies on more limited data "when accompanied by other indicia of representativeness," like "where data . . . are ascertained based on a trusted source/methodology." Final Remand Results at 55, Appx18563.

---

[3]     While the *Fishing Chimes* report describes the collection of feed pricing data by the study authors, no feed pricing data is actually provided in the *Fishing Chimes* report. Only the *Chepala Sandadi* version contains any such data. NTSF's May 10 Submission at Ex. SV-5-A and Ex. SV-5-B, Appx11289-11377.

Ct. No. 22-125

In this regard, Commerce references a series of decisions in which it relied on *Doing Business*, a series of annually prepared World Bank Reports. *Id.* at 55, n. 217.

As an initial matter, Commerce has repeatedly emphasized its preference for "country wide data" over regional data. *See, e.g.*, *Fresh Garlic Producers Ass'n v. United States*, 83 F. Supp. 3d 1330, 1337-38 (Ct. Int'l Trade 2015); *see also* Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 79 Fed. Reg. 19,053 (Dep't Commerce Apr. 7, 2014) (final results of antidumping duty admin. rev. and new shipper rev.; 2011-2012) at 33; *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010) (characterizing Commerce's practice as that of using "countrywide data, whenever available" and resorting to data of less breadth only "when countrywide data are not available"). Thus, under Commerce's practice, geographically limited data of the kind presented in the *Fishing Chimes/Chepala Sandadi* reports is not the best available unless countrywide data is unobtainable, which is not the case here.

Ct. No. 22-125

In any event, *Fishing Chimes/Chepala Sandadi* (and, as further discussed below, *Undercurrent News*) are not well-known, vetted sources like the World Bank. The study reported in these publications is a one-off, private study that is internally inconsistent regarding its own sample size, while *Undercurrent News* is a private pricing data portal. The data presented in both sources is too limited and lacks sufficient contextual information to support broader conclusions regarding the Indian market overall, and both possess indicia of unreliability.

*Second*, Commerce asserts that the researchers that performed the study reported in *Fishing Chimes/Chepala Sandadi* conducted "cross verification of economic data outcomes" from other sources to produce "generalizable data." Final Remand Results at 56, Appx18564; Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam – Factual Information Submission* (Aug. 2, 2021) at Exs. 1-3, P.R. 354-357, Appx15687-15734 ("NTSF Aug. 2 Submission"). But the report neither provides underlying information to establish such "cross verification" nor sufficient detail to independently cross verify and generalize the data they contain. Indeed, the study reports lack fundamental

**Ct. No. 22-125**

information about the variance between the sample set (54 farmers from two districts in one Indian state) and the broader population of Indian pangasius producers, or even the subset of such producers within Andhra Pradesh. The study does not even specify what percentage of the pangasius farms within the two districts covered by the survey are represented in the data—just that they are located within 46 of an estimated 300 villages with pangasius production in those districts.

Likewise, the study offers no insight into how prices for whole fish, fingerlings, and feed in Andhra Pradesh compare to the prices for those inputs in other regions—an important issue given Andhra Pradesh's rapidly falling share of India's pangasius production. NTSF May 10 Submission at Ex. SV-5-A, p.37, Appx11289, Appx11331. In particular, while Andhra Pradesh accounted for approximately 58% of India's pangasius production in 2018, this figure fell from 80% in 2017. At this rate, Andhra Pradesh's production percentage would have fallen to below-majority levels in 2019 and even further in 2020.

Further, the purported "steps" taken by the authors to achieve "generalizable data" amount to little more than "computeriz{ing}" the

Ct. No. 22-125

partial data obtained "in Excel" and subjecting it to vague and

undefined statistical analysis using "means" and "standard deviation."

*Id.* at Ex. SV-5-A, and Ex. SV-5-B, Appx11289-11377. The reports'

failure to clearly explain the statistical methods employed to generalize

the data is inherently problematic, particularly given that the

underlying data sets are not provided. In any event, the study reports'

description of the study methodology and data analysis do not establish

that the data presented in the *Fishing Chimes/Chepala Sandadi*

reports reflects a broad market average.

    *Undercurrent News* suffers from the same deficiencies. The pricing

portal alleges that it provides pricing data "collected via interviews with

farmers in all major producing regions," but fails to disclose details

necessary to test that assertion—such as the number of interviews

conducted, the timing of the interviews, which regions were considered

major, or the volume of overall pangasius production represented by the

farmers interviewed. *See* CFA's Opening Br. (Oct. 20, 2022), ECF No. 37

at 27-29; CFA's Reply Br. (Mar. 10, 2023), ECF No. 46 at 22-24; NTSF

May 10 Submission at Ex. SV-8, Appx11603-11615; NTSF Aug. 2

Submission at Ex. 1, Appx15687-15702. As this Court has previously

Ct. No. 22-125

concluded, the portal's vague and unsubstantiated assertions do not
establish that the data reflects broad market averages. *See* Slip Op. 24-
67 at 7-8. And—although the data nominally relate to *pangasius
hypophtalmus*—Commerce provides no substantive analysis as to
whether the data are truly representative of the market for such fish in
India.

Beyond failing to provide any basis to determine the actual
breadth of pricing data, the *Undercurrent News* portal information
exhibits indicia of unreliability. For example, *Undercurrent News*
refused to answer questions posed by independent market researchers
seeking to understand its data collection methods. *See* Letter from
Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen
Fish Fillets from the Socialist Republic of Vietnam: Rebuttal Surrogate
Factor Value Information* (May 24, 2021) at Ex. 3-B, P.R. 295-309,
Appx13019-13073 ("CFA May 24 Submission"). A researcher from
Mississippi State University, Professor Ganesh Kumar Kanrunakaran,
sought details on basic methodological issues, like how *Undercurrent
News* "determine{d} which farmers and feed mills to interview and
obtain the prices," "the process by which Under Current News

Ct. No. 22-125

examined the 2019 Indian pangasius pricing data," and "why the Indian pangasius pricing data is limited to 2019." *See id.* at Ex. 3-B, Att. D, Appx13063-13073. Commerce asserts that the *Undercurrent News* team engaged with Dr. Karunakaran, Final Remand Results at 57, Appx18565, but ignores that they never provided answers to these fundamental questions. *See* Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Initial Comments and Factual Information in Advance of Commerce's Preliminary Results of Review* (Aug. 3, 2021) at Ex. 2, C.R. 202, P.R. 358, Appx7379-7380. As Dr. Karunakaran explained, he has come to "definitely doubt the intentional data dumping specifically with regard to fingerling, feed and other related price information just for India, in an easily manipulatable and less reliable database, that is not scientifically validated." *Id.*

Commerce essentially recognizes the problems inherent with the *Undercurrent News* portal and the *Fishing Chimes/Chepala Sandadi* report but contends that these sources nevertheless reflect "broad market averages" because "the data themselves are broader than a single data point" and "are generally reflective of market conditions on

**Ct. No. 22-125**

a larger scale." Final Remand Results at 54-55, Appx18562-18563. But this misses the point. Being comprised of more than a single data point does not inherently make that data reflective of a "broad market average"— particularly absent information on the size of that larger/broader market.

For that matter, the Tariff Act directs Commerce to rely on the *best available* information. Commerce cannot simply use *any* data that allegedly "generally reflect{s} . . . market conditions." *Id.* Rather, Commerce must demonstrate that the data selected is better than other available data sources. This reflects Commerce's own policy that "*data quality is a critical consideration* affecting surrogate country selection. After all, *a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable.*" Policy Bulletin (emphasis added).

Here, Commerce has not adduced substantial evidence that the *Undercurrent News* pricing data and *Fishing Chimes/Chepala Sandadi* reports reflect broad market averages for the key FOPs involved in pangasius production. Commerce's continued reliance on these dubious

sources is troubling. *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotations omitted)); *see also Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (Commerce "must take into account whatever in the record fairly detracts" from the weight of its purported "substantial evidence." (internal quotations omitted)).

## 2. The Indonesian Data For Whole Fish, Fingerlings, and Feed Is Superior to the Flawed Indian Data

Instead of grappling with the deficiencies in the Indian data, Commerce attempts to impugn the reliability of the Indonesian data with respect to whole fish, fingerlings, and feed. These attempts fall flat.

*Whole Fish*. With respect to whole fish, Commerce asserts that the Indonesian data is "less desirable" than the vague, unsubstantiated, and poorly documented Indian data for two reasons. Final Remand Results at 25, Appx18533. *First*, Commerce argues that the Indonesian *pangasius* data provided by the Indonesian government are not as species specific as the Indian data—even though *pangasius*

*hypophtalmus* is the predominant *pangasius* species in Vietnam—
because it is unclear "how predominant the species was." *Id.* at 26,
Appx18534. This mischaracterizes the record. As Indonesian fisheries
expert, Dr. Ir Agus Oman Sudrajat, declared in a November 11, 2020
affidavit, 99% of pangasius production volumes and values reported by
the Indonesian government correspond to *pangasius hypophthalmus*
since Indonesian fish farmers cannot efficiently cultivate other species
in the country. Letter from Cassidy Levy Kent (USA) LLP to Sec'y
Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of
Vietnam: Surrogate Country Selection Comments* (Apr. 20, 2021) at Ex.
SC-7.K (Nov. 11, 2020 Affidavit), C.R. 149-167, P.R. 189-207, Appx6899,
Appx7106-7107 ("CFA SC Selection Comments"). Commerce attempts to
ignore this evidence as "estimates from third parties" that is not "more
probative than the information provided by the {Indonesian} officials."
Final Remand Results at 59, Appx18567. In this regard, Commerce
overlooks that the third party in question is an Indonesian aquacultural
expert—and disregards evidence on the record *from the Indonesian
government* explaining that "approximately 90% of pangasius fish
cultivators are still cultivating patin siam {pangasius hypopthalmus}"

Ct. No. 22-125

since other breeds "do{} not develop well." CFA SC Selection Comments

at Ex. SC-7.K (Letter from Dr. Ir. Slamet Soebjakto), Appx6899,

Appx7063-7064. Commerce's assertion that it is not possible to

ascertain "how predominant" the *pangasius hypophtalmus* species is in

Indonesia is thus not adequately explained or supported by substantial

evidence. *Suramerica de Aleaciones Laminadas, C.A.*, 44 F.3d at 985

(Fed. Cir. 1994) (Commerce "must take into account whatever in the

record fairly detracts" from the weight of its purported "substantial

evidence." (internal quotations omitted)).

*Second*, Commerce contends that the Indonesian data provide only

"very provisional" or "preliminary" figures. Final Remand Results at 25-

26, Appx18533-18534; *id.* at 60, Appx18568. Not so. Commerce's

contention mistakenly associates data provided *by* the acting director of

the Indonesian fisheries ministry's statistical center, Mr. Priatno, with

different information from a website, https://satudata.kkp.go.id/webiste,

that CFA's attorneys provided *to* Mr. Priatno in the context of a request

for clarity on Indonesian pangasius production. *Id.* at 26, Appx18534.

As the record shows, the data provided *by* Mr. Priatno are *not*

"provisional" or "preliminary," are *not* marked as "provisional" or

Ct. No. 22-125

"preliminary," and are *not the provisional or preliminary figures* referred to by Commerce in its Final Remand Results. *Compare* Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Pre-Preliminary Surrogate Value and Factual Information Submission* (July 30, 2021) at Ex. 4, Appx. C (July 15 Letter from Mr. Yudi Priatno), P.R. 325-352, Appx13992, Appx14055-14064 ("CFA July 30 Submission"), *with id.* at Ex. 4, Appx. C (2019 pangasius production volumes and values as an attachment) Appx14065-14066, *with id.* at Ex. 4, Appx. B (Letter to Mr. Yudi Priatno inquiring about attached pangasius production volumes and values that include the "provisional" and "preliminary" figures referenced by Commerce), Appx13998, Appx13998-14054. To the contrary, the whole live fish data Mr. Priatno provided are different from, and far more detailed than, the figures in the website printouts. *See id.* at Ex. 4, Appx. C, Appx14055-14077.

Commerce also asserts that "{t}he 2020 values" for Indonesian whole fish provided by Dr. Budiyanto "are also denoted with an asterisk," and that it is accordingly "unclear the extent to which the data underlying the Indonesian prices are finalized." Final Remand

Ct. No. 22-125

Results at 26, Appx18534. Here, too, Commerce errs. Commerce

appears to believe that the asterisk denotes provisional data—but there

is no basis for that belief anywhere in the record, and Commerce

provides none. CFA July 30 Submission at Ex. 3, Att. 3, Appx13910,

Appx13943-13991. To the contrary, Commerce concedes that the data

provided by the Indonesian officials are "not explicitly marked as

provisional." Final Remand Results at 60, Appx18568. Commerce

nevertheless concludes that the Indian data is preferable because a

table in one of Dr. Budiyanto's affidavits contains "a source/data

description that appears not to have been fully translated." *Id.* at 60-61,

Appx18568-18569. Commerce gives no explanation for why this alleged

partial omission supports a conclusion that the data provided by Dr.

Budiyanto must be provisional. *Id.* Instead, it simply speculates. But

speculation is not evidence, much less substantial evidence. *See, e.g.,*

*Asociacion Colombiana Exportadores de Flores v. United States*, 23 CIT

148, 153-154, 40 F. Supp. 2d 466, 472 (1999). In any event, even if the

2020 values were provisional, the 2019 figures are reliable,

contemporaneous with the POR, relate to nationwide production across

the whole of Indonesia, and are validated by the Indonesian official

28

responsible for providing aquacultural statistics.

*Fingerlings.* Commerce likewise asserts there are "disadvantages" to relying on the Indonesian data for fingerlings for two reasons. *First*, Commerce reiterates that there is "no basis to conclude that the data are specific with respect to the particular species in question." Final Remand Results at 31, Appx18539. As discussed above, this assertion is wrong because 99% of pangasius production volumes and values reported by the Indonesian government correspond to *pangasius hypophthalmus*. CFA SC Selection Comments at Ex. SC-7.K (Nov. 11, 2020 Affidavit), Appx6899, Appx7106-7107.

*Second,* Commerce argues that the Indonesian fingerling data comes from a "single source with limited information concerning the nature of the underlying information." Final Remand Results at 64, Appx18572. But that source is the government ministry in charge of collecting and disseminating nationwide statistical information regarding aquaculture. In this regard, the data meets Commerce's own articulated standard of representativeness, *i.e.*, "data . . . ascertained based on a trusted source/methodology." *Id.* at 55, Appx18563. Indeed, Commerce has relied on data provided by officials within this same

Ct. No. 22-125

Indonesian government ministry to value fingerlings in past reviews.

*See, e.g.* Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 81 Fed. Reg. 17,435 (Dep't Commerce Mar. 29, 2016) (final results and partial recission of antidumping duty admin. rev.; 2013-2014) at 35-38 (relying on affidavit provided by Indonesian aquaculture ministry official to value fingerings); *see also* Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019) (final results, and final results of no shipments of the antidumping duty admin. rev.; 2016-2017) at 44 (noting reliance on information provided by same official to value fingerlings). Moreover, the data provides substantial detail regarding the nature of Indonesia's fingerlings industry—including production volume, the number of hatcheries, and the types and locations of hatcheries across Indonesia. *See* Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Submission of Proposed Surrogate Factor Values* (May 10, 2021) at Ex. 2-A (April 22, 2020 Affidavit), P.R. 239-263, Appx8736, Appx8749-8793 ("CFA May 10

**Ct. No. 22-125**

Submission"). The nature of the source and breadth of the data included therein thus bolsters the quality and reliability of the data, particularly when compared to the Indian alternatives.

*Feed*. Commerce concludes that the "Indian data for fish feed" obtained through *Undercurrent News* and *Fishing Chimes* are "preferable" to the Indonesian data for three reasons. *First*, Commerce asserts that the Indonesian data "is not limited to" *pangasius hypopthalmus* feed because it includes data for shrimp feed or marine fish. Final Remand Results at 30, 66, Appx18538, Appx18574. *Second*, Commerce questions the source of the Indonesian data as being "from Mr. Deni . . . and internet." *Id.* at 30, 66-67, Appx18538, Appx18574-18575. *Finally*, Commerce notes that the Indonesian prices may not be market prices since "independent feed is not taxed," *id.* at 66, Appx18574.

These criticisms lack merit and are again based on a misreading of the record. The Indonesian data for feed comes from two affidavits by Dr. Budiyanto, an Indonesian fisheries ministry official. *See* CFA July 30 Submission at Ex. 3, Att. 3, Appx13910, Appx13943-13967; CFA May 10 Submission at Ex. 2-A, Appx8736-8882. Dr. Budiyanto provided

these affidavits in response to questions that inquired, among other

things, about the prices for 22%, 24%, 26%, 28%, 30%, 32%, 34%, 35%,

36%, 38%, and 40% *pangasius hypopthalmus* feed. Dr. Budiyanto's

April 2020 affidavit provided information on the prices for these

categories of feed through 2019 and specified that the 38% and 40%

data were not specifically for *pangasius hypopthalus*, but for feeding

marine fish in general. CFA May 10 Submission at Ex. 2-A (April 22,

2020 Affidavit), Appx8736, Appx8749-8793. He identified Mr. Deni

Indrajaya, former chairman of Indonesia's Farmer Feed Entrepreneurs

Association and general manager of PT Central Protein Prima ("CPP"),

as the source of the pricing data. CFA May 10 Submission at Ex. 2-A,

Att. 3, Response to Question 16, Appx8736, Appx87685. In other words,

Mr. Deni is not some unknown source—as Commerce implies—but an

industry expert with direct knowledge of feed prices, who was directly

consulted by an Indonesian government official regarding feed prices in

Indonesia in 2019.

In his July 2021 affidavit, Dr. Budiyanto provided feed pricing

data for 2020. Once again, he provided data on specific individual feed

types. Once again, he clarified that the 38% and 40% feed data were for

Ct. No. 22-125

shrimp feed. CFA July 30 Submission at Ex. 3, Att. 3, Response to Question 16, Appx13910, Appx13943, Appx13953. And, once again, he noted that the pricing information came from Mr. Deni; he also noted that it was further corroborated through internet sources. *Id.* Dr. Budiyanto also stated that, according to Mr. Deni, Indonesian feed prices had been flat since 2017 and remained so through 2021. *Id.* In other words, Mr. Deni confirmed that feed prices were constant throughout the review period.

As for the contention that the Indonesian prices are problematic because feed is not taxed, Commerce does not explain why the Indonesian government's decision not to tax a product would support the conclusion that the prices are not market based. Final Remand Results at 66, Appx18574. And confusingly, the agency simultaneously complains that the Indonesian prices may not be "tax and duty free." *Id.* at 67, Appx18575. Commerce cannot have it both ways: the feed prices cannot be rejected because feed is not taxed (a fact which would seem to make the prices particularly suitable for SV purposes, *see* discussion *supra* at page 5), but also rejected based on speculative assertions that they may be tax-inclusive.

Ct. No. 22-125

All-in-all, Commerce's purported concerns regarding the quality of the Indonesian feed data ring hollow. The record reflects that the data came from an Indonesian official in charge of providing aquacultural statistics and that he consulted with an industry expert, Mr. Deni, as a source for feed pricing information. The record indicates that the vast majority of feed information related specifically to *pangasius hypopthalmus* feed, with two outliers (for 38 and 40 percent) feed that relate to marine feed more broadly. And the record reveals that feed pricing was static throughout the review period. The data is thus from a reliable source, contemporaneous with the period of review, and species specific.

Considered in light of the record as a whole, it is clear that Commerce failed to "examine the relevant data and articulate a satisfactory explanation" for its decision to use Indian SVs. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm. Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted). The agency has yet to articulate a "rational connection" between the facts on the record and the choice Commerce made, *see id.,* or to adduce substantial record evidence to support its choice of Indian SVs.

Ct. No. 22-125

### B.   Commerce Has Not Adequately Explained or Supported its Use of Indonesian Data for Labor, Byproducts, and Financial Ratios

Commerce's choice to rely on Indian SVs for labor, byproducts, and financial ratios as the "best available" data is likewise unsupported by substantial evidence and inadequately explained.

*Labor data.* CFA provided contemporaneous and specific Indonesian wage rates for "Agriculture" and "Manufacturing" workers. CFA May 10 Submission at Ex. 8, Appx9926-9954. Commerce nevertheless chose to rely on Indian wage data from 2011-2012—nearly a decade before the review period. Final Remand Results at 33, Appx18541. The Court has already criticized the use of such outdated data in the context of a related administrative review, *see* Slip Op. 24-23 at 9, Slip Op. 22-38 at 48. Commerce asserts, however, that its use of outdated data here is "distinguishable," because "the 2006 data predated that POR by a longer period of time," *i.e.* 12 as opposed to eight years. Final Remand Results at 75-76, Appx18583-18584. But the four-year difference is not sufficiently distinguishable to allay the Court's stated concerns.

Commerce also contends that CFA's arguments in favor of the

contemporaneous Indonesian data would require the agency to "select the 'best' SV data on a factor-specific basis, regardless of the primary surrogate country," even if it would "introduce distortions into the calculations." *Id.* at 74, Appx18582. But, as this Court has recognized, the Tariff Act requires Commerce to "in all instances" use "the best available information." Slip Op. 24-67 at 13 (internal quotations omitted). Commerce cannot rely on its regulations or practice to "defeat the statutory directive that the factors of production be valued according to the best available information." *Id.* at 13-14 (internal citations omitted). And contemporaneous information is, without question, better than an out-of-date alternative.

*By-products*. It is undisputed that, generally speaking, a by-product is less valuable than its input. Issues and Decision Memorandum accompanying *Monosodium Glutamate From the People's Republic of China*, 79 Fed. Reg. 58,326 (Dep't Commerce Sept. 29, 2014) (final deter. of sales at less than fair value and the final affirm. deter. of critical circumstances) at 21. Here, Commerce nevertheless relied on Indian by-product values that exceed the selected surrogate value for whole live fish, which is the main production input. Memorandum from

Ct. No. 22-125

Javier Barrientos, Sr. Case Analyst, through Robert Galantucci,

Program Manager, Off. V, Enf't & Compliance, to The File, re: *17th*

*Administrative Review of Certain Frozen Fish Fillets from the Socialist*

*Republic of Vietnam: Surrogate Values for the Preliminary Results* (Aug.

31, 2021) at Att. 1, P.R. 387-388, Appx15856-15965 (showing value of

79.67 rupees/kg for whole live fish, and values of 462.45 rupees/kg for

fish oil and 86.69 rupees/kg for fish meal). Commerce attempts to

explain this discrepancy by citing a flow chart detailing "the steps and

inputs used in the production process for" the fish meal and fish oil

byproducts. Final Remand Results at 76, Appx18584. Commerce

reasons that, because fish meal and fish oil undergo these processing

steps, the "fact that the corresponding SVs were higher than the SV for

the underlying input (*i.e.*, whole live fish) does not signify that the SV

for the by-product is necessarily distortive." *Id.* at 77, Appx18585.

But the flow chart does not establish that the steps involved in

producing fish meal and fish oil are independently more costly than the

process of raising commercial grade *pangasius hypopthalmus*, the main

input. This omission is particularly troubling since the Indonesian data

for byproducts reflects lower surrogate values than for the whole fish—

37

information that calls into question Commerce's assumption that the byproducts must be more valuable than the main input as a result of the steps required to produce the byproducts.

In addition, the Indian data are not specific to the factors here since the relevant tariff codes encompass fish meal and fish oil of all species and qualities, not just pangasius. NTSF May 10 Submission at Exs. SV-1 and SV-2, Appx11233-11271. Furthermore, the Indian import data largely reflect imports from NMEs or countries without significant pangasius production, such as Chile, the United States, and the United Kingdom. CFA May 24 Submission at Ex. 6, Appx13473-13589. The record thus indicates that the Indian data are not species-specific and are unlikely to represent significant quantities of pangasius-based fish oil or meal. Commerce attempts to discount this problem by asserting that "fish meal and fish oil are not inputs but, rather, outputs," and there is no "evidence that input species is a determining factor in the selling and/or buying of fish meal or fish oil." Final Remand Results at 78, Appx18586. This argument misses the mark.

As an initial matter, Commerce presents no evidence to show that input species is *not* a determining factor in the selling and/or buying of

fish meal or fish oil. Commerce's speculation is not evidence. Beyond this, as Commerce notes, fish is an input into the production of fish meal and fish oil. *See id.* at 77-78, Appx18585-18586. The Indian data for fish meal and fish oil are not specific to the species at issue in this review—namely, pangasius—and thus do not reflect pangasius-specific costs. As a result, the agency cannot reasonably ignore the lack of species-specificity with respect to determining surrogate values for fish meal and fish oil—particularly as it has placed heavy weight on species-specificity for other FOP.

The Indonesian byproduct data do not share the Indian data's flaws. They include an affidavit provided by an Indonesian official in the country's fisheries ministry with respect Indonesian production and prices for patin siam (*i.e., pangasius hypophthalmus*) byproducts. CFA May 10 Submission at Ex. 9-A, Appx9956-9981. Specifically, the affidavit provides prices for crude fish oil produced from smoked patin fish, as well as refined patin oil produced in a center managed by Indonesia's fisheries ministry. *Id.* at Ex. 9-A, p. 16 of English Translation, Appx9964. Commerce discredits this data on grounds that it does not include a time frame, volume, source, number of datapoints,

type of oil refined, whether the numbers are based on "price quotes,"
and whether the data is "regularly collected." Final Remand Results at
80, Appx18588.

The record belies Commerce's contentions. The affidavit
specifically responds to requests for pricing information for "2017, 2018,
and 2019, and August 2018 through July 2019." CFA May 10
Submission at Ex. 9-A, Appx9956-9981. And it identifies the type of oils
refined, the prices, the locations where the oil is refined, and even who
is doing the refining (inclusive of the Indonesian government itself). *See
id.* at Ex. 9-A, p. 16 of English Translation, Appx9964. Beyond this, the
affidavit overall provides substantial detail regarding its data sources.
*See generally id.* at Ex. 9-A, Appx9956-9981.

The Indonesian data also includes near-contemporaneous prices
(from January-June 2019) provided by five Indonesian sellers of "patin
siam" fish oil, *i.e.*, oil specific to *pangasius hypothalmus. Id.* at Ex. 9-C,
Appx10159-10397. Similarly, the Indonesian data include such prices
provided by seven Indonesian sellers of *pangasius hypothalmus*-specific
fish meal. *Id.* Commerce attempts to discredit these data as mere "price
quotes," based on "price lists" that "often represent a starting point in

negotiations rather than a final price." Final Remand Results at 79,
Appx18587. But the affidavits from these Indonesian sellers state that
they provide "sales prices," not price quotes. *See* CFA May 10
Submission at Ex. 9-C, Appx10159-10397.

*Financial Ratios.* The record includes contemporaneous financial
statements from two Indian seafood processors, Ananda Enterprises
(India) Private Limited ("Ananda") and MMC Exports Limited
("MMC"), and two Indonesian seafood processors, PT Dharma
Samudera Fishing Industries Tbk ("Dharma"), and Japfa. *See* Final
Remand Results at 68, Appx18576. Commerce finds that the Indonesian
statements "are not preferable" to the Indian alternatives because (1)
Dharma has a "going concern" note; and (2) Japfa's statements "reflect a
relatively low percentage of business activity relating to aquaculture."
*Id.* at 68-69, Appx18576-18577. These concerns do not withstand
scrutiny.

Regarding Dharma, Commerce asserts that the "going concern"
note is relevant because "a company with greater current liabilities
than current assets . . . may potentially understate its full costs of
production." *Id.* at 69, Appx18577. Accordingly, where "there is a going

**Ct. No. 22-125**

concern on a company's ability to continue operating," Commerce "has

rejected the financial statements with the going concern." *Id.* But this

does not accurately describe Dharma's situation. As an initial matter,

Dharma's current liabilities are not greater than its current assets. To

the contrary, assets exceeded liabilities in both 2018 and 2019 and, in

both years, total assets exceeded total liabilities. CFA May 10

Submission at Ex. 11-A (Auditor's Report at Consolidated Statement of

Cash Flows), Appx10494, Appx10505.

Not only do the statements not bear out the agency's concern over

liabilities versus assets, they indicate that Dharma is "implement{ing}

strategies to maintain the Company's sustainability" by providing

"{i}nput and data analysis that is more orderly, accurate and practical"

as well as "more accurate cost analysis." *Id.* at Ex. 11-A, Note 37,

Appx10494, Appx10572-10574. In other words, the going concern note

referenced by Commerce explicitly states that Dharma is providing

"accurate," and "orderly" data and analysis—including regarding its full

cost of production. Final Remand Results at 69, Appx18577 (citing CFA

May 10 Submission at Ex. 11-A (Auditor's Report at Consolidated

Statement of Cash Flows), Appx10505)). And even if Commerce is

**Ct. No. 22-125**

correct that "profitability alone" does not "render the financial statements . . . equivalent in quality to the financial statements of companies which are on solid financial footing," *id.* at 70, Appx18578, Dharma was more profitable in 2018 and 2019 than MMC, one of the Indian companies from whose statements Commerce derived surrogate financial ratios. *See infra* at 44-45. Finally, while Commerce evinces concern over the company's 2018 and 2019 deficits, Final Remand Results at 70, Appx18578, the company's equities far outstripped its deficits in both years. CFA May 10 Submission at Ex. 11-A (Consolidated Statement of Changes in Equity), Appx10504.

As for Japfa, Commerce acknowledges that it has "relied on financial statements from this company in other segments of the proceeding," but disagrees that it should do so here since "Japfa's main business activity is not aquaculture." Final Remand Results at 70, Appx18578. To the contrary, as Commerce has concluded in the past, Japfa's statements are particularly useful and relevant in determining surrogate financial ratios for NTSF Seafoods Joint Stock Company

Ct. No. 22-125

("NTSF"),[4] because both Japfa and NTSF engage in multiple activities beyond the production of frozen fish fillets. *See, e.g.,* Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 89 Fed. Reg. 18, 595 (Dep't Commerce Mar. 14, 2024) (final results and partial recission of admin. rev.; 2021-2022); Issues and Decision Memorandum accompanying *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 84 Fed. Reg. 18,007 (Dep't Commerce Apr. 29, 2019) (final results, and final results of no shipments of the antidumping duty admin. rev.; 2016-2017) at cmts. 4-6, 11.

Commerce's ongoing preference for the Indian financial statements is particularly troubling given the issues with the Indian statements on the record—particularly those of MMC. The company is barely profitable, with a profit ratio of just over one one-hundredth of a percent. Commerce's reliance on MMC's statements thus runs afoul of the department's preference for profitable companies. *See, e.g.,* Issues and Decision Memorandum accompanying *Certain Frozen Warmwater*

---

[4]    NTSF is the sole mandatory respondent for which Commerce calculated a dumping margin in the review.

Ct. No. 22-125

*Shrimp From the Socialist Republic of Vietnam*, 72 Fed. Reg. 52,052
(Dep't Commerce Sept. 12, 2007) (final results of the first antidumping
admin. rev. and first new shipper rev.) at cmt. 2. The agency's
preference for this statement is particularly strange given that it has
rejected the statement of a far more profitable Indonesian company
because it has a "going concern" note, despite information indicating
that the Indonesian company is on far sounder financial footing than
MMC. *See* discussion *supra* at 41-42.

And crucially, as Commerce concedes, the record does not
establish that MMC produces frozen fish fillets or any comparable
goods. *See* Final Remand Results at 71, Appx18579 (acknowledging that
the record does not "clearly undermine" a finding that MMC is a
reseller rather than a producer). And while the agency concludes that
the record does not definitively demonstrate that MMC is merely a
reseller, *see id.*, the evidence on this point cannot simply be waved away
as not definitive. For example, rather than referencing any production
operations, the company's financial statements identify it as operating
"retail sale of food in specialized stores," with this activity accounting
for a full 100% of company turnover. NTSF May 10 Submission at Ex.

45

Ct. No. 22-125

SV-19-B (Principal Business Activities of the Company), Appx12205,
Appx12213. The statements also lack any references to fixed assets of
the type necessary to produce/process frozen fish fillets, such as deep
freezers. *Id.* at Ex. SV-19-B, Note 5 – Fixed Assets – Tangible Assets,
Appx12225. Finally, expenses identified as arising from "processing and
packing" are extremely minimal in relation to the "cost of material
consumed," as well as all other individual expenses listed in the
company's profit and loss statement. *Id.* at Ex. SV-19-B, Profit and Loss
Statement, Appx12222. Here, too, neither the agency's rejection of the
Indonesian data nor its selection of the Indian data are appropriately
explained and supported.

## IV.    **CONCLUSION**

Commerce's continued reliance on India as a primary surrogate
country has not been adequately explained or supported. Further, the
agency has not adequately explained or supported its reliance on Indian
SVs, and its rejection of Indonesian SVs, for individual FOP such as
whole live fish, fingerlings, feed, labor, byproducts, and financial
factors.

Ct. No. 22-125

CFA respectfully requests that the Court remand for a second time with instructions that Commerce reevaluate the relative quality of the Indian and Indonesian data on the record as to the primary surrogate country selection and the valuation of individual factors of production. Commerce must pay careful attention to the reliability and quality of the *Undercurrent News* and *Fishing Chimes / Chepala Sandadi* data for valuing the primary inputs and objectively assess these data against the Indonesian alternatives. Any such assessment must, at a minimum, fairly and frankly acknowledge the serious limitations with the information provided by *Undercurrent News* and *Fishing Chimes / Chepala Sandadi*. The agency must also reevaluate its reliance on Indian labor data—which is outdated and less specific than the Indonesian data on the record, and which the agency candidly admits to choosing because of the alleged superiority of the Indian data with respect to primary inputs. Commerce must reconsider its selection of data for valuing fish by- and co-products—including by comparing the relative quality of the Indonesian and Indian data. And Commerce must also reconsider the relative quality of the Indian and Indonesian financial statements, particularly in light of its own past choices and

47

Ct. No. 22-125

precedent regarding the selection of unprofitable companies and

appropriate comparators.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.*

Dated: December 16, 2024

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Comments on Remand Results, Catfish Farmers of America, *et al.*, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 9,283 words.


*/s/ Nazak Nikakhtar*
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

The Catfish Farmers of America and individual U.S. catfish processors
America's Catch, Inc., Alabama Catfish, LLC
d/b/a Harvest Select Catfish, Inc., Consolidated Catfish
Companies, LLC
d/b/a Country Select Catfish, Delta Pride Catfish, Inc.,
Guidry's Catfish, Inc., Heartland Catfish Company,
Magnolia Processing, Inc. d/b/a Pride of the Pond, and
Simmons Farm Raised Catfish, Inc.
(Representative Of)

December 16, 2024
(Date)

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

CATFISH FARMERS OF
AMERICA, *et al.*,

            Plaintiffs,

      v.

UNITED STATES,

            Defendant,

      and

NAM VIET CORPORATION, et
al.,

        Defendant-Intervenor.

Before: Hon. M. Miller Baker,
Judge

Court No. 22-00125

## <u>ORDER</u>

Upon consideration of the comments filed by Plaintiffs Catfish
Farmers of America and individual U.S. catfish processors America's
Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc.,
Consolidated Catfish Companies, LLC d/b/a Country Select Catfish,
Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish
Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and
Simmons Farm Raised Catfish, Inc. (collectively, "CFA") regarding the

**Ct. No. 20-00105**

October 18, 2024 remand results filed by the U.S. Department of

Commerce ("Commerce"), and all other papers and proceedings herein,

it is hereby

ORDERED, that the October 18, 2024 remand results filed by the

Commerce are remanded to Commerce for further consideration; and it

is further

ORDERED, that Commerce on remand shall reconsider its reliance

on Indian data to value whole live fish, fingerlings, feed, labor, by-

products and financial factors in light of:

(1)  the overall statutory directive that the agency rely on the "best

available information";

(2)  the need to evenhandedly and appropriately consider the relative

merits of Indian and Indonesian surrogate value data, while

adequately explaining and supporting its surrogate value selections;

and it is further

ORDERED, that this case will proceed with the following schedule:

(1)  Commerce shall file its remand determination on or before 120 days

after the date of entry of this order;

Ct. No. 20-00105

(2)  Commerce shall file the administrative record on or before fourteen days after the date on which it files the remand determination;

(3)  No later than fourteen days after Commerce files the administrative record, the parties shall file a proposed scheduling order advising the Court of which appendix preparation option the parties have selected and proposing due dates for parties' comments, the Remand Appendix, and any motions for oral argument. The proposed due dates should reflect the appendix preparation option the parties choose; and

(4)  The parties' proposed scheduling order must prescribe deadlines for the intervenor's comments that are later than the deadlines for the parties the intervenors support in order to avoid repetition of arguments, and include an appropriately-reduced word count limitation for the intervenor's comments. The Court normally allows an intervenor half the words available to the party-in-chief; if the parties believe that some other word count is necessary, the parties shall explain why; and it is further

Ct. No. 20-00105

**ORDERED**, that Joint Appendix Preparation instructions posted to the Court's website will govern preparation of the post-remand Joint Appendix, with the following exceptions:

(1) The Joint Appendix in the post-remand proceedings must be titled "Remand Appendix" (clarified, if necessary, with "Public" and "Confidential" designations as appropriate, as well as with volume numbers indicating the page ranges contained in each volume, again as appropriate);

(2) The Remand Appendix must include all pages cited in the parties' post remand comments to this Court, even if they were previously included in the original Joint Appendix;

(3) Any page repeated from the original (pre-remand) Joint Appendix will bear the same Appx page number it bore in the original appendix—*e.g.*, page Appx1776 remains Appx1776. New pages not contained in the original Joint Appendix will receive page numbers that continue the numerical sequence from the last page of the original Appx page numbering. The process for numbering pages, and then for determining the actual pages to be included in the

**Ct. No. 20-00105**

Remand Appendix, will follow the Joint Appendix Preparation

instructions.

**SO ORDERED.**


Dated: _____, 2025          _____
          New York, N.Y.                              M. Miller Baker, Judge